## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

W.R. HUFF ASSET MANAGEMENT CO., L.L.C., as investment adviser and as attorney-in-fact on behalf of a Beneficial Owner of Securities in Adelphia Communications Corporation and Arahova Communications, Inc. f/k/a Century Communications Corporation Excluded from Class Action Settlements,

        Plaintiff,

        -v-

DELOITTE & TOUCHE LLP; CITIGROUP GLOBAL MARKETS HOLDINGS, INC. (f/k/a SALOMON SMITH BARNEY INC. f/k/a SMITH BARNEY INC.); BANC OF AMERICA SECURITIES LLC; JOHN J. RIGAS; TIMOTHY J. RIGAS; MICHAEL J. RIGAS; JAMES P. RIGAS;  and PETER L. VENETIS,

        Defendants.

Civil Action No.

## COMPLAINT AND JURY DEMAND

W.R. Huff Asset Management Co., L.L.C. ("Huff") is the investment adviser and attorney-in-fact on behalf of a certain beneficial owner of high yield debt securities issued by Adelphia Communications Corporation ("Adelphia" or the "Company") and Arahova Communications Inc. f/k/a Century Communications Corporation ("Century Communications" or "Century"), which beneficial owner on or about October 1, 2006 submitted a Request for Exclusion from the class settlements recently reached by the plaintiff Class in *In re Adelphia Communications Corporation Sec. & Deriv. Litig.*, No. 03 MD 1529 (LMM) (S.D.N.Y.).  Huff, upon personal knowledge as to itself and its own acts, and upon its own knowledge and other facts obtained through an extensive investigation by Huff and its undersigned counsel, which has included, among other things, review and analysis of Adelphia's publicly-filed documents, press releases, prospectuses, and offering memoranda, as well as news articles and analysts' reports concerning Adelphia and certain of the Defendants herein, alleges and says as follows by way of

Complaint against the Defendants.  Huff also reviewed and relied on complaints filed against one or more Defendants by the United States Securities and Exchange Commission, Adelphia, and the Official Committee of Unsecured Creditors of Adelphia.  Huff also reviewed and relied on the publicly filed indictment and superseding indictment and materials relating to the criminal trials of Defendants John Rigas, Timothy Rigas and Michael Rigas.  Based on the foregoing, Huff believes that substantial, additional evidentiary support exists for the allegations herein, which will be uncovered after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      This is a case against, *inter alia*, underwriters and auditors who were integrally involved in the issuance and sale of Adelphia's high yield notes and subordinated convertible debt to Huff in six separate public offerings and numerous secondary market transactions since June 1999.  Motivated by their desire to receive lucrative fees, these Defendants were complicit in unprecedented acts of self-dealing by corporate insiders in a publicly-traded company.  As a result, Huff purchased the securities in reliance on materially misleading and deceptive offering materials and public filings that concealed the true state of affairs at Adelphia.

2.      Huff was completely unaware that Adelphia, purported to be the Country's sixth largest cable operator -- and the Rigas family who founded and controlled it -- had entered into multi-billion dollar transactions for the Rigases' own benefit that had created multi-billion dollar liabilities on the part of Adelphia with no benefit to the Company.  These facts were never disclosed in the public disclosures, financial statements, registration statements or prospectuses disseminated by the Defendants on which Huff actually relied.  Defendants similarly failed to disclose to Huff that the Rigas Family had purchased securities in Adelphia with funds borrowed by the Company, and made direct misstatements to Huff about the source and use of these funds when Huff made inquiries about them.  Finally, Adelphia and its underwriters and auditors concealed the fact that Adelphia committed numerous violations of covenants contained in the indenture agreements governing the debt securities it issued to the

public, which meant that Adelphia lacked the authority to make at least four of the public offerings out of which Huff purchased bonds.

3.    Had the true facts been disclosed -- about the Rigases' self-dealing; about the Company's actual earnings, debt and liabilities; about its flagrant breach of its indenture covenants -- Adelphia would never have been able to complete the public offerings it made since June 1999 at the prices Huff paid, if it could have completed them at all.

4.    Before making the decision to invest in Adelphia debt securities, Huff read and reviewed Adelphia's registration statements, prospectuses, 10-Ks, 10-Qs, 8-Ks, public filings and financial statements. Because it was purchasing debt securities -- which are extensions of credit to the Company -- Huff examined the information that Defendants made available concerning Adelphia's capital structure in order to make a judgment as to Adelphia's creditworthiness. Huff reviewed this information to determine how much of Adelphia's debt was senior to the debt securities being offered to Huff, what assets were available to support that debt, and how much equity the Company had. From Huff's perspective, the less debt that Adelphia had that was senior to its bonds, and the more equity capital that was junior to its bonds, the more attractive its bonds became as an investment. Huff also examined the indenture agreements for the debt securities offered by Adelphia to determine what covenants were contained in those agreements.

5.    Huff was aware that Adelphia's business model, like those of most other companies in the cable television industry, required ongoing capital expenditures to build, maintain, upgrade and expand its cable service infrastructure. Since the Company's operations did not yet generate sufficient cash to fund these expenditures, Adelphia needed other sources of financing -- bank loans and injections of capital through the sale of debt and equity securities -- in order to continue. Consequently, Huff examined Adelphia's registration statements, prospectuses, 10-Ks, 10-Qs, 8-Ks, public filings and financial statements to evaluate whether Adelphia could continue to obtain the liquidity that it needed to function. That evaluation included looking at how much was available for Adelphia to borrow under its bank credit

facilities, as well as whether anything in Adelphia's reported financial condition and results jeopardized its ability to obtain capital infusions from the securities markets -- such as whether Adelphia had exceeded the total amount of indebtedness permitted under the bond indenture covenants, which would prevent the Company from issuing new public debt securities.

6.     Based on its review of the information the Defendants chose to disclose -- which consistently generated a B+ credit rating from Standard & Poor's for Adelphia's senior unsecured debt securities -- Huff determined that Adelphia was a good investment.

7.     The truth was far different.     Adelphia's registration statements, prospectuses, public filings and financial statements on which Huff relied contained numerous material misrepresentations and omissions that completely undermined Huff's ability to make informed investment decisions about Adelphia's securities.  These documents presented a picture of Adelphia's capital structure that was totally false:  Adelphia had far more debt that was senior to the securities sold to Huff -- and, thus, had a higher priority claim to repayment out of Adelphia's assets -- and far less equity than its financial statements presented.

8.     Moreover, unknown to Huff, the bank credit facilities that were represented to be available to Adelphia to provide the liquidity necessary for the Company to continue operations had been exhausted through undisclosed borrowings made by the Rigases. In short, the Rigases used a substantial portion of the proceeds of those borrowings to purchase Adelphia securities, giving the illusion that they had injected new equity into Adelphia to enhance the Company's financial health when, in fact, they had merely created new debt for Adelphia that was senior to Huff's securities without conferring any legitimate benefit to Adelphia or the senior noteholders.  Making matters even worse, Adelphia flagrantly violated indenture covenant restrictions on, inter alia, engaging in transactions with affiliate entities, making or permitting certain defined Restricted Payments, and incurring too much indebtedness, with the result that these covenants prohibited at least two of the securities offerings from which Huff purchased notes.

9.     Adelphia's underwriters and auditors owed duties to Huff under the

securities laws to ferret out and disclose all material information concerning Adelphia --
including the rampant Rigas Family self-dealing taking place. To Huff's detriment, these entities
failed to disclose the true facts concerning Adelphia's financial condition.

10.     The underwriters who sold notes to Huff knew that Huff would rely on the
statements contained in the registration statements, prospectuses and public filings of Adelphia
in making its investment decisions. They likewise knew that Huff would be alarmed if it knew
that the proceeds of its investments were being made available to the Rigases for their own
personal use. The underwriters saw Adelphia as simply an opportunity to make lucrative
underwriting fees, knowing that Adelphia would repeatedly seek access to the capital markets
and therefore offer underwriters a steady stream of profits -- at least $188,000,000 in
underwriting fees in the last three years. The underwriters "earned" approximately $45 million
of these fees from debt securities offerings in 2000 and 2001 that were made in violation of the
indenture covenants for Adelphia's bonds and, therefore, never should have been made in the
first place.

11.     Moreover, in many cases the proceeds of the notes the underwriters issued
were used to pay off loans made by banks who were *affiliated with* the underwriters. These
enormous financial incentives induced the underwriters to shirk their statutorily-imposed
obligation to, *inter alia*, prudently investigate the disclosures made in connection with the
Adelphia securities they were selling.

12.     The auditor, Deloitte & Touche LLP ("Deloitte"), similarly failed to
discharge its professional obligations. Deloitte represented to Huff, through written statements
contained in Adelphia's registration statements, prospectuses and public filings, that it had
conducted a proper and thorough audit of Adelphia's financial statements, that it had conducted
its audit in accordance with Generally Accepted Auditing Standards ("GAAS"), that the financial
statements fairly presented the financial condition of Adelphia in all material respects, and that
those financial statements accorded with Generally Accepted Accounting Principles ("GAAP").
In fact, the financial statements were flat-out wrong, with many line items off by billions of

dollars. Given its position as the auditor for both Adelphia *and* the entities controlled by the Rigas Family -- which were improperly intertwined with Adelphia -- Deloitte should have known of the true facts. Deloitte, nevertheless, failed to disclose in the financial statements that Adelphia and its subsidiaries were allowing the Rigas Family to access Company cash for personal use and were liable for billions of dollars of debt borrowed by the Rigas Family -- debt that was senior to the notes purchased by Huff. Deloitte failed to disclose that the Rigas Family used Adelphia as a personal piggy-bank to fund a plethora of private transactions and line the pockets of Rigas Family members.

13. Indeed, the truth about Adelphia was very different from the picture of Adelphia portrayed by the underwriters who were selling the notes and the auditors who were certifying its financial statements. For example, what were represented to be multi-hundred million dollar equity investments by the Rigas Family (and, accordingly, sources of additional financial protection for noteholders) were, in fact, disguised senior debts because the Rigases purchased equity and other investments with funds from secured credit facilities the Company was obligated to repay. The total amount of Adelphia's debt was grossly understated, the equity capital grossly overstated, the capital structure fundamentally misrepresented, and the source and flow of funds concealed. In fact, by borrowing money to finance the Rigas Family's acquisition of Adelphia securities, Adelphia and its professionals artificially and deceptively inflated the Company's value, making it appear far more financially healthy than it actually was.

14. When the truth was finally disclosed beginning on March 27, 2002, it precipitated: (1) an almost immediate cessation in the trading of the Company's stock; (2) criminal investigations by two separate grand juries convened by the offices of the United States Attorney for the Southern District of New York and the Middle District of Pennsylvania; (3) an investigation by the United States Securities and Exchange Commission ("SEC"); and (4) the resignations of John J. Rigas, the Chief Executive Officer, Timothy J. Rigas, the Chief Financial Officer, and three other members of the Rigas Family from officer and director positions with the company. The SEC also broadened its investigation to examine Deloitte's role in the scandal, as

well as what Citigroup, Inc. and Salomon Smith Barney Inc. knew about Adelphia's financial condition before underwriting various offerings of Adelphia securities. By Friday, May 24, 2002, The Wall Street Journal reported that investigators were calling Adelphia "one of the largest cases of inside dealings ever seen at a public company." Nevertheless, disclosure of the truth did not precipitate an immediate cessation of the wrongful activities, as they continued.

15.     The shock to the market from the disclosure of the truth was so severe as to initially drive the price of Adelphia's stock down by 70% before NASDAQ suspended trading on May 15, 2002. After trading resumed, the stock continued to plummet, closing at $.70 a share on the last trading day before NASDAQ de-listed the stock in early June due to Adelphia's failure to file its 10-K for the year ending December 31, 2001. By June 7, 2002, Adelphia stock - which had traded as high as 86.56 in May 1999 -- closed in over-the-counter trading at 30 cents, after falling as low as 13 cents. By June 10, with evidence of rampant financial irregularities at Adelphia mounting, Adelphia fired Deloitte & Touche as its auditor.

16.     Adelphia has restated its financial results for the fiscal year ended December 31, 2000 and released preliminary restated financial results for the fiscal year ended December 31, 2001 and announced it may need to restate its results for 1999. This constitutes an admission by Adelphia that the balance sheets and financial statements it issued for these periods are materially false, misleading and incomplete.

17.     Additional disclosures of wrongdoing continued in May and June 2002. Adelphia inflated its subscriber count, overstated its capital expenditures, improperly capitalized labor expenses and inflated its earnings through phony payments from digital converter box vendors for "marketing support." All of this occurred under the watchful eye of the auditors and underwriters whose duty it was to uncover and disclose such fraudulent activity.

18.     This Complaint seeks to recover damages from (1) Deloitte, at all relevant times Adelphia's auditors, (2) Citigroup Global Markets Holdings, Inc. and Banc of America Securities LLC, who were underwriters for numerous Adelphia's public offerings of high yield debt securities, and (3) members of the Rigas Family who at relevant times held positions as

officers and directors or Adelphia. These defendants all had a primary role in the issuance of notes pursuant to registration statements and prospectuses that were materially false and misleading. Specifically, they misrepresented and/or failed to disclose, *inter alia*, the following material information:

- Adelphia and its subsidiaries were liable for at least ***$3.1 billion*** in so-called "off balance sheet" loans taken by entities controlled by the Rigas Family.

- The financial statements for 1999, 2000 and 2001 were false and must be restated.

- The Company overstated the number of its cable television subscribers by as many as 500,000 subscribers.

- The Company falsely overstated the amount of money Adelphia spent to upgrade its cable systems.

- Adelphia overstated its earnings through a host of accounting gimmicks, including (1) phony payments from digital converter box vendors for "marketing support" that in reality were merely rebates on amounts paid by Adelphia for the converter boxes; (2) failing to reduce earnings by the decline in value of securities that Adelphia had accepted as payment for services to certain interactive cable service providers; (3) understating amounts paid to television programming providers; (4) improperly capitalizing labor expenses; and (5) improperly recognizing revenue from deferred billing arrangements with customers.

- Several Adelphia bond offerings represented to be valid were, in fact, issued in violation of indenture covenants, including, *inter alia*, covenant restrictions on the amount of overall debt that Adelphia could carry, the making and permitting of certain defined Restricted Payments, and affiliate transactions.

- The Rigas Family used substantial portions of the proceeds of the loans guaranteed by Adelphia and/or its subsidiaries to purchase $1.4 billion of Adelphia stock and debt securities, as well as to fund the Rigas Family's acquisition of numerous other assets for its own use and benefit.

- Adelphia implemented a cash management system ("CMS") that was the very antithesis of reasonable corporate controls on the use of corporate cash. In fact, the CMS was a vehicle for commingling the funds of Adelphia, its subsidiaries and the affiliates controlled by the Rigas Family. Rigas Family members took advances from the CMS for personal purposes at will.

- Adelphia funded the Rigas Family's acquisition of the Buffalo Sabres professional hockey franchise, and periodically "recapitalized" -- through an infusion of hundreds of millions of dollars -- the Rigas Family entity that held the ownership interest.

- The Rigas Family used $12 million in Adelphia corporate funds to build themselves a golf course near Coudersport, Pennsylvania.

- Adelphia paid $25 million in corporate funds for timber rights to a parcel of land owned by the Rigas Family near Coudersport, Pennsylvania.

- The Rigas Family compelled Adelphia to make over $1.3 million in payments to Praxis Capital Ventures in order to cover the salary that defendant Peter Venetis, John Rigas's son-in-law and a former Adelphia director, was drawing from that nearly-bankrupt entity.

- John Rigas withdrew $1 million a month from Adelphia for his own personal use at the same time that the Company publicly represented that his total compensation from the Company was less than $2 million a year.

19.    Adelphia also generated "phantom" earnings in the form of management fees it was supposed to receive from the Rigas Family companies it managed. These so-called

Managed Entities often paid these fees using funds taken from the CMS or borrowed under the co-borrowing facilities, thereby paying the fees with Adelphia's money. In some cases, the Managed Entities simply failed to pay the management fees at all. All of this contributed to the deceptive overstatement of Adelphia's revenues, gross margins and Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA"), and understatement of the Company's net loss.

20.    The underwriters and auditors knew that Huff, on behalf of its clients, purchased Adelphia debt securities in direct, eyeball reliance on the registration statements, prospectuses, 10-Ks, 10-Qs and 8-Ks filed with the SEC -- statements that prominently featured each of their names -- as well as other public filings for which these professionals bear responsibility. They also knew that Adelphia's and Century's bonds were traded on the open market in reliance on Adelphia's public SEC filings that contained material misrepresentations and omissions. The effect of these material misrepresentations and omissions, *inter alia*, was to: (1) give Huff a materially false account of the Company's capital structure and financial condition by fundamentally misrepresenting the amount of liabilities on Adelphia's balance sheet; (2) give Huff false information about the amount of bank debt that was effectively senior in repayment priority to the debt securities Adelphia offered to the public; (3) mislead Huff into believing that Adelphia's founding and controlling owners were pumping hundreds of millions of dollars of their own money into Adelphia as new capital; (4) falsely lead Huff to believe that Adelphia was prudently managing its cash and other assets and that there were reasonable internal controls in place at Adelphia, and (5) as to several of the bond offerings, falsely represent that the issuance of the bonds was valid. Had it not been for the materially false and misleading statements and omissions contained in Adelphia's publicly-filed statements, there would not have been a market for any of the securities at issue.

<u>Background</u>

21.    Huff manages bond portfolios for charities, endowments, foundations, state and local pension funds (teachers, police, firefighters, and municipal and state employees),

employee pension plans formed under the Employee Retirement Income Security Act of 1976 ("ERISA"), and other institutions and investors. Among the investment management activities that it performs for its clients, Huff purchases, holds and sells high yield corporate bonds, like those issued by Adelphia. Huff's clients depend on the returns from these investments to fund their beneficiaries' needs.

22.    Between June 7, 1999 and March 27, 2002, Huff purchased on behalf of its clients high yield debt securities issued by Adelphia and Century. The investment decisions to purchase those securities were at all times made by Huff, which exercises investment discretion with respect to its clients' accounts. The Underwriter Defendants (defined below) sold these securities to Huff directly in various public offerings. Huff also purchased Adelphia and Century debt securities in the secondary market during this time period.

23.    If Adelphia's financial statements were accurate, Adelphia would be the Country's sixth largest provider of cable television services, with a purported total of approximately 5.8 million subscribers. Adelphia is a holding company and accordingly conducts its operations through various subsidiaries, including Century, Olympus Communications ("Olympus") and FrontierVision Holdings ("FrontierVision"). Adelphia provides telecommunications services over broadband networks. As of December 31, 2000, Adelphia claimed to own or manage cable television systems with broadband networks that passed in front of more than nine million homes and served approximately 5.7 million basic cable subscribers. Adelphia was founded by defendant John J. Rigas ("Rigas") and, until his recent resignation, was dominated and controlled by Rigas and his family (the "Rigases" or the "Rigas Family"). Although the Rigas Family owned only 20% of Adelphia's outstanding common stock, it possessed shares with super-majority voting rights that enabled it to control over 60% of the voting power of Adelphia's outstanding shares, as well as eight of nine seats on Adelphia's board of directors. In addition, members of the Rigas Family occupied five of the top management positions in the Company. Especially given the enormous power and control exercised by the Rigas Family, the underwriters and auditors had a duty to ensure that self-dealing and conflicts

-11-

of interest were adequately disclosed, that the finances of the Company were safeguarded, and that the Company's financial condition was fully and adequately disclosed to Huff.

24.    Huff, on behalf of its clients, made its purchases of, and continued to hold, Adelphia and Century securities in eyeball reliance on the financial data and representations made in the registration statements and prospectuses for each offering of high yield securities, as well as in Adelphia's 10-Ks, 10-Qs, 8-Ks, prospectuses for the Company's offerings of equity securities and subordinated convertible notes, and other public filings with the SEC.

25.    In the course of making its purchases of Adelphia securities, Huff relied on the underwriters and auditors to do their jobs as "watchdogs" of the Company. Each of these defendants prepared, reviewed, signed and/or consented to the use of its name in the registration statements, prospectuses and other filings on which Huff relied. By doing so, these defendants represented to Huff that they had performed the requisite level of due diligence, conformed to applicable professional standards to which they were subject, and faithfully discharged their obligations in making the statements that induced Huff to invest in Adelphia securities.

26.    In addition to their interest in Adelphia, the Rigas Family controlled a number of other entities engaged in a smorgasbord of investment and business activity. Some of these entities were engaged in the same business as Adelphia -- providing cable television services. The cable television entities outside of Adelphia controlled by the Rigas Family were euphemistically called the "Managed Entities" in the registration statements and other filings with the SEC to focus attention on the fact that they were managed by Adelphia in exchange for a management fee. In fact, these Managed Entities -- along with other entities controlled by the Rigas Family but not engaged in the cable business (the "Rigas Entities") -- were used by the Rigas Family to "manage" Adelphia and were used to perpetrate a massive fraud -- a fraud in which all of the other Defendants failed to disclose.

27.    None of the underwriters and auditors came forward with any information about the widespread abuses at the Company. Nevertheless, the fraud eventually became too big for the cover-up to continue. Consequently, on March 27, 2002, senior members of Adelphia's

management, including defendant Timothy J. Rigas, then Adelphia's chief financial officer, and James Brown, then Adelphia's VP of Finance, revealed for the first time in a telephone conference call that the Managed Entities had borrowed what was at that time reported to be approximately $2.3 billion as of December 31, 2001 under co-borrowing arrangements essentially guaranteed by Adelphia and its subsidiaries.  However, even in that March 27 conference call, Adelphia was not forthcoming, as later revelations showed.  For example, within several weeks, the amount of Adelphia's off-balance sheet debt ballooned to $2.5 billion as of December 31, 2001 and $3.1 billion as of April 30, 2002.

28.     During the March 27 call, Timothy Rigas acknowledged that the amount of these borrowings had not been previously disclosed or included as part of Adelphia's total debt on its audited consolidated balance sheet or other financial statements.  Moreover, Adelphia also revealed for the first time that the Rigases had used hundreds of millions of dollars of the proceeds from these co-borrowing arrangements to fund their purchases of Adelphia stock and convertible subordinated notes.  In other words, the Rigas Family used money loaned by Adelphia's banks -- and effectively guaranteed by Adelphia -- to buy Adelphia's equity and debt securities.  The result was a massive, undisclosed margin loan for which the Company was on the hook, but from which the Company received no legitimate business benefit.

29.     In a press release also issued on March 27, seeking to calm the storm in the markets Adelphia's disclosure provoked, the Company concealed the fact that the Rigas Family lacked the funds available to repay the loans.  Instead, Adelphia misleadingly asserted that it "expect[ed] the Managed Entities to repay their borrowings in the ordinary course," and that the Company did "not expect that it will need to repay the amounts borrowed by the Managed Entities."  On the March 27 call, Adelphia's representatives echoed these representations in a calculated effort to give analysts and investors a false sense of security.  Of course, an immediate concern of Huff's was whether the Managed Entities had sufficient assets to cover their borrowings, or whether Adelphia would have to take up the slack, dramatically increasing Adelphia's debt and bringing the Company's liquidity into question.  Reflecting these

same concerns, participants in the March 27 call asked whether the Managed Entities' ownership of 300,000 cable subscribers was a sufficient asset base to support the loans that had been taken. In response, Messrs. Rigas and Brown falsely asserted that "there are substantial other assets that back those [debts] beyond the cable systems that are owned there," and that "[w]e have very strong interest coverage, very strong ability to kind of repay." Indeed, they assured investors that Adelphia was "very comfortable" that the loans were covered. Messrs. Rigas and Brown promised to provide "more clarity" in the future on the issue of the Managed Entities' ability to repay the co-borrowing facilities. However, the more "clarity" that Adelphia provided, the more it became apparent that the loans could not be repaid and that a massive scandal of corporate insider self-dealing and deception had been concealed by the underwriters and auditors lawyers who were involved in the offerings of Adelphia debt securities.

30.    The March 27 announcement immediately caused an uproar in the securities markets. The market responded to these revelations by devaluing Adelphia's bonds, notes and stock. On May 14, 2002, the day that NASDAQ suspended trading, Adelphia's stock - - which peaked at $86.56 in May 1999 -- closed at $5.70, down over 70% since the March 27 announcement.  On May 31, 2002, the last trading day before Adelphia's de-listing by NASDAQ, the stock closed at $.70 a share. On June 7, 2002, the stock traded over the counter at prices as low as $.13 a share, closing at $.30.

31.    Following the March 27 announcement, the Company failed to file its Form 10-K for the year ending December 31, 2001. Its purported reason was that it needed to investigate the accuracy and completeness of its prior 10-K filings - filings that Deloitte had repeatedly certified as fairly presenting the Company's condition in accordance with GAAP. Adelphia's failure to file its 10-K compelled NASDAQ to suspend trading in Adelphia stock and, ultimately, de-list the stock. The Company has since confirmed that investigations are now under way by grand juries in the Southern District of New York and the Middle District of Pennsylvania, as well as by the SEC.  With the pressure mounting, John and Timothy Rigas finally resigned from their management positions.

-14-

32.    The Rigases and the Managed Entities lacked the ability to repay the amounts borrowed under the co-borrowing facilities, a fact which neither Adelphia, the underwriters nor the auditors ever disclosed.  The Managed Entities' "substantial other assets" turned out to be equity securities and convertible subordinated notes that the Rigases had purchased with the Company's debt, the value of which dropped precipitously upon the disclosure of Adelphia's myriad misrepresentations of its financial condition and concealment of management misconduct.  Shockingly, these "substantial other assets," to which Messrs. Rigas and Brown referred, were at the heart of the scandal itself.

33.    More details about the extent of the improper dealings between Adelphia and the Rigas Family emerged, as the Company reluctantly began to disclose the truth about the Rigases' abuse of their corporate positions.  Specifically, Adelphia disclosed that, besides purchasing Adelphia securities, the Rigases had used millions of dollars of Adelphia's cash and credit -- by means of carefully-crafted co-borrowing arrangements -- to, *inter alia*, finance the family's furniture business (Eleni Interiors), construct a golf course (The Golf Club at Wending Creek Farms) and acquire other assets for the benefit of the family, including $25 million in timber rights and an ownership interest in the Buffalo Sabres professional hockey team.  Furthermore, Adelphia disclosed that its management had implemented a "cash management system," the CMS, that was, in fact, a means of circumventing corporate controls -- to the extent they even existed -- on the use of corporate funds that enabled the Rigas Family to withdraw millions from the Company with the same ease as withdrawing money from an automatic teller machine.  Indeed, Adelphia's recent disclosures suggest that a total breakdown of internal corporate controls occurred at the Company.

34.    The pattern of misappropriation of corporate funds and misuse of the Rigases' official positions revealed by these belated disclosures is so extensive that Deloitte -- especially in light of its dual role as auditors for Adelphia and the Managed Entities -- should have been aware of the misconduct.  Nor should the underwriters have been unaware of the

Rigas Family's misdeeds, since even minimal due diligence in connection with Adelphia's public offerings of securities should have, and would have, revealed the misconduct.

35.    On May 2, 2002, Adelphia issued a press release which revealed that it had reached a "tentative conclusion" that Deloitte had certified Adelphia financial statements that misrepresented its true debt liability on its balance sheets by at least $1.6 billion (this tentative figure would balloon to $2.5 billion just a few weeks later).    After implementing a proper accounting treatment of the co-borrowing arrangements, Adelphia admitted that it "expects [such treatment] will result in a restatement of [Deloitte's previously certified] financial statements for 1999 and 2000 and interim financial statements for 2001."    The May 2 press release further elaborated Adelphia's conclusions about the inaccuracy of Deloitte's accounting treatment:

> The Company has tentatively concluded that it should reflect borrowings and related interest expense under certain co-borrowing arrangements associated with amounts payable directly or indirectly by certain Rigas family owned entities, primarily incurred in connection with other Rigas entities which purchased Adelphia securities, as liabilities in its consolidated financial statements, with a corresponding decrease in shareholders' equity. These borrowings approximated $1.6 billion as of December 31, 2001.  They were approximately $1.2 billion as of December 31, 2000 and $700 million as of December 31, 1999.

36.    On May 15, 2002, Adelphia and its subsidiaries failed to make $38.3 million dollars in payments of interest on two of its bond issues.  The Company also missed a multi-million dollar dividend payment on a series of preferred shares.  Unbelievably, under the watchful eye of the auditors, the Rigas Family after March 27 extracted an additional $174 million of cash from Adelphia to pay off margin loans for its securities purchases.

37.    Then, on May 23, 2002, Adelphia issued a press release announcing that the independent directors had taken control of Adelphia from the Rigas Family.  Under the terms of the agreement, the Rigases purportedly agreed to return to the Company some of the assets that they had acquired with Adelphia's credit, in an attempt to partially offset the debts that the family had run up on the Company's credit lines.  James and Michael Rigas, following the path

taken by their father and brother, John and Timothy, finally resigned as officers of the Company.

38.    Reflecting the continuing disarray of the Company's internal accounting practices, in the May 23 press release, Adelphia revised upward yet again -- by $900 million -- its "tentative" conclusion as to the degree to which its financial statements -- purportedly audited and certified by Deloitte -- had understated the true amount of the Company's consolidated debt. Specifically, Adelphia announced that it had "tentatively concluded that it should increase to approximately $2.5 billion the amount of indebtedness to be included in its consolidated financial statements, as of December 31, 2001, to reflect the full amount of principal borrowings and interest expense by entities affiliated with the Rigas family under certain co-borrowing arrangements for which the Company is jointly and severally liable." The amount announced represented a nearly $1 billion increase over the Company's May 2 "tentative conclusion" that the amount borrowed under the co-borrowing facilities totaled $1.6 billion as of December 31, 2001. In the May 23 press release, Adelphia also announced that it believed that "at April 30, 2002, the total amount of co-borrowings by entities affiliated with the Rigas family for which Adelphia is jointly and severally liable was approximately $3.1 billion."

39.    In an extremely unusual move, as Adelphia was telling the markets that it was continuing the process of restating its blatantly false financial statements and figures for 1999, 2000, 2001, and possibly other periods, Deloitte "suspended" its audit of the Company. Because the accounting firm's credibility had been compromised by the steady stream of increasingly more onerous disclosures from the Company of Deloitte's appalling professional failures in certifying financial statements that were inaccurate, Adelphia ultimately responded to the suspension by firing Deloitte. Notably, Deloitte recently paid $50 million to settle claims asserted by the SEC concerning its misconduct in connection with Adelphia.

40.    Adelphia issued its senior notes pursuant to indenture agreements that contained various covenants designed to protect investors in the debt securities. Included among these provisions was a covenant that limited the total indebtedness that Adelphia could incur to 8.75 x EBITDA. Once Adelphia's debt exceeded this threshold, it could not take out new loans

or issue additional debt securities to the public, absent certain exceptions not available to the Company.

41.     In addition, the indentures contained a covenant that imposed restrictions on transactions between Adelphia or its subsidiaries, on the one hand, and the Managed Entities or Rigas Entities, on the other.  Such transactions were prohibited, if the terms would be less favorable than those Adelphia could obtain in an arms-length transaction with someone other than an affiliate.  Indeed, this covenant required Adelphia to obtain Board approval, as well as a fairness opinion, for the very transactions that it routinely entered into with the Managed Entities without these protections.  The covenants also limited Adelphia's ability to make any direct or indirect acquisition of Adelphia Indebtedness subordinate in right of payment to the notes, or of shares of Adelphia capital stock, except under certain conditions not here applicable.

42.     Essentially admitting that it had flouted these covenants for years despite its contrary representations to Huff, Adelphia announced in its May 23 press release that it was in the process of "determining whether it is in compliance with the debt incurrence tests contained in its public indentures" and that it "believes that it is not in compliance with certain other covenants contained in its public indentures, in particular, restrictions on the Company's ability to enter into transactions with affiliates without obtaining the requisite approval of the independent members of the Board of Directors."

43.     These disclosures by Adelphia call into question the validity of several bond issues in which Huff participated as a purchaser on behalf of its clients.  Beginning in early 2001 -- and possibly as early as 2000 -- Adelphia's total indebtedness exceeded the 8.75 x EBITDA threshold.  As a result, Adelphia's offerings of high yield debt securities in June and October 2001 -- and the September 2000 and January 2001 offerings as well -- out of which Huff purchased a substantial amount of notes, breached the covenants in the then-existing indentures, and, thus, the notes in these offerings were not valid and never should have been issued.  In addition, Adelphia committed numerous other covenant violations, including breaches of the covenants against affiliate transactions and against restricted payments to subsidiaries, that

undermined the validity of the note offerings.

44.    The underwriters and auditors -- who were tasked with preventing Adelphia's breach of its indenture covenants and its concealment of those very breaches -- failed to disclose that, on account of the co-borrowing facilities, Adelphia issued notes in excess of its permissible level of indebtedness and engaged in patently unfair related-party transactions without the proper approval of the Board of Directors. Nevertheless, the underwriters, auditors, lawyers and other professionals signed off on offering documents which contained material misrepresentations as to covenant compliance. Incredibly, it appears the Board may have approved some of these transactions with input from the other professional Defendants. Meanwhile, the professionals reaped hundreds of millions of dollars in fees in connection with offerings that breached Adelphia's indenture covenants and should not have been made.

45.    Adelphia's banks also ignored Adelphia's breaches of its public debt indentures because it was in the banks' interest for Adelphia to continue to tap the high yield credit markets, convertible markets and equity markets, using the banks' underwriting arms and generating lucrative fees as well as huge proceeds to repay amounts the banks had lent to Adelphia, its subsidiaries and the Managed Entities. Indeed, some of Adelphia's banks even profited from the Rigases' purchases of Adelphia equity and subordinated debt securities with funds borrowed under the co-borrowing facilities, since Adelphia used the proceeds of those purchases to pay off other loans those banks had extended to Adelphia subsidiaries.

46.    On May 16, 2002, Adelphia's Board of Directors finally and at long last authorized a special committee ("Special Committee" or "Committee") to investigate the web of related company dealings launched and maintained through the concerted actions and/or willful ignorance of the Defendants that were previously undisclosed to the public -- but known to insiders.

47.    The Special Committee's investigation into the issues raised by the March 27 disclosures led to the filing of a Form 8-K with the SEC on May 24, 2002 (the "May 2002 8-K") that purported to disclose details within the Company's knowledge about the Rigas Family's

abuse of its control over Adelphia.

48.    However, the disclosures in the May 2002 8-K are heavily qualified. The qualifications *alone* reveal both the presumptively misleading nature of Adelphia's prior public statements and the complicity of the Defendants, including Deloitte -- the then auditor for Adelphia, its subsidiaries *and* the Rigas Entities -- who gave their imprimatur to those statements. For example, the May 2002 8-K provides that:

> [t]he Special Committee is continuing its investigation. This investigation may result in supplementing or revising information contained in this Form 8-K. In addition, *various sources have indicated that there may be other relationships and transactions between the Company and its subsidiaries, on the one hand, and Rigas Persons and Entities, on the other hand.* Accordingly, this Form 8-K may be supplemented or revised to reflect these other relationships and transactions.

(emphasis added).

49.    The May 2002 8-K also states that:

> [a]ll of the financial information contained in this Form 8-K is unaudited. The Company has announced that it expects to restate its financial statements for the years ended December 31, 1999 and 2000, and its interim financial statements for 2001 and possibly other periods.

According to GAAP, financial statements are to be restated only if the error involved is material and if the error was in existence at the time the financial statements were issued.

50.    Furthermore, while the May 2002 8-K provides a disturbing glimpse of what actually went on behind the scenes at Adelphia, it is itself the product of an incomplete and woefully inadequate investigation by the Special Committee. For example, since their resignation from the Company *en masse*,

> *The Rigas Parties have refused to review, or provide information for, this Form 8-K.* In addition, certain other current and former officers, executives and employees of the Company have been unavailable to review and provide information for this Form 8-K. Accordingly, the information in this Form 8-K may be incomplete and may be revised or supplemented by the Company.