(emphasis added). Thus, even now, the Special Committee cannot stand behind the veracity and completeness of its already-disturbing disclosures.

51. Indeed, the Special Committee's warnings confirm that the assumptions required to be made by the recipient in order to make any public disclosure of corporate information meaningful could not, and still cannot, be made in the case of Adelphia. The May 2002 8-K cautions that:

> Unless expressly noted otherwise, you should NOT [emphasis in original] assume that:
>
> o the transactions discussed herein were presented to or approved by the Board of Directors or the independent or disinterested directors of the Board of Directors or, if so approved, if such approval was based on accurate complete information; and/or
>
> o the financial and other terms of the transactions discussed in this Form 8-K between the Company and its subsidiaries, on the one hand, and Rigas Persons and Entities, on the other hand, were the product of arm's-length negotiations between the parties and, accordingly, you should not assume that these terms are as favorable to the Company and its subsidiaries as terms that these parties could have negotiated with independent third parties.

52. Nevertheless, the May 2002 8-K documents a pattern of corporate fraud and abuse so pervasive that it could not have escaped the attention of the underwriters, auditors, and lawyers who were charged with ferreting out precisely this kind of deceptive conduct.

53. Among the Special Committee's conclusions in the May 2002 8-K are the following:

- The Rigases paid for purchases of Adelphia securities through a series of bookkeeping entries that, when combined with Defendants' selective disclosure practices, had the effect of deceptively and artificially inflating shareholder equity while at the same time artificially decreasing Adelphia's total consolidated debt;

- Adelphia and its subsidiaries commingled funds with the Rigas Entities

and the Managed Entities by means of the CMS;

- The Rigas Family withdrew hundreds of millions of dollars from the CMS to fund the purchase of various assets for their own personal use;

- Managed Entities either failed to pay Adelphia management fees to which it was entitled, or paid these fees using corporate funds taken from the CMS, which had the effect of artificially inflating Adelphia's earnings;

- Adelphia paid millions of dollars to entities controlled by the Rigas Family for goods and services without any competitive bidding;

- Adelphia funded various pet projects of the Rigas Family, including the golf course, Peter Venetis's venture capital firm, Ellen Rigas's filmmaking career, and the Rigas Family's ownership of the Buffalo Sabres.

54. On June 6, 2002, the Company filed an 8-K (the "June 6, 2002 8-K") announcing the appointment of two new executives. In the June 6, 2002 8-K, the Company also informed the SEC that it had concluded, because some of the Individual Defendants had deliberately breached their fiduciary duties to the Company during their tenure as Adelphia officers and directors, the Company would no longer pay these Individual Defendants' legal fees and costs incurred in defending lawsuits filed against them. As stated therein:

> The Board of Directors, based on the recommendation of the Special Committee and consultation with counsel to the Special Committee, has determined that each of John Rigas, Timothy Rigas, Michael Rigas, Peter Venetis and James Brown deliberately breached his duty to the Company and/or its shareholders. As a result, under the Company's bylaws, these individuals are no longer entitled to have the expenses (including the fees and expenses of their counsel) incurred in defending actions against them advanced to them by the Company.

55. On June 10, 2002, Adelphia filed yet another 8-K (the June 10, 2002 8-K) detailing additional fraudulent misrepresentations that had been made in reports (including financial statements Deloitte had audited) of the Company's financial results. In this document, the Company announced that on June 9, 2002 it had "terminated the engagement of Deloitte &

Touche LLP as the Company's independent accountants."

56. Furthermore, in the June 10, 2002 8-K, Adelphia reported to the SEC that "[b]ased on the preliminary results of the investigation by the Special Committee, current management of the Company has determined that it will make certain adjustments to its results of operations for 2000 and 2001. . . ." These "adjustments" consisted of reductions of hundreds of millions of dollars in previously-reported EBITDA -- from $1,202,000,000 (which figure had been audited by Deloitte) to $1,042,000,000 for the year ended December 31, 2000, and from $1,409,000,000 to $1,199,000,000 for the year ended December 31, 2001.

57. According to the June 10, 2002 8-K, Adelphia's previously-reported EBITDA was inflated by at least the following six fraudulent accounting practices:

- Adelphia conspired with its two main vendors of digital converter boxes to raise the price of each box by $26. Thereafter, for each digital converter box Adelphia purchased, the vendors rebated $26 of the purchase price back to Adelphia for "marketing support." Adelphia improperly treated these payments as a reduction of operating expenses, and treated the payments for the boxes as capital expenditures, resulting in overstatements of EBITDA by $54 million in 2001 and $37 million in 2000.

- Adelphia accepted financial instruments as payment from certain interactive cable service providers. When the value of these instruments subsequently declined, Adelphia did not reflect their reduction in value in reported EBITDA, resulting in overstatements of EBITDA by $52 million in 2001 and $28 million in 2000.

- Adelphia improperly accounted for the cost of certain contracts for television programming, resulting in overstatements of EBITDA by $42 million in 2001 and $23 million in 2000.

- The Company improperly capitalized labor expenses, resulting in overstatements of EBITDA by approximately $40 million in 2001 and

2000.

- The Company failed to properly account for transactions with its (former) subsidiary, Adelphia Business Solutions, the Rigas Entities and other parties, resulting in overstatements of EBITDA by approximately $18 million in 2001 and $19 million in 2000.

- Adelphia improperly recognized revenue from subscribers under deferred billing arrangements, resulting in overstatements of EBITDA by approximately $4 million in 2001 and $13 million in 2000.

58. Finally, in the June 10, 2002 8-K, Adelphia reported that its current management believes the Rigas Family routinely provided "unreliable" information to the investing public. Specifically, Adelphia now

> believes that the public information provided by prior management on other matters of interest to investors, such as the Company's rebuild percentage (the percentage of the Company's cable television systems that the Company believes have been upgraded to current standards), was unreliable, and the Company intends to correct the information, where material, as current management develops information it considers reliable.

59. None of these activities was disclosed to Huff by any of the Defendants.

60. In light of the revelations that have emerged since March 27, 2002, numerous material misrepresentations and omissions in Adelphia's registration statements, prospectuses and SEC public filings since June 7, 1999 have become apparent. Adelphia, as well as the underwriters and auditors who prepared, reviewed, signed and consented to have their names appear in these documents, failed to disclose that: (1) the Managed Entities and the Rigases had borrowed as much as $2.5 billion under the so-called "co-borrowing" facilities as of December 31, 2001, for which Adelphia and its subsidiaries are jointly and severally liable to repay; (2) the Rigases used a substantial portion of the proceeds from those borrowings to purchase equity and/or debt securities in Adelphia and its subsidiaries, as well as to acquire numerous other assets for the their sole benefit and use; (3) the Rigases and the Managed Entities

lacked the ability to repay the borrowings under the co-borrowing facilities, thereby leaving Adelphia and its subsidiaries straining to repay those loans, and further diminishing the company's liquidity; and (4) that, as a result of the Managed Entities' use of the co-borrowing facilities, Adelphia was in breach of the restrictions on indebtedness, restricted payments and affiliate transactions set forth in the indenture agreements for the debt securities it had issued to the public. All of this withheld information was and would have been highly material to Huff and other purchasers of high yield debt securities issued by Adelphia and its subsidiaries.

61.     Following the publication of the June 10, 2002 10-K, the value of the Adelphia and Century notes purchased by Huff plummeted. For example, the Company's 10.875% notes maturing in 2010 fell from a bid of 97 cents on March 27, 2002 to 67 cents on May 16 and continued to decline after June 10, 2002. Adelphia's bond rating declined to BB- on March 28, 2002, to CCC+ on April 22, 2002, and to C- on May 20, 2002. The prices and ratings of the other bonds issues by Adelphia similarly dropped in response to the disclosures. Indeed, Adelphia's 6% Convertible Subordinated Notes declined to just over 10 cents after June 10, 2002. Adelphia itself fell into a death spiral. Unable to obtain the liquidity necessary to keep its operations going, Adelphia filed for Chapter 11 protection on June 25, 2002.

62.     On July 24, 2002, Defendants John Rigas, Timothy Rigas and Michael Rigas were arrested and charged with, among other things, securities fraud. John, Timothy and Michael Rigas were subsequently convicted of numerous charges following a jury trial in the United States District Court for the Southern District of New York and (in the case of John and Timothy) sentenced to jail terms. The convictions are now on appeal.

## JURISDICTION AND VENUE

63.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) and 77o, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, Section 18(a) of the Exchange Act, 15 U.S.C. § 78r, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

64. This Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

65. Venue is proper in this District pursuant to Section 22 of the Securities Act and Section 27 of the Exchange Act. Many of the acts or transactions constituting violations of the Securities Act and Exchange Act alleged herein occurred in this District. In addition, a number of the Defendants transact business in this district.

66. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

67. Plaintiff Huff is a limited liability company with its principal office and place of business located at 1776 On The Green, 67 Park Place, 9th Floor, Morristown, New Jersey 07960. Huff brings this action in its capacity as investment manager and attorney-in-fact for the Pennsylvania State Employees' Retirement System ("SERS"), a client of Huff on whose behalf Huff purchased and held public debt securities in Adelphia and Century Communications. On or about October 1, 2006, SERS opted out of the class action settlements reached in *In re Adelphia Communications Corporation Sec. & Deriv. Litig.*, No. 03 MD 1529 (LMM) (S.D.N.Y.). A table identifying Huff's purchases of Adelphia and Century securities on behalf of SERS during the relevant time period is attached hereto as Exhibit A. As investment manager for SERS, Huff has investment discretion and was solely responsible for making all investment decisions with respect to transactions in Adelphia's and Century Communications' public debt securities.

68. Defendant Deloitte & Touche LLP ("Deloitte") is a Delaware limited liability partnership with a principal place of business located at 1633 Broadway, New York, New York 10019. At all relevant times, Deloitte audited the financial statements of Adelphia

and Century. At all relevant times, Deloitte also served as accountants for the Rigases, the Rigas Entities and the Managed Entities.

69.  Defendant Citigroup Global Markets Holdings, Inc. (f/k/a Salomon Smith Barney Inc. f/k/a Smith Barney Inc.) ("Salomon"), is a New York corporation with a principal place of business located at 388 Greenwich St., New York, New York 10013. Salomon, a subsidiary of Citigroup, Inc., acted as a lead underwriter for the following public offerings of Adelphia securities:

- 6,000,000 shares of Class A Common Stock issued October 1999;
- $500,000,000 9 3/8% Senior Notes issued November 16, 1999;
- $750,000,000 10 7/8% Senior Notes issued September 20, 2000;
- $750,000,000 6% Convertible Subordinated Notes issued January 2001;
- 17,000,000 shares of Class A Common Stock issued January 2001;
- $500,000,000 3.25% Convertible Subordinated Notes issued April 2001;
- $1,000,000,000 10 1/4% Senior Notes issued June 12, 2001;
- 20,000,000 units 7.5% Series E Mandatory Convertible Preferred Stock issued January 2002; and
- 40,000,000 shares of Class A Common Stock issued January 2002.

In addition, Salomon acted as an underwriter for a public offering of 30,000,000 shares of Class A Common Stock issued November 2001. Salomon also acted as a lender and Lead Arranger in connection with the $1 billion credit facility entered into by certain Adelphia subsidiaries on or about December 3, 1999.

70.  Defendant Banc of America Securities LLC ("Banc of America") is a Delaware limited liability company with a principal place of business located at 9 West 57th Street, New York, New York 10019. Banc of America is an investment bank that is affiliated, and under common ownership with, Bank of America, N.A. Banc of America acted as a lead underwriter for the following public offerings of Adelphia securities:

- $750,000,000 10 7/8% Senior Notes issued September 20, 2000;

- $750,000,000 6% Convertible Subordinated Notes issued January 2001;
- 17,000,000 shares of Class A Common Stock issued January 2001;
- $500,000,000 3.25% Convertible Subordinated Notes issued April 2001;
- $1,000,000,000 10 1/4% Senior Notes issued June 12, 2001; and
- 30,000,000 shares of Class A Common Stock issued November 2001.

In addition, Banc of America acted as an underwriter in connection with a public offering of 6,000,000 shares of Class A Common Stock issued October 1999.

71. Salomon and Banc of America are collectively referred to herein as the Underwriter Defendants. In their capacity as underwriters, the Underwriter Defendants owed Huff a duty to conduct due diligence in connection with Adelphia's offerings of debt securities and to confirm that the prospectuses and registration statements issued in connection with those offerings disclosed all material information and did not contain any material misrepresentations. In connection with public offerings of Adelphia equity and debt securities between June 7, 1999 and January 2002, the Underwriter Defendants received millions of dollars in underwriter fees and discounts. The Underwriter Defendants also received additional fees from Adelphia financial advisory and investment banking services they provided.

72. Defendant John J. Rigas is an individual and, on information and belief, a citizen of the State of Pennsylvania. John Rigas founded Adelphia in 1952 and, at all relevant times, was President, Chief Executive Officer, Chairman and a director of Adelphia. John Rigas resigned his officer positions on May 15, 2002, and resigned as a director on May 23, 2002. As described in greater detail below, John Rigas signed the Adelphia registration statements, prospectuses, and SEC filings on which Huff relied in making its purchases of Adelphia and Century securities, thereby attesting that all of the statements and representations made in those documents were true, accurate and complete.

73. Defendant Timothy Rigas is an individual and, on information and belief, a citizen of the State of Pennsylvania. At all relevant times, Timothy J. Rigas was Executive Vice President, Chief Financial Officer, Chief Accounting Officer, Treasurer, a director of

Adelphia and a member of the Audit Committee of Adelphia's Board of Directors. Timothy Rigas stepped down from the Audit Committee in June 2001, resigned his officer positions on May 16, 2002, and resigned as a director on May 23, 2002. As described in greater detail below, Timothy Rigas signed the Adelphia registration statements, prospectuses, and SEC filings on which Huff relied in making its purchases of Adelphia and Century securities, thereby attesting that all of the statements and representations made in those documents were true, accurate and complete.

74. Defendant Michael J. Rigas is an individual and, on information and belief, a citizen of the State of Pennsylvania. At all relevant times, Michael Rigas was Executive Vice President, Operations, Secretary and a director of Adelphia. Michael Rigas resigned from all of these positions on May 23, 2002. As described in greater detail below, Michael Rigas signed the Adelphia registration statements, prospectuses, and SEC filings on which Huff relied in making its purchases of Adelphia and Century securities, thereby attesting that all of the statements and representations made in those documents were true, accurate and complete.

75. Defendant James P. Rigas is an individual and, on information and belief, a citizen of the State of Pennsylvania. At relevant times, James Rigas was Executive Vice President, Strategic Planning and a director of Adelphia. James Rigas resigned from all of these positions on May 23, 2002. As described in greater detail below, James Rigas signed the Adelphia registration statements, prospectuses, and SEC filings on which Huff relied in making its purchases of Adelphia securities, thereby attesting that all of the statements and representations made in those documents were true, accurate and complete.

76. Defendant Peter L. Venetis is an individual and, on information and belief, a citizen of the State of New York. At relevant times, Peter Venetis, a son-in-law of John Rigas, was a director of Adelphia. Peter Venetis resigned from his position as a director of Adelphia on June 11, 2002. As described in greater detail below, Peter Venetis signed Adelphia registration statements, prospectuses, and SEC filings on which Huff relied in making its purchases of Adelphia and Century securities, thereby attesting that all of the statements and representations

made in those documents were true, accurate and complete.

77. John Rigas, Timothy Rigas, Michael Rigas, James Rigas, and Peter Venetis (collectively, the "Individual Defendants"), because of their positions with Adelphia, had access to the material adverse undisclosed information about the Company's business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

78. As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ National Market (the "NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become known to have been materially false or misleading, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions since June 7, 1999 violated these specific requirements and obligations.

79. The Individual Defendants participated in the drafting, preparation, and/or approval of the various registration statements, prospectuses, public, shareholder and investor reports and other communications complained of herein and were aware of or recklessly disregarded the misstatements contained therein and omissions therefrom, and were aware of or recklessly disregarded their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Adelphia, each of the Individual Defendants had access to the material adverse undisclosed information about Adelphia's

business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Adelphia and its business issued or adopted by the Company materially false and misleading.

80. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various registration statements, prospectuses, SEC filings, press releases and other public statements pertaining to the Company discussed herein. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the registration statements, prospectuses, public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

## HUFF'S STANDING TO SUE

81. Huff brings this lawsuit in two representative capacities on behalf of SERS (the "Beneficial Owner"): (1) as the investment adviser for the Beneficial Owner who actually made the decision to purchase the Adelphia securities on their behalf; and (2) as the "attorney-in-fact" for the Beneficial Owner.

82. Huff is an investment manager and registered investment adviser under the Investment Advisers Act of 1940 that purchases high yield notes predominantly for public and private pension funds, charities, foundations and other institutions, and high net worth individuals, many of whom are beneficial owners of Adelphia securities purchased by Huff. The Beneficial Owner hired Huff to manage its high yield bond portfolio and depends on the income generated from the investments to fund its own needs, including the provision of pension benefits to retired employees of the Commonwealth of Pennsylvania.

83. The Beneficial Owner granted Huff complete discretion to invest on its behalf under the terms of an investment management agreement. Decisions concerning whether

to buy or sell particular securities for the Beneficial Owner's accounts are solely Huff's; the Beneficial Owner has no role whatsoever in these investment decisions.

84. In exercising this discretionary authority, Huff made numerous investment decisions to purchase Adelphia notes on the Beneficial Owner's behalf. In making these investment decisions, Huff specifically read, reviewed and actually relied on the representations contained in all of Adelphia's registration statements, prospectuses, indenture agreements, and other SEC filings. As described in Exhibit A hereto, relying on the representations in these documents, Huff purchased Adelphia and Century senior notes directly out of various public offerings and numerous secondary market transactions for the benefit of the Beneficial Owner.

85. The Beneficial Owner did not have any input, at any time, into Huff's decision to purchase Adelphia securities for its account.

86. As explained below, unbeknownst to Huff, these Adelphia filings on which it relied in making the decision to purchase Adelphia securities turned out to be filled with outright falsehoods and omissions concerning Adelphia's true financial picture.

87. As a consequence of its investment adviser contracts and relationships with its clients, Huff may-- and often does -- take steps to protect its clients in connection with investments it has made. Huff decided to do so in the case of the Beneficial Owner's investments in Adelphia.

88. The Beneficial Owner provided Huff specific authority, by means of a power of attorney, to commence this suit for recovery of its losses. Thereafter, Huff filed this case, as investment adviser and attorney-in-fact, to recover damages on behalf of the Beneficial Owner. Huff is required to distribute the proceeds of this suit (less payment of attorneys fees and expenses) to the Beneficial Owner on a proportionate basis with other clients on whose behalf it has brought suit.

89. Huff's fiduciary relationship with the Beneficial Owner is sufficiently close to make Huff as effective a proponent of the client's interests as the client itself. Huff exercised discretionary investment authority to purchase the securities for the Beneficial Owner,

and has obtained full authority to prosecute this suit on its behalf. Both the Beneficial Owner and Huff as its fiduciary have a common interest in recouping the investment losses Defendants caused, and in deterring future violations of the securities laws. Indeed, by virtue of its fiduciary position, Huff has a strong incentive to recoup the Beneficial Owner's losses from the Defendants, ensuring the existence of an adequate case or controversy. In this respect, Huff is not different from a trustee or other fiduciary who is empowered to bring suit in a representative capacity to recover damages suffered ultimately by the beneficiaries.

90. Having made the decision to purchase the Adelphia securities at issue on behalf of the Beneficial Owner, and having sued in its capacity as a fiduciary on behalf of the Beneficial Owner with its full authority and consent pursuant to a power of attorney, Huff is in privity with the Beneficial Owner. Huff's interests align perfectly with those of the Beneficial Owner. Having been vested with full authority to bring suit by virtue of its contractual rights and the power of attorney, Huff can and will adequately represent those interests and bind the Beneficial Owner to any judgment ultimately entered by the Court. Given this close fiduciary and privity relationship between Huff and the Beneficial Owner, Huff has standing to bring this suit on the Beneficial Owner's behalf and is the real party in interest in this litigation.

## SUBSTANTIVE ALLEGATIONS

I. **The True State of Affairs at Adelphia**

    A. **Overview**

91. Adelphia's May 2002 8-K, June 6, 2002 8-K and June 10, 2002 8-K provide an astonishing look at what prior public disclosures and audited financial statements utterly failed to disclose and/or misrepresented. At all relevant times, Adelphia was administered not in the manner of a healthy, independent cable company -- as portrayed to Huff and the general public -- but rather as a goose from which the Rigas Family, through carefully constructed related entities, could pluck the golden eggs. Not only were funds of Adelphia consistently commingled with those of purportedly separate companies, but Adelphia was in reality a guarantor -- without benefit -- of billions of dollars of loans whose proceeds were used

for purposes ranging from buying hundreds of millions of dollars of Adelphia securities to paying a Rigas Family member millions of dollars for documentary film development to financing the purchase of the Buffalo Sabres hockey team. The Rigases used the CMS as a family bank account. The Underwriter Defendants, Deloitte, and the Individual Defendants failed to disclose that these improprieties were taking place, or their true nature and extent.

92. The "co-borrowing facilities" loaned money that flowed through Adelphia and out its doors, leaving behind actual but publicly undisclosed liabilities. Investment bank affiliates of the co-borrowing lenders -- including Salomon, an investment bank affiliate of Citibank -- also acted as underwriters for numerous public offerings of Adelphia debt securities. Adelphia used the proceeds of these offerings to directly repay the banks under the co-borrowing and other Adelphia credit facilities. Thus, by means of these offerings and the deceptive public disclosures that accompanied them, the banks were able to reduce their exposure to Adelphia by shifting hundreds of millions of dollars of bad loans -- which the banks knew about -- to Huff and other purchasers of Adelphia notes before actual defaults.

93. Certain Rigas Entities also purchased hundreds of millions of dollars of Adelphia junior debt and equity securities -- which, at the time, the Company announced to the public with great fanfare. However, the Defendants failed to disclose, among other things, that these purchases were in large part "paid for" either with entries on Adelphia's books that were essentially laundered corporate "IOUs," or with money borrowed from senior credit facilities for which Adelphia itself was jointly and severally liable.

94. Thus, unknown to Huff, Adelphia was guaranteeing loans taken out to purchase its own junior securities on a massive scale, which artificially inflated the value of the Company and increased its borrowing capabilities, enabling the Company to continue to finance the personal expenditures of the Rigas Family. Because their full extent was not disclosed, the loans dramatically distorted the capital structure of Adelphia. The Rigas Family's purchases of Adelphia securities, while having the appearance of injecting new capital into the Company and retiring debt, in reality did no such thing. Because the Rigas Family made their purchases with

borrowings on credit facilities for which Adelphia and its subsidiaries were ultimately liable, the Rigas Family's "investments" merely served to increase the Company's overall debt load. Making matters worse for Huff, this additional debt came in the form of bank debt that was senior to -- and, thus, ostensibly had a higher repayment priority than -- the notes held by Huff. Thus, instead of providing the beneficial capital infusions represented by the Defendants, the Rigases' securities purchases only served to worsen Huff's overall position. All of these transactions were given the financial seal of approval by Adelphia's hopelessly-conflicted auditor, Deloitte, the underwriters and the other Defendants.

### B.  The Co-Borrowing Credit Facilities

95.  Beginning in at least 1998, various subsidiaries of the Company and Managed Entities entered into co-borrowing credit facilities with lenders (collectively, the "Co-Borrowing Facilities"). Under the terms of these lending arrangements, each co-borrower under each of the credit facilities was permitted to borrow up to the entire amount of the available credit under the applicable facility. As confirmed by the May 2002 8-K, both the Adelphia subsidiary and Managed Entity on a given co-borrowing facility are jointly and severally liable to repay all amounts borrowed under the facility, regardless of which entity actually borrowed the money. These credit facilities were collateralized by a pledge of the stock of each co-borrower, and the stock of the co-borrower's pledged or guarantor subsidiaries.

96.  During the year ended December 31, 2001, the Company's subsidiaries were parties to the following co-borrowing credit facilities:

- On March 29, 1996, Telestat Acquisition Limited Partnership ("TALP")[1], Global Acquisition Partners, L.P., (a subsidiary of the Company) and Highland Video Associates, L.P. ("HVA")[2], entered into a $200,000,000

---

[1]  TALP was a subsidiary of Olympus Communications, L.P., which until October 1999 was a joint venture owned by Adelphia and FPL Group, Inc.

[2]  The Five Named Rigas Family Members (John, Timothy, Michael, James and Ellen Rigas Venetis, the wife of Peter Venetis) are all of the general partners of Highland Holdings. The Five Named Rigas Family Members directly, or indirectly through Highland Holdings, own all of the partnership interests in HVA. HVA in turn owns substantially all of the partnership interests in the "HVA Entities," which own or operate certain cable systems.

- co-borrowing loan agreement (the "TALP Facility"). This agreement was refinanced and terminated on September 28, 2001, as described below.

- On May 6, 1999, UCA Corp., UCA LLC, National Cable Acquisition Associates, L.P., Grand Island Cable, Inc., SVHH Cable Acquisition, L.P. and Tele-Media Company of Hopewell-Prince George, each a subsidiary of the Company, and HHC[3], closed on an $850,000,000 co-borrowing credit facility with several banks, which remained in effect at December 31, 2001 (the "UCA/HHC Co-Borrowing Facility").

- On April 14, 2000, Century Cable Holdings, Ft. Myers Cablevision, LLC, each a subsidiary of the Company, and HPGI[4], closed on a $2,250,000,000 co-borrowing credit facility with several banks (the "CCH Co-Borrowing Facility"). In addition, on September 28, 2000, Century Cable Holdings, Ft. Myers Cablevision, LLC, and HPGI, closed on a $500,000,000 9 1/4 year term loan. This term loan is part of the credit facility that closed on April 14, 2000, and all of the indebtedness under this facility remained outstanding at December 31, 2001. Adelphia Business Solutions Operations, Inc. ("ABSO"), a subsidiary of Adelphia Business Solutions, Inc. ("ABIZ"),[5] which filed for bankruptcy court protection on March 27, 2002, was an unrestricted borrower under the revolving credit portion of this co-borrowing credit facility, and borrowed $500,000,000 in a number of transactions. The proceeds of these transactions were deposited into the Adelphia CMS. As of December 31, 2001, ABSO was allocated

---

[3] The Five Named Rigas Family Members directly or indirectly own Doris Holdings L.P. ("Doris L.P."), NCAA Holdings, Inc. and Illiad Holdings, Inc. These companies collectively own the "HHC Entities," which operate cable systems.

[4] The Five Named Rigas Family Members own all of the equity interests in Highland Prestige Georgia, Inc. ("HPGI"). HPGI is the parent of the "Highland Prestige Entities," which own or operate cable systems.

[5] ABIZ was a consolidated subsidiary of the Company on December 31, 2001, and became a former subsidiary of the Company on January 11, 2002 by virtue of a spin-off transaction.

> $500,000,000 of the outstanding loans under this co-borrowing credit facility. The Company's subsidiaries under this credit facility and HPGI are each jointly and severally liable for the ABSO borrowings. ABSO, as an unrestricted borrower, is liable only for its own borrowings.
>
> - On September 28, 2001, Olympus Cable Holdings, LLC, Adelphia Company of Western Connecticut and Adelphia Holdings 2001, LLC, each a subsidiary of the Company, HVA, and CTCC[6], closed on a $2,030,000,000 co-borrowing credit facility with several banks which remained in effect at December 31, 2001 (the "Olympus Co-Borrowing Facility"). A portion of the proceeds from this facility were used to repay and terminate the $200,000,000 TALP Co-Borrowing Facility dated March 29, 1996 identified above.

97.  Since use of the co-borrowing facilities commenced, Adelphia's practice was to disclose on its consolidated balance sheets and financial statements only those amounts that were borrowed directly by its subsidiaries under the facilities. Amounts borrowed by the Managed Entities were not disclosed as part of Adelphia's balance sheets and financial statements, notwithstanding the fact that Adelphia and its subsidiaries were (and remain) jointly and severally liable for repayment of the Managed Entities' borrowings and that such disclosures were required under GAAP. As discussed in greater detail below, this practice resulted in the presentation in Adelphia's registration statements, prospectuses, public SEC filings and other reports of an extremely misleading picture of the Company's financial condition and results.

98.  As of December 31, 2001, the maximum aggregate amount that could be borrowed by the co-borrowers under all of the co-borrowing credit facilities was $5,630,000,000. Between January 1999 and March 2002, the Managed Entities borrowed billions of dollars under these facilities, which they used for purposes having nothing to do with the legitimate business of

---

[6]   CTCC (Coudersport Television Cable Company) is an operating cable company 100% of which is owned by John J. Rigas.

Adelphia and its subsidiaries. Indeed, as of December 31, 2001, at least $2.5 billion of Managed Entity borrowings remained outstanding, which Adelphia and its subsidiaries are liable to repay.

99.   Deloitte, the Underwriter Defendants, and the Individual Defendants failed to disclose that the Managed Entities were borrowing massive amounts of money under the co-borrowing facilities -- and that they were using the proceeds of these borrowings to buy assets and engage in transactions that benefited only the Rigas Family with no legitimate corporate benefit or purpose for Adelphia. The overall effect of the Managed Entities' borrowings on Adelphia -- again, an undisclosed effect -- was to impair Adelphia's working capital and add to Adelphia's already significant interest expense.

100.   Nor did the Managed Entities' borrowing binge end in 2001. According to the May 2002 8-K, the total amount outstanding under all of the co-borrowing credit facilities as of April 30, 2002 was approximately $4.58 billion -- meaning that the Managed Entities borrowed approximately an additional $1.5 billion in the first four months of 2002. These transactions all took place under the watchful eye of Deloitte, the Underwriter Defendants and the Individual Defendants.

### C.   Commingling of Funds Among Adelphia, Adelphia's Subsidiaries and Related Parties

101.   In addition to running up huge Company debts via the Managed Entities' use of the co-borrowing facilities, the Rigas Family systematically commingled the funds of Adelphia, its subsidiaries, the Managed Entities and the other Rigas Entities, and treated all of these funds as available for their personal use.

102.   The vehicle for the Rigas Family's commingling of corporate and personal monies was Adelphia's CMS. As disclosed in the May 2002 8-K, the "Adelphia CMS Participants" included Adelphia, its subsidiaries, Managed Entities and the Rigas Entities. The CMS was a vast pot into which the Adelphia CMS Participants deposited their cash -- including amounts borrowed under the co-borrowing facilities -- and from which they withdrew funds as needed -- whether for legitimate corporate purposes or not. Under the CMS, all cash received by

Adelphia, its subsidiaries and the Rigas Entities (including amounts borrowed under the Co-Borrowing Facilities) was swept, on a regular basis, into accounts maintained at First Union of Florida (now Wachovia) in Pensacola, Florida. In turn, expenses of Adelphia, its subsidiaries and the Rigas Entities were paid from the same accounts. Revenues and expenses of particular entities were accounted for through intercompany payables and receivables within the CMS. Adelphia subsidiaries also transferred funds back and forth with other subsidiaries, Managed Entities and Rigas Entities, resulting in an elaborate set of accounting entries purporting to document inter-company liabilities. As explained in the May 2002 8-K:

> [e]ach Adelphia CMS Participant (i) deposits all or some of its cash generated or otherwise obtained from its operations, borrowings and other sources into the Adelphia CMS, (ii) withdraws cash from the Adelphia CMS to be used for its expenses, capital expenditures, repayments of debt and other uses, and (iii) engages in transfers of funds with other Adelphia CMS Participants. *The operation of the Adelphia CMS results in the commingling of funds among the Adelphia CMS Participants, which include Company subsidiaries and Rigas Entities*. These transactions create numerous related party payables and receivables among the Adelphia CMS Participants.

(Emphasis added).

103.   Given the sheer scope of this commingling, the Underwriter Defendants and the Individual Defendants should have been aware of the CMS. Indeed, the CMS had been in place for many years with the blessing of Deloitte and Adelphia's Board of Directors. Nor should the Defendants have failed to appreciate the drain on Adelphia's working capital and other corporate resources caused by the Rigas Family's use of the CMS -- all without any legitimate benefit flowing to Adelphia from the Rigas Family's transactions. However, none of the Defendants disclosed the inner-workings of this system to investors.

104.   The CMS was also an instrument for self-dealing by the Rigas Family. As the May 2002 8-K reveals, "[t]ransactions involving Adelphia CMS Participants sometimes occur, that result in payables and receivables between and among various Adelphia CMS

Participants and/or other Rigas Persons and Entities." In other words, individual members of the Rigas Family commingled, transferred and withdrew monies from the CMS. As described in greater detail below, the Rigas Family used corporate monies taken from the CMS for a wide variety of personal pursuits. Simply put, Deloitte, the Underwriter Defendants and the Individual Defendants let Adelphia serve -- undisclosed -- as the Rigas Family's personal cash machine.

105. The wide ranging commingling of funds achieved through the CMS allowed Adelphia, among other things, to move loan proceeds and resultant debt between "CMS Participant" balance sheets in a corporate shell game. As stated in the May 2002 8-K:

> [c]ertain Adelphia CMS Participants that are Managed Cable Entities are co-borrowers with certain of the Company's subsidiaries under revolving credit and term loan agreements. Borrowings under these co-borrowing credit facilities are generally deposited in the Adelphia CMS. On a quarterly basis, the Company records journal entries to record the indebtedness attributed to the co-borrowers with corresponding adjustments to their receivables or payables. Such adjustments are based on consideration of the net effect of quarterly transactions between the Company and certain of its subsidiaries, on the one hand, and the Managed Cable Entities, on the other hand.

Adelphia had no regular policy for billing and collection of the receivable balances from its subsidiaries or the Rigas Entities.

106. For example, at the close of the third quarter of 2000, Adelphia arbitrarily reclassified $187,001,026 of co-borrowing debt on Adelphia's books and placed that debt on the books of HPGI, a Rigas Entity, as debt of HPGI under the CCH Co-Borrowing Facility. Adelphia made similar reclassifications of Adelphia's co-borrowing debt to HPGI under the CCH Co-Borrowing Facility at the end of the quarters ending on December 31, 2000, March 31, 2001 and June 30, 2001. In another instance, at the end of the quarter ending September 30, 2001, Adelphia reclassified approximately $215,009,000 of Adelphia's co-borrowing debt as transferred to the books of Highland Video, a Rigas Entity that is also a co-borrowed on the CCH Co-Borrowing Facility. For each of these reclassifications and transfers, no attempt was made to