verify that the Rigas Entity had drawn down, or otherwise benefited from, the funds drawn down from the co-borrowing facility. The transfer was purely arbitrary, and served the purpose of concealing the true of amount of Adelphia's debt.

107. Although proceeds from the co-borrowing facilities were deposited in Adelphia's CMS, Adelphia's allocation on its books of primary responsibility for that debt to the Managed Entities -- combined with Adelphia's practice of not disclosing Managed Entity borrowings under the co-borrowing facilities on Adelphia's financial statements -- enabled Adelphia to hide from investors billions of dollars in such borrowings. Although the debt incurred remained the ultimate responsibility of Adelphia and its subsidiaries, borrowings "allocated," or "reallocated" through quarterly or periodic "adjustments," to Rigas Entities and/or Managed Entities, were never disclosed.

108. The very existence of the CMS should have been a fundamental concern of due diligence by Deloitte and the Underwriter Defendants in connection with evaluating the state of Adelphia's internal controls.

### D.    Rigas Entity Securities Purchases

109. Among the Rigas Family's preferred uses of proceeds from the co-borrowing facilities was the funding of their acquisition of Adelphia securities. These purchases served a highly useful purpose: they artificially boosted the confidence of Adelphia investors by giving the appearance that the Rigas Family was injecting hundreds of millions of dollars of new capital into Adelphia -- capital that Adelphia was purportedly using in part to retire senior bank debt. In fact, the Rigas Family's purchases were being funded by Adelphia's incurrence of additional, undisclosed senior bank debt, with the result that Adelphia had far less equity, and far more debt, than its public filings represented.

110. The May 2002 8-K reveals many details about the Rigas Family's securities purchases and how they were funded. Two Rigas-controlled entities, Highland 2000 and Highland Holdings, entered into a number of transactions since January 1, 2001 relating to the acquisition of debt or equity securities of the Company that were funded through use of the

co-borrowing facilities.

        111.    In each transaction consummated by Highland 2000, the "purchase price" for the securities was settled through a series of bookkeeping entries as follows:

- The securities were issued by the Company to Highland 2000, and the Company recorded a receivable from Highland 2000 for the amount of the purchase price.

- A Managed Cable Entity was allocated, as among the co-borrowers, the primary obligation to repay outstanding indebtedness under a co-borrowing credit facility that had previously been allocated, as among the co-borrowers, to a subsidiary of the Company, in an amount equal to the purchase price, and the Company recorded a payable to the Managed Cable Entity for the amount of the purchase price.

This mechanism was essentially a "double whammy" accounting gimmick designed to mislead investors as to what were the true economic realities behind the Rigas Family's acquisition of Adelphia securities. As a result of these bookkeeping entries, the Adelphia subsidiaries misleadingly transferred senior bank debt off their own books (and, hence, off Adelphia's consolidated balance sheet) to that of a Managed Entity. At the same time, the transaction gave the appearance that the Rigas Family was injecting new capital into Adelphia subordinate to the high-yield debt purchased by Huff. In fact, no new cash was injected into Adelphia, and Adelphia and its subsidiaries remained jointly liable for the senior bank debt that had been "reallocated" to the Managed Entities -- debt that was ostensibly senior to Huff's securities. From the perspective of a bondholder like Huff, the equity cushion it was relying on was transformed into debt senior to the securities it held. Moreover, by moving the bank debt off of Adelphia's balance sheet, these accounting gimmicks concealed the fact that Adelphia exceeded the restrictions on total indebtedness contained in its bond covenants, which undermined the validity of numerous bond offerings in 2000 and 2001. In addition, the ultimate economic effect of the Rigas Family's use of co-borrowing facilities -- for which Adelphia was ultimately liable -- to purchase Adelphia securities, was to effectuate an indirect acquisition by the Company of Indebtedness of Adelphia subordinate in right of payment to Huff's notes or of shares of Adelphia capital stock, which acquisitions violated the restricted payment covenant in the bond

indentures.

   112. In other instances, the Rigas Family -- acting through Highland Holdings -- simply paid for Adelphia securities with cash withdrawn from the Adelphia CMS.

   113. *Just in the years 2000 and 2001,* the following Rigas Family securities purchases were undertaken with Adelphia's credit or with corporate funds:

| Date of Agreement | Purchaser | Type and Amount Of Securities | Total Aggregate Purchase Price | Form of Consideration |
|---|---|---|---|---|
| 1/24/00 | Highland Holdings | Class B Common Stock | $368,000,000 | Purchase price paid through $368,000,000 drawdown on UCA/HHC Co-Borrowing Facility and assignment of this debt to HHC in lieu of cash payment |
| 7/3/00 | Highland Holdings | Class B Common Stock | $145,000,000 | Purchase price paid through $145,000,000 drawdown on CCH Co-Borrowing Facility and assignment of this debt to HPGI in lieu of cash payment |
| 1/17/01 | Highland 2000 | 5,819,367 shares of Class B Common Stock | $259,900,000 | Agreement provided for payment of immediately available funds; purchase price paid through bookkeeping entries in lieu of cash payment |
| 1/17/01 | Highland 2000 | $167,400,000 aggregate principal amount of 6% convertible subordinated notes due 2006 | $162,500,000 | Agreement provided for payment of immediately available funds; purchase price paid through bookkeeping entries in lieu of cash payment |
| 2/1/01 | Highland Holdings | 100,000 Shares of Class A Common Stock | $4,452,000 | Cash Withdrawn from Adelphia CMS |
| 4/19/01 | Highland 2000 | $400,000,000 aggregate principal amount of 3.25% convertible subordinated notes due 2021 | $393,500,000 | Agreement provided for payment of immediately available funds; purchase price paid through bookkeeping entries in lieu of cash payment |
| 10/20/01 | Highland | Class B Common | $423,375,076 | Purchase price paid by |

-43-

| | 2000 | Stock and 6% Convertible Subordinated Notes | | transfer of co-borrowing debt to Rigas Entity Highland Video |
|---|---|---|---|---|

**2001 TOTAL:    $820,352,000**

114. In October 1999, April 2000 and February 2001, the Rigases, through Highland Holdings, acquired a total of $59 million worth of Adelphia securities on the open market using funds obtained from the CMS. Highland never reimbursed or otherwise compensated Adelphia for the purchases.

115. In addition to using the proceeds of the co-borrowing facilities to fund its acquisition of Adelphia securities, the Rigas Family took out a series of margin loans from investment and commercial banks, to which it pledged as collateral the Adelphia securities it purchased. When they experienced margin calls, the Rigases simply withdrew cash from the Adelphia CMS to pay off the calls -- a fact that the Company and the Defendants failed to disclose even in Adelphia's March 27 disclosure of its off balance sheet debt. However, as revealed in the May 2002 8-K, the Rigas Family continued this practice even after the Company's March 27 disclosure by withdrawing approximately $175 million from the CMS to make payments on margin calls:

> Certain Rigas Persons and Entities have entered into margin loan agreements with various investment banks and other financial institutions and pledged equity and debt securities issued by the Company to secure such loans. Although the total amount of these loans is unknown, since January 1, 2001, certain Rigas Persons and Entities have made $241,167,006 of payments in connection with margin calls. *Of that amount, $177,789,669 has been paid in 2002, with approximately $174,638,151 having been paid since March 27, 2002.* Funds for these margin call payments by Rigas Persons and Entities came from the Adelphia CMS.

(Emphasis added).

Thus, even after Adelphia had begun disclosing the Rigases' pattern of self-dealing, the Rigases engaged in even more brazen acts of self-dealing. The Defendants failed to disclose the Rigases' improper conduct, even though less than six weeks after paying $175 million to cover Rigas Family margin calls to commercial and investment banks, Adelphia missed $38 million in

interest payments on bonds held by the faceless public.

### E. Management Services Provided By The Company to Related Entities

116. While on the one hand falsely reducing its apparent liabilities by failing to disclose debts incurred on behalf of related entities, Adelphia on the other hand inflated its earnings and assets by either failing to collect actual receivables, or booking apparently dummied receivables, from related companies. The Rigas Family, who actually controlled these related companies, either paid Adelphia using Adelphia's own funds, or simply failed to make the required payments.

117. For instance, during the year ended December 31, 2001, Adelphia purportedly provided management services to the Highland Prestige Entities for which the Highland Prestige Entities were to pay the Company up to 5% of system revenues for such services, as well as other related fixed fees charged by the Company. For the year ended December 31, 2001, the total aggregate amount of all fees and expenses that the Highland Prestige Entities were charged by the Company was $7,793,000. Apparently, the Rigas-owned Highland Prestige Entities never actually paid any of these fees to Adelphia.

118. During the year ended December 31, 2001, the Company provided similar management services to the Rigas-owned Highland Holdings (parent of the HVA Managed Cable Entities), Doris L.P. (parent of the HHC Managed Cable Entities), and NFHLP[7]. For the year ended December 31, 2001 the fees booked as paid by each of these entities to the Company were as follows:

- Highland Holdings paid $3,944,000;
- Doris L.P. paid $3,675,000; and
- NFHLP paid $3,417,000.

While it appears that Adelphia actually received these fees, Adelphia is also the one who actually

---

[7] NFHLP (Niagara Frontier Hockey, L.P.) owns the National Hockey League franchise for the Buffalo Sabres hockey team. John J. Rigas owns a 99% limited partnership interest in NFHLP. A 1% general partnership interest in NFHLP is owned by Patmos, Inc., a Delaware corporation which is 100% owned by the Rigas Parties.

-45-

paid them. The Special Committee has concluded that, in fact, "funds for the payment of these services by NFHLP came from the Adelphia CMS." In other words, the Rigas Family paid Adelphia the fees they owed with Adelphia's own money.

119. These revelations are merely the tip of the iceberg. For example, the May 2002 8-K states that the Special Committee was "investigating whether management fees paid by Highland Holdings to the Company were paid using borrowings under a co-borrowing credit facility ... [and] whether these management fees may have been effectively offset by the assumption by the Company or one of its subsidiaries of obligations, including interest payment obligations, of Rigas Persons and Entities, and whether these offsetting transactions were undertaken solely to increase the Company's revenues." What can be gleaned from the Special Committee's investigation thus far is that Adelphia's presentation of its earnings and debts on its consolidated financial statements was, at the very least, highly misleading.

F. **Inflation of EBITDA Through Accounting Irregularities**

120. According to the June 10, 2002 8-K, Adelphia's previously-reported EBITDA was artificially and fraudulently inflated by the following six accounting practices:

- Adelphia conspired with its two main vendors of digital converter boxes to raise the price of each box by $26. Thereafter, for each digital converter box Adelphia purchased, the vendors rebated $26 of the purchase price back to Adelphia for "marketing support." Adelphia improperly treated these payments as a reduction of operating expenses, and treated the payments for the boxes as capital expenditures, resulting in overstatements of EBITDA by $54 million in 2001 and $37 million in 2000.

- Adelphia accepted financial instruments as payment from certain interactive cable service providers. When the value of these instruments subsequently declined, Adelphia did not reflect their reduction in value in reported EBITDA, resulting in overstatements of EBITDA by $52 million in 2001 and $28 million in 2000.

- Adelphia improperly accounted for the cost of certain contracts for television programming, resulting in overstatements of EBITDA by $42 million in 2001 and $23 million in 2000.

- The Company improperly capitalized labor expenses, resulting in overstatements of EBITDA by approximately $40 million in 2001 and 2000.

- The Company failed to properly account for transactions with its (former) subsidiary, Adelphia Business Solutions, the Rigas Entities and other parties, resulting in overstatements of EBITDA by approximately $18 million in 2001 and $19 million in 2000.

- Adelphia improperly recognized revenue from subscribers under deferred billing arrangements, resulting in overstatements of EBITDA by approximately $4 million in 2001 and $13 million in 2000.

G. **Rigas Entity Transactions For the Benefit of the Rigas Family**

121. Besides using corporate funds and credit to purchase the Company's securities, the Rigas Entities engaged in a lengthy set of undisclosed transactions that were intended to enrich members of the Rigas Family at the expense of Adelphia and its investors. The sheer size and frequency of these transactions could not have escaped the notice of the Underwriter Defendants, Deloitte and the Individual Defendants. Indeed, the details of these transactions bespeak a shocking lack of internal controls at Adelphia over the use of corporate resources.

122. **Payments by Adelphia to Rigas Entities for Products and Services.** As disclosed in the May 2002 8-K, during the year ended December 31, 2001, the Company made the following payments to related parties owned and controlled by the Rigas Family:

   o The Company paid approximately $12,416,000 to EI[8] and $371,000 to Dobaire[9],

---

[8] EI (Eleni Interiors, Inc.) is an interior design firm 100% owned by John J. Rigas. It is not known whether EI performs services for any parties other than the Company, its subsidiaries and the Rigas Persons and Entities.

    primarily for office furniture and fixtures and related installation and design services.

- o The Company paid approximately $2,019,000 to Wending Creek[10] for various maintenance and related services.

- o The Company paid an aggregate amount of approximately $100,000 to Rigas Persons and Entities, including Ellen Rigas Venetis, Dorellenic Cable Partners, John J. Rigas, the Coudersport Theatre[11] and Wending Creek, for office and warehouse rent.

- o The Company paid approximately $50,000 to Ellen Rigas Venetis for community service and public relations consulting services.

- o During the year ended December 31, 2001, the Company purchased approximately 50 motor vehicles from Preston Motors, a car dealership in which Defendant John J. Rigas has a material beneficial interest.

123. **The Buffalo Sabres.** The Rigas Family funded NFHLP's acquisition of the Buffalo Sabres with Adelphia corporate monies. Moreover, as disclosed in the May 2002 8-K, in addition to receiving loans from the Company, NFHLP "from time to time ... finances its operations through withdrawals of cash (and the generation of net payables to the Company) under the Adelphia CMS." As of December 31, 2001, the total amount outstanding to Adelphia under various notes, assumed loans and advances to and on behalf of NFHLP was $150,157,000. This amount notwithstanding, the Company paid $744,000 to NFHLP (net of certain payables due to the Company generated for certain services rendered) for luxury suite rentals and other related expenses at HSBC Arena in Buffalo, New York, including tickets for the Company's employees to Buffalo Sabres games and other related entertainment costs. At the same time, Adelphia provided free advertising to the Sabres on cable television networks owned by the

---

[9]     Dobaire is a design services firm and sole proprietorship owned by Doris Rigas, the wife of John J. Rigas and the mother of Michael J. Rigas, Timothy J. Rigas, James P. Rigas and Ellen Rigas Venetis.

[10]     Wending Creek is a provider of facilities maintenance services and related materials 100% owned by John J. Rigas. Services provided by Wending Creek include electrical, heating, ventilation and air conditioning services, snow removal, lawn care services, landscaping and minor construction services. It is not known whether Wending Creek performs services for any parties other than the Company, its subsidiaries and the Rigas Persons and Entities.

[11]     Coudersport Theatre is a sole proprietorship 100% owned by John J. Rigas.

Company.

124. **Loans to Rigas-Controlled Affiliates.** According to the May 2002 8-K, during 2001, and possibly in prior periods, the Company advanced funds to ErgoArts and SongCatcher Films[12] on an unsecured basis. At December 31, 2001, the outstanding balance due to the Company from ErgoArts and SongCatcher Films under these arrangements was approximately $677,000 and $3,077,000, respectively. The advances to ErgoArts were made principally in connection with the development and potential production of documentary films. The advances to SongCatcher Films were made in connection with the creation and production of the motion picture entitled SongCatcher.

125. **Loans to Adelphia Corporate Officers.** James R. Brown, the Company's former Vice President of Finance, received a loan from the Company in the aggregate principal amount of $700,000. According to the May 2002 8-K, "[t]he date and terms of this loan are not known to the Company at this time." Again, this loan appears to be the tip of the iceberg, and the Special Committee investigated the existence of other loans to officers of the Company, in order "to identify and categorize other loans to affiliates that may exist."

126. **Adelphia's Payments to Praxis, Praxis Capital and Praxis Management.** Defendant Peter Venetis is the Managing Director of Praxis Capital Partners, LLC ("Praxis Capital"), the general partner of Praxis Capital Ventures, L.P. ("Praxis"), an investment partnership. Formed in June 2001, Praxis focuses on private equity investments in the telecommunications market. Although without any legitimate corporate purpose, the Company signed a contract calling for the commitment of $65,000,000 of capital to Praxis, of which it has actually funded approximately $2,950,000. The Company is the sole limited partner of Praxis and has 99.5% of the total partnership interest.

127. Praxis Capital Management, LLC ("Praxis Management"), owned by Mr.

---

[12] ErgoArts is 100% owned by John J. Rigas and Ellen Rigas Venetis. John J. Rigas and Ellen Rigas Venetis have an equity interest in SongCatcher Films. ErgoArts is a film development and production company. SongCatcher Films is a developer and provider of films. It is not known whether ErgoArts and SongCatcher Films perform services for any parties other than the Company, its subsidiaries and Rigas Persons and Entities.

Venetis, was the management company of Praxis and received a management fee of 2.0% of Praxis' committed capital, in the amount of approximately $1,307,000 annually, virtually all of which Praxis Management paid to Mr. Venetis in the form of salary. Adelphia has paid management fees of approximately $1.96 million to Praxis Management out of its capital contributions to Praxis. Thus, Adelphia has paid Peter Venetis approximately $1.96 million per year for work he has purportedly performed managing Praxis. The Praxis entities were but another way for a Rigas Family member to skim money from the Company.

128. **The Golf Club.** Adelphia, through Golf Club, a wholly-owned subsidiary of the Company, was constructing a golf club and golf course on approximately 830 acres of land near Coudersport, Pennsylvania, of which 535 acres are owned by Wending Creek, a Rigas Entity, 126 acres are owned by Wending 3656, another Rigas Entity, and 169 acres are owned by a wholly-owned subsidiary of the Company. The Company has expended approximately $13,000,000 on equipment and development costs for this project, with no apparent purpose but to benefit the Rigas Family.

129. **Timber Rights Transaction.** In February 2000, a subsidiary of the Company, ACC Operations, purchased timber rights, covering a twenty-year period from the date of closing, from an unaffiliated third party with respect to 3,656 acres of land located in Potter County, Pennsylvania, for a purchase price of $26,535,070. At the end of the twenty-year period, the timber rights revert to the owner of the underlying land at such time. The revenue earned by the Company during the year ended December 31, 2001, is unknown. At or about the same time in an apparent straw transaction, Wending 3656 purchased the underlying 3,656 acres from the unaffiliated third party for a purchase price of $464,930. The timber purchase agreement provides that if a change in ownership of the Company occurs during the twenty-year period, then the timber rights would revert to Wending 3656 as part of the consideration received by Wending 3656 as a result of the change in ownership transaction. A change in ownership is defined to occur in the event that the cumulative voting percentage of the Company stock held by John J. Rigas and the members of his immediate family falls below 50% of all outstanding

voting shares.

130. **Corporate Perks for the Rigas Family.** The Rigas Family used corporate resources to fund various "perks" for themselves. For example, Rigas Persons and Entities used Company aircraft for reasons unrelated to the business or operations of the Company or any of its subsidiaries. Company funds and resources were used to construct, acquire or maintain condominiums in Beaver Creek, Colorado, and Cancun, Mexico, for use exclusively or primarily by Rigas Persons and Entities as opposed to Company personnel. Finally, the Company owns two apartments in New York City that, since some time in 1998, have been used on a rent-free basis exclusively by Ellen Rigas Venetis and Peter L. Venetis. John Rigas also received at least $1 million per month in undisclosed advances from the CMS beginning in 2001.

H. **The Highland Video Digital Converters Transaction.**

131. In another sham transaction designed to fraudulently reduce Adelphia's true debt, Adelphia removed $101 million of co-borrowing debt from its books in the fourth quarter of 2001 through a fraudulent transaction with Highland Video in which Highland Video received digital converters from Adelphia. Highland Video had no cable operations and, consequently, no need for the digital converters. Nevertheless, Adelphia purported to "sell" digital converters to Highland Video in order to remove excess inventory from its books. In satisfaction of the purported purchase price for the converters, Adelphia transferred $101 million of co-borrowing debt under the CCH Co-Borrowing Facility to Highland Video, thereby also artificially reducing the debt carried on Adelphia's financial statements.

I. **Inflation of Cable Subscribers**

132. Adelphia also artificially inflated the number of basic cable subscribers it reported through a number of gimmicks. Adelphia counted as basic cable subscribers numerous persons who did not fit within the definition of "a home with one or more television sets connected to a cable system" set forth in Adelphia's 1999 10-K and 2000 10-K. For example:

- o  Beginning in the first quarter of 2000, Adelphia included in its reported

- count of basic cable subscribers 15,000 subscribers of an unconsolidated affiliate located in Brazil in which Adelphia did not own a controlling interest.
- Beginning in the third quarter of 2000, Adelphia included in its reported basic cable subscriber count 28,000 customers of an unconsolidated Venezuelan affiliate in which Adelphia did not own a controlling interest.
- Beginning in the third quarter of 2000, Adelphia counted as basic cable subscribers customers who subscribed to long distance telephone service offered by an Adelphia subsidiary in the business of reselling long distance capacity.
- In the last three quarters of 2001, Adelphia included in its reported basic subscriber count tens of thousands of customers who received Adelphia's Internet service, rather than cable television services.
- In the third and fourth quarters of 2001, Adelphia included in its reported number of basic cable subscribers 60,000 customers who subscribed to Adelphia's home security service.
- Adelphia also began including in its basic cable subscriber count each unit in a multi-family dwelling even though only one unit may have been a paying subscriber and met Adelphia's definition of a basic cable subscriber.
- Adelphia also at times counted as basic cable subscribers customers of Rigas Entities that competed with Adelphia.

## II. Overview of Huff's Purchases of Adelphia and Century Communications Securities on Behalf of the Beneficial Owner.

133. Adelphia was a prolific issuer of securities, often soliciting capital through public securities offerings several times a year.

134. As described in Exhibit A, Huff made purchases of Adelphia high yield

debt securities on behalf of the Beneficial Owner in the following public offerings, as well as in the secondary market following the public offerings:

    a.    a June 15, 1999 exchange offering of 7 ¾% Series B Senior Notes due January 15, 2009 (the "June 1999 Offering");

    b.    a November 16, 1999 offering of 9 3/8% Senior Notes due November 15, 2009 (the "November 1999 Offering"); and

    c.    a September 20, 2000 offering of 10 7/8% Senior Notes due October 1, 2010 (the "September 2000 Offering").

134.    As described in Exhibit A, Huff made additional purchases on behalf of the Beneficial Owner of each of the securities described above in the secondary market following the public offerings. In addition, as described in Exhibit A, since May 31, 1999, Huff has made purchases on behalf of the Beneficial Owner on the secondary market of the following Adelphia high yield debt securities, which were issued in public offerings made prior to May 31, 1999:

    a.    Adelphia 9 7/8% Senior Notes due March 1, 2005;

    b.    Adelphia 9 7/8% Senior Notes due March 1, 2007;

    c.    Adelphia 10 1/2% Senior Notes due July 15, 2004;

    d.    Century 0% Senior Notes due January 15, 2008;

    e.    Adelphia 8 1/4% Senior Notes due July 15, 2003; and

    f.    Adelphia 7 7/8% Senior Notes due May 1, 2009.

135.    In the course of making the above purchases, Huff eyeballed, read, reviewed and relied upon all of Adelphia's SEC filings, registration statements and prospectuses in an effort to consider all publicly-available material information about Adelphia and the securities concerned.

### III. Deloitte's and the Underwriter Defendants' Involvement In Adelphia's Misconduct

136.    Deloitte and the Underwriter Defendants failed to disclose Adelphia's true financial condition by preparing all or a portion of the misleading registration statements, prospectuses and public filings. Each of these entities had a role to play under the federal

securities laws -- laws which were designed to protect investors from deceptive issuers of securities. However, Deloitte and the Underwriter Defendants failed to perform their roles faithfully. At a minimum, had these defendants performed their roles with anything resembling the requisite degree of diligence, they would have discovered the flagrant misrepresentations and material omissions contained in the offering documents and public filings with which they were associated.

137. In light of the revelations in the May 2002 8-K and the June 10, 2002 8-K, it has become abundantly clear that, throughout the entire period when Huff was purchasing Adelphia debt securities in the offerings described above, Adelphia's image -- as described in public filings, registration statements and prospectuses prepared, reviewed and/or approved by the Underwriter Defendants and the Individual Defendants and in connection with which the Deloitte made expert statements that were materially false and misleading -- was starkly different from the reality of what was happening inside the Company. While Adelphia and the other defendants heralded the Rigas Family's management of Adelphia and its substantial equity investments in the Company, in fact the Rigases ran Adelphia as if it existed solely to benefit them. Adelphia and the Defendants failed to disclose the Rigas Family's egregious acts of self-dealing -- as well as Adelphia's false inflation of subscribers, EBITDA and capital expenditures -- from the outside world so as to maintain Adelphia's ability to obtain new equity and debt financing from investors like Huff and keep the Rigases' gravy train running. This concealment was achieved through a series of extremely misleading registration statements, prospectuses and public SEC filings on which Huff relied to its detriment in making its purchases of Adelphia securities, and which artificially inflated the price of the Company's securities.

138. Indeed, Adelphia's restatement of its consolidated balance sheets and financial statements and figures for 2000, and its announced intention to restate the results for 1999 and 2001, and perhaps other periods as well, to properly account for the co-borrowing arrangements is an admission that the financial statements for these periods were false and misleading at the time they were made and that the inaccurate and omitted information therein

was material to investors like Huff. In addition to restating its results for the fiscal year ended December 31, 2000, the Company released preliminary revised financial results for the fiscal year ended December 31, 2001. Under GAAP, companies may restate financial statements only when there has been a change in the reporting entity, a change in governing accounting principles or a material error in the previously issued financial statements that needs to be corrected. Adelphia's announced restatement clearly resulted from the need to correct material errors in its previously-reported financial statements, and not from a change in reporting entity or accounting principles. Consequently, by announcing a restatement and its intention to restate further, Adelphia admitted that its previously-reported financial statements were and are materially false and misleading.

### A.     Deloitte

139.   Deloitte was heavily involved in virtually every aspect of Adelphia's business. Deloitte audited Adelphia's consolidated financial statements and prepared Adelphia's tax returns. In addition, Deloitte provided auditing and accounting services to the Managed Entities and the Rigas Entities. As a result, Deloitte was on both sides of the fence, giving it a complete picture of the finances, operations and business of Adelphia, its subsidiaries, the Managed Entities and the Rigas Entities.

140.   As Adelphia's independent auditor, Deloitte's responsibilities spread far beyond the confines of the Company. Investors -- like Huff -- rely on the audits of independent accounting firms like Deloitte when making investment decisions. If Deloitte states it has reviewed a company's books and records, audited their financial statements, and certified that the financial statements are accurate and prepared in accordance with GAAP, that certification is an assurance to investors that they can safely rely on the data contained in those financial statements. The core of GAAP is the principle that complete financial statements must disclose all material information necessary to fairly and validly represent the underlying events and conditions. Capital markets cannot function properly if investors are unable to rely on auditors' work product.

141. GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X, 17 C.F.R. § 210.4-01(a)(1), states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate. As set forth in Financial Accounting Standards Board ("FASB") Statement of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, ¶42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

142. Four GAAP standards are of particular relevance to this case. First, SFAS 125 (now SFAS 140) provides that debt can be extinguished from a balance sheet only when (a) the debtor pays its creditor and is relieved of its obligation for the liability, or (b) the debtor is legally released from being the primary obligor under the liability either judicially or by the creditor.

143. Second, GAAP provides specific guidance on how to properly disclose and record loss contingencies in Statement of Financial Accounting Standard ("SFAS") No. 5. Paragraph 8 of SFAS No. 5 provides that:

> An estimated loss from a loss contingency . . . shall be accrued by a charge to income if both the following conditions are met: (a) Information available prior to the issuance of the financial statements indicate that it is probable that . . . a liability had been incurred at the date of the financial statements. It is implicit in this that it must be probable that one or more future events will occur confirming the fact of the loss; (b) The amount of loss can be reasonably estimable.

144. Paragraph 10 of the SFAS No. 5 provides that

> If no accrual is made for a loss contingency because one or both of conditions in paragraph 8 are not met . . . disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred . . . Disclosure is not required of a loss contingency involving an unasserted claim or assessment when there has been no manifestation by a potential claimant of an awareness of a possible claim or assessment unless it is considered probable that a claim will be asserted and there is a reasonable possibility that the outcome will be unfavorable.

145. Third, GAAP has a specific standard -- SFAS No. 57 -- that governs disclosures of related party transactions, which include transactions between a company and its management, principal owners or affiliates of such parties. To comply with SFAS No. 57, a company's financial statements must disclose certain material information about such transactions, including the nature of the relationships involved, a description of the transactions, the dollar amounts involved and any amounts due to or from a related party as of the date of the balance sheet along with the terms and manner of settlement of such payments. Sufficient information must be disclosed to enable a reviewer of the disclosure to understand the effects of the related party transactions on the financial statements. SFAS No. 57 also prevents an auditor from presuming that a related party transaction was conducted at arms-length.

146. In addition to SFAS No. 57, Item 404 of Regulation S-K requires disclosure of any transaction in an amount greater than $60,000 in which an executive officer of a company has a material interest. The instructions to this section provide that:

> The materiality of any interest is to be determined on the basis of the significance of the information to investors in light of all the circumstances of the particular case. The importance of the interest to the person having the interest, the relationship of the parties to the transaction with each other and the amount involved in the transaction are among the factors to be considered in determining the significance of the information to investors.

147. Fourth, Emerging Issues Task Force No. 85-1, "Classifying Notes Received for Capital Stock," which is based upon SEC Staff Accounting Bulletin No. 40, Topic 4-E, "Receivables from Sale of Stock," provides that a company that records a note or receivable

as payment for its stock should record the note as a reduction to shareholder's equity and not as an asset.

148.  Item 303 of Regulation S-K imposes a duty on companies to disclose in their public filings with the SEC "known trends or any known demands, commitments, events or uncertainties" that are reasonably likely to have a material impact on the company's sales revenues, income or liquidity, or cause previously reported financial information not to be indicative of future operating results.

149.  In addition to the specific standards discussed above, GAAP also establishes principles that govern sound financial reporting, including:

    a.  The principle that financial reporting should provide information that is useful to current and potential investors and creditors and others in making rational investment, credit and similar decisions (Concepts Statement No. 1, ¶34);

    b.  The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶40);

    c.  The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶50);

    d.  The principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least

partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶42);

   e.   The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶58-59);

   f.   The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶79);

   g.   The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶95, 97);

   h.   The principle embodied in SFAS No. 57 and Item 404 of Regulation S-K that all material information be disclosed concerning material related party transactions;

   i.   The principle embodied in Item 303 of Regulation S-K that all known trends or any known demands, commitments, events or uncertainties that are reasonably likely to have a material impact on the company's sales revenues, income or liquidity, or cause previously reported financial information not to be indicative of future operating results be disclosed.

   150.   In Independent Auditors' Reports made part of the March 1998 10-K, the 1998 10-K, the 1999 10-K and the 2000 10-K, Adelphia's Annual Reports for the years ended March 31, 1996, March 31, 1997 and March 31, 1998, Deloitte represented that, as independent auditor, (1) it had audited Adelphia's consolidated financial statements reported in those public filings in accordance with Generally Accepted Auditing Standards ("GAAS"), (2) Adelphia's consolidated financial statements fairly presented, in all material respects, the financial position of Adelphia and its subsidiaries and the results of their operations and cash flows for the periods covered by the statements, and (3) the consolidated financial statements had been prepared in

accordance with GAAP. Each of these representations was false.

151. In fact, Deloitte did not act as an "independent" auditor. Rather, in order to protect its position as the accountant for Adelphia and its subsidiaries, the Managed Entities and the Rigas Entities, and to maintain its close relationship and secure other business with the Rigas Family, Deloitte compromised its objectivity and independence by actively seeking to protect the wrongful and deceptive conduct of Adelphia and the Rigas Family from disclosure to Huff and the investing public. Moreover, Deloitte failed to conduct its audits of Adelphia's consolidated balance sheets and financial statements in accordance with GAAS.

152. In addition, as discussed below in greater detail, Adelphia's financial statements audited by Deloitte, *inter alia*, (1) failed to adequately disclose material information about the Co-Borrowing Facilities and other related party transactions between Adelphia and its subsidiaries, on the one hand, and the Rigas Family, the Rigas Entities and the Managed Entities, on the other, in violation of SFAS 5 and SFAS 57; (2) failed to disclose any information about the Rigas Family's self-dealing and exploitation of Adelphia's corporate funds and resources for their own purposes; (3) conveyed a totally misleading picture of Adelphia's financial condition and results; (4) reported debt figures that were highly misleading due to Adelphia's reallocation of co-borrowing debt to Managed Entities in violation of SFAS 125; and (5) contained numerous accounting irregularities, as described in the June 10, 2002 8-K.

153. Adelphia was more than simply a guarantor under the Co-Borrowing Facilities. To the contrary, Adelphia was jointly and severally liable as a primary obligor for repayment of all amounts borrowed under the Co-Borrowing Facilities -- whether nominally borrowed by an Adelphia subsidiary, a Rigas Entity or a Managed Entity. The entire amount outstanding under the Co-Borrowing Facilities at any given time constituted an actual, non-contingent debt of Adelphia and its subsidiaries. Under GAAP, the entire amount of this debt had to be disclosed as part of the consolidated debt figures on Adelphia's balance sheet.

154. Adelphia's pattern of "transferring" or "allocating" co-borrowing debt to Rigas Entities or Managed Entities does not change this result. Under SFAS 140, the co-