borrowing debt could only be removed from Adelphia's balance sheet if a borrower repaid it to the co-borrowing lender or if the lender (or a court) released Adelphia from its obligation. Simply declaring that a Rigas Entity, rather than an Adelphia subsidiary, will now be solely responsible for repayment of the debt -- in direct contravention of the terms of the credit agreements making the Adelphia subsidiary a joint obligor -- is woefully inadequate under SFAS 140 to justify not disclosing the debt as debt of Adelphia in the financial statements. Adelphia and Deloitte's failure to disclose in Adelphia's balance sheets co-borrowing debt that was "reallocated" to Rigas Entities thus violated SFAS 140.

155. Moreover, even if the co-borrowing debt is properly considered a contingent liability of Adelphia under SFAS 5, the failure to disclose the full amount of that debt violated GAAP under the facts of this case. The only arguable contingency on Adelphia's obligation to repay the co-borrowing loans (which requires viewing Adelphia as a guarantor and ignoring the fact that Adelphia and its subsidiaries are jointly and severally liable for repayment of the debt under the credit agreements) is the financial wherewithal of the Rigas Entities and Managed Entities. If the Rigas Entities lacked the ability to repay the borrowed amounts, Adelphia would have to repay them. Given the plainly inadequate assets of the Rigas Entities and the Managed Entities in relation to the debt owed, there was a "reasonable possibility" within the meaning of SFAS 5 that Adelphia would be called upon to repay all of the co-borrowed amounts itself. As a result, SFAS 5 required that the full amount of the co-borrowing debt be disclosed as debt of Adelphia on the Company's balance sheets.

156. In flagrant violation of SFAS 57 and Item 404 of Regulation S-K, Adelphia's audited financial statements and 10-Ks disclosed no details at all about any of the related party transactions between Adelphia and the Rigas Defendants (or entities under their control). Even where these documents disclosed the existence of some transactions -- such as the Rigases' securities purchases or the co-borrowing facilities -- the disclosures omitted huge amounts of material information. In the case of the co-borrowing arrangements, Adelphia and Deloitte never disclosed even the fact that amounts had been drawn down on the co-borrowing

facilities, who borrowed the money, or what the borrower used the money for. In the case of the securities purchases, Adelphia and Deloitte left out the critical facts that the Rigases either did not give the Company any cash for the securities or simply borrowed the money used to buy the securities from the co-borrowing facilities that Adelphia was responsible to repay.

157. Adelphia's audited financial statements also violated GAAP -- specifically, the principles set forth in Emerging Issues Task Force No. 85-1, "Classifying Notes Received for Capital Stock" -- by failing to reduce Adelphia's reported shareholder's equity as a result of the cashless, sham purchases of Adelphia securities by the Rigases. Because Adelphia received no cash for these purchases, but merely transferred co-borrowing debt and recorded a receivable as payment from the purchasing Rigas Entity, Adelphia should have recorded a reduction to shareholder's equity on its financial statements.

158. In addition to making material misrepresentations and omissions in violation of GAAP, Deloitte failed to conduct a reasonable audit under GAAS. The essence of GAAS is the duty of the auditor to exercise independent professional judgment when conducting an audit. The auditor must exercise "professional skepticism," which means "an attitude that includes a questioning method and critical assessment of audit evidence. The auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence." Codification, AU § 230.

159. Consistent with this requirement of professional skepticism, GAAS requires an auditor to look behind the representations made by a company's management, and instructs auditors that company representations are no "substitute for the auditing procedures necessary to afford a reasonable basis for" the auditor's "opinion on the financial statements." Codification, AU § 333(a). In fact, an auditor must not discount the possibility of fraud or other intentional wrongdoing by management. In fact, GAAS imposes a responsibility on auditors to "plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." Codification,

AU §§ 110, 316.

160. In conducting an audit, "the auditor should obtain an understanding of internal control sufficient to plan the audit by performing procedures to understand the design of controls relevant to an audit of financial statements and determining whether they have been placed in operation." Codification, AU § 319.02. The audit must also involve an evaluation of "the effectiveness of an entity's internal control in preventing or detecting material misstatements in financial statements." Codification, AU § 319.64.

161. GAAS requires auditors to carefully scrutinize transactions between the company and related entities, to obtain as much information about such transactions as is necessary to fully understand their implications for the company's financial statements, and to ensure that the transactions are adequately disclosed to investors. An auditor must "be aware of the possible existence of material related party transactions that could affect the financial statements and of common ownership or management control relations for which" disclosure is required under GAAP. Codification, AU § 334.04. Consequently, the "auditor should place emphasis on testing material transactions with parties he knows are related to the reporting entity," evaluate "the company's procedures for identifying and properly accounting for related party transactions" and employ procedures to "obtain satisfaction concerning the purpose, nature and extent" of the related party transactions and their impact on the financial statements. Codification, AU § 334.

162. In order to thoroughly vet related party transactions, an auditor must:
- Obtain an understanding of the business purposes of the transaction;
- Examine invoices, executed copies of agreements, contracts, and other pertinent documents, such as receiving reports and shipping documents;
- Determine whether the transaction has been approved by the board of directors or other appropriate officials;
- Test for reasonableness the compilation of amounts to be disclosed, or considered for disclosure, in the financial statements;

- Arrange for audits of intercompany account balances . . . and for the examination of specified, important and representative related party transactions by the auditors for each of the parties, with appropriate exchange of relevant information;

- Inspect or confirm and obtain satisfaction concerning the transferability and value of collateral;

- With respect to material uncollected balances, guarantees, and other obligations, obtain information about the financial capability of the other party or parties to the transaction;

  163. In addition, under GAAS, for each material related party transaction for which GAAP requires disclosure, "the auditor should consider whether he has obtained sufficient competent evidential matter to understand the relationship of the parties and, for related party transactions, the effects of the transaction on the financial statements. He should then evaluate all the information available to him concerning the related party transaction or control relationship and satisfy himself on the basis of his professional judgment that it is adequately disclosed in the financial statements."

  164. In violation of GAAS, Deloitte failed to design its audits in such a way as to provide reasonable assurance that material errors would be detected, as required by Statement of Auditing Standards No. 82. Indeed, GAAS sets forth a list of "red flags" that auditors are supposed to look for in attempting to ferret out fraudulent financial reporting. As follows, several of these red flags were in plain sight at Adelphia and should have caused Deloitte to treat Adelphia as a high-risk audit:

> Motivations for management to engage in fraudulent financial reporting, including a significant portion of management's total compensation being represented by bonuses, stock options, or other incentives, the value of which was contingent upon the entity achieving unduly aggressive targets for operating results, financial position, or cash flow;

An excessive interest by management in maintaining or increasing the entity's stock price or earnings trend through the use of unusually aggressive accounting practices;

Significant pressure to obtain additional capital necessary to stay competitive considering the financial position of the entity -- including the need for funds to finance major research and development or capital expenditures;

Significant related-party transactions not in the ordinary course of business or with related entities not audited or audited by another firm;

Overly complex organization structure involving numerous or unusual legal entities, managerial lines of authority, or contractual arrangements without apparent business purpose;

Failures by management to display and communicate an appropriate attitude regarding internal control and the financial reporting process, including lack of effective oversight by the Board or Audit Committee; [and]

Unusually high dependence on debt or marginal ability to meet debt repayment requirements; debt covenants that are difficult to maintain[.]

165. Furthermore, Deloitte, in violation of GAAS, failed to obtain sufficient "evidential matter" on which to reasonably base its opinion, and failed to corroborate and confirm the evidence it did obtain.

166. Adelphia has restated its financial results for 2000, and announced that its financial statements for the years 1999 and 2001 and possibly other periods must also be restated to properly account for at least $2.5 billion in borrowings by the Rigas Family under the Co-Borrowing Facilities, thereby conceding the materiality of this information to investors. Given the existence of co-borrowing arrangements going back to 1996, and the other deceptive practices appearing in Adelphia's financial statements, it can be expected that the data for 1996, 1997 and 1998 will need to be restated as well. Nevertheless, with its audit of its 2001 results still incomplete, Adelphia fired Deloitte in June 2002, a clear indication that Adelphia's new non-Rigas management lost confidence in Deloitte's ability to competently audit the Company'

financials.

### B.   The Underwriter Defendants

167.   Adelphia's public offerings of debt securities were managed by underwriters, who purchased notes from Adelphia and re-sold them to Huff and other investors. Like independent auditors, under the federal securities laws underwriters perform a critical prophylactic function for investors. Underwriters, who are often affiliated with large commercial banks, are experts in the securities business and have the financial and intellectual resources to investigate and evaluate the *bona fides* of a company's public offerings of securities. Underwriters have complete access to the issuer's inside information and the expertise to evaluate it. Moreover, underwriters will hire experts -- like attorneys -- to cover matters about which they lack sufficient knowledge. The securities laws impose a duty on underwriters to do precisely that when they decide to put their name on a particular offering.

168.   The array of underwriters on Adelphia's public offerings of debt securities reads like a "who's who" of the investment banking world. Salomon and Banc of America are considered among the cream of the crop when it comes to underwriting public offerings of securities. When merely one of these underwriters puts its imprimatur on an offering, investors believe they can rely on whatever is said in the offering documents. When a group of underwriters of this caliber does so -- as happened repeatedly on Adelphia's offerings -- the assurance provided to investors is all the more substantial. Investors rely on underwriter integrity, and the underwriters that participated in Adelphia's offerings would not have risen to the top of their industry had they not gained investor confidence.

169.   By associating themselves with a particular offering, underwriters make a representation to potential investors that: (1) the underwriters have conducted an investigation of the offering and the issuer in accordance with prevailing professional standards; (2) the investigation conducted by the underwriters was designed to probe and verify the accuracy of the statements and data provided by the issuer, and was not merely based on blind reliance upon those statements and data; and (3) based on that investigation, the underwriters have concluded

that the representations made in the registration statement and prospectus for the offerings are true, accurate and complete. Stated differently, an underwriter's name on a registration statement or prospectus is a representation to investors that they can rely on the accuracy and completeness of what is contained in those documents.

170. While hardly an exhaustive list, an underwriter's "due diligence" investigation -- conducted with the assistance of a law firm -- in connection with a public offering includes, *inter alia*: (1) attending presentations by the issuer's management; (2) asking questions of management, as well as of the issuer's auditors and lawyers; (3) requesting, reviewing and analyzing the issuer's financial statements and data, internal documents, corporate books and records and business plans, whether or not publicly available; (4) conducting site visits of the issuer's operations and facilities; (5) speaking with the issuer's customers, competitors and lenders to obtain an accurate picture of the issuer's condition and competitive environment; (6) examining the issuer's prior public offerings; (7) examining each and every material contract affecting the issuer; (8) evaluating the accuracy and support available for each and every statement contained in the offering documents; and (9) comprehensively evaluating all aspects of the issuer's operations -- capital structure, sales, marketing, facilities, infrastructure, labor force, management, financing, major contracts, legal, accounting issues and litigation.

171. The Underwriter Defendants were named in and participated in the drafting and preparation of the registration statements and prospectuses used in connection with the November 1999 Offering and the September 2000 Offering. The Underwriter Defendants owed a duty to make a reasonable and diligent investigation of the statements contained in these registration statements and prospectuses. Indeed, the Underwriter Defendants were obligated to review and verify the statements in each and every paragraph and sentence of these documents to ensure their accuracy and completeness.

172. As described below in greater detail, the registration statements and prospectuses used in connection with the November 1999 Offering and the September 2000 Offering contained numerous material misrepresentations and omissions concerning the financial

condition and results of Adelphia, the transactions between Adelphia and its subsidiaries, on the one hand, and the Rigas Family, the Rigas Entities and the Managed Entities, on the other, and the Rigas Family's self-dealing and exploitation of Adelphia's corporate funds and resources for their own purposes. The Underwriter Defendants failed to conduct a reasonable investigation and reasonable due diligence with respect to these offerings, and, as a consequence, failed to detect or correct the material misrepresentations and omissions contained in the registration statements and prospectuses for these offerings.

173. Moreover, the Underwriter Defendants were affiliated with commercial banks -- Citibank and Bank of America -- who extended several billion dollars in bank loans -- including co-borrowing facilities -- to Adelphia subsidiaries and Managed Entities. Adelphia depended on these loans to provide the liquidity necessary to finance its operations and the nefarious deeds described herein.

174. Beginning long before the events that gave rise to this litigation occurred, the Underwriter Defendants and their commercial bank affiliates developed a close relationship with Adelphia and the Rigas Family. Shortly after the Company's initial public offering in 1986, Adelphia, through the Rigas Family, began to establish significant relationships with each of the Underwriter Defendants and their affiliate banks, who provided significant debt and equity financing, underwriting, investment banking advice and other financial services to Adelphia, to certain of the Managed Entities and RFEs, and directly to members of the Rigas Family over the next sixteen years. Indeed, the Underwriter Defendants and banks were intimately involved, on a non-arms length basis, in the financial affairs of Adelphia and the Rigas Family.

175. Thus, the Underwriter Defendants rendered substantial financial advisory services to Adelphia and, after reviewing Adelphia's confidential and proprietary information, advised Adelphia on financing acquisitions and their business plans. For example, Banc of America and Salomon acted as mergers and acquisitions advisors to Adelphia for various acquisitions of cable systems around the country. In connection with those services, Banc of America and Salomon had their bank affiliates, Bank of America and Citibank, offer bridge

loans to finance Adelphia's acquisitions.

176. The Underwriter Defendants and affiliated banks shared all material information about the debtors' businesses and finances. Securities analysts and investment bankers at each Underwriter Defendant freely exchanged information about Adelphia with commercial banking personnel at the corresponding bank affiliate involved in the provision of loans and commercial banking services to Adelphia. Indeed, Adelphia's underwriting agreements with the Underwriter Defendants apparently authorized information-sharing between the Underwriter Defendants and their bank affiliates. One of these underwriting agreements provided that:

> The Investment Banks may . . . share any Offering Document, the Information and any other information or matters relating to Company, any assets to be acquired or the transactions contemplated hereby with Bank of America, N.A. ("BofA") and Citibank, N.A. (together with SSBI, "Citi/SSB") and BofA and Citi/SSB affiliates may likewise share information relating to Company, such assets or such transaction with the Investment Banks.

177. In addition to sharing information, each Underwriter Defendant worked as a team with its respective bank affiliate to provide "one stop shopping" financial services to Adelphia and ensure that they extracted maximum fee income from Adelphia. For example, Banc of America "deal teams" for many Adelphia securities offerings included employees of both Banc of America and Bank of America. The December 21, 2000 agreement pursuant to which Adelphia retained Banc of America to act as, among other things, its investment advisor, states: "For purposes of this engagement letter, 'BAS' shall mean Banc of America Securities LLC and/or any affiliate thereof, including BofA, as BAS shall determine to be appropriate to provide the services contemplated herein[.]"

178. Similarly, in performing the acts described herein, Salomon, Citibank and their affiliates acted together in pursuit of a common plan, such that each acted on behalf of, and as the agent for, the others. Among other things, these entities shared information and worked as

a "team" to obtain investment bank engagements and to extend credit to Adelphia, including presenting themselves to Adelphia as a single provider of financing and related services and products. As part of this approach, Citibank and its affiliates at times conditioned the extension of credit by one or more of them to Adelphia and the Rigas Family on Adelphia's engaging another of them to provide investment banking services, and *vice versa.*

179.   The Underwriter Defendant and their bank affiliates also ignored any real distinction between lending and investment banking divisions in their dealing with Adelphia and the Rigas Family. Adelphia deal teams for these entities also included employees from both lending and investment banking groups.

180.   Moreover, the Underwriter Defendants and their affiliated banks made no meaningful distinction between Adelphia, the Rigas Family, and the Managed Entities. Indeed, they realized that the key to doing business with Adelphia was to satisfy the personal financial whims of the Rigas Family. For example, in internal documents, Bank of America and Banc of America often referred to their business with Adelphia and the Rigas Family as part of a "Rigas Family" connection, and Citibank and its affiliates often referred to Adelphia and the Rigas Family interchangeably.

181.   Many of the co-borrowing and other credit facilities extended to Adelphia and the Rigas Family by the Underwriter Defendants' bank affiliates contained terms -- such as duration, interest rates, re-payment conditions, etc. -- that were extremely favorable to the borrowers. The banks acceded to these terms because of the promise of lucrative fees to the Underwriter Defendants, which was their primary motivation in their dealings with Adelphia. The "Rigas Family" connection was extremely lucrative for each of the Underwriter Defendants and their affiliated banks.

182.   To obtain these lucrative fees, the banks approved the co-borrowing facilities even though their total credit exposure to Adelphia and the Rigas Family exceeded lending policy limits. For example, Citibank authorized an exception to its exposure limit in connection with its approval of the Olympus Co-Borrowing Facility and justified that exception

based upon "future capital markets opportunities." Based on a similar motive, Salomon authorized margin loans for the Rigas Family that were outside house limits.

183. The Rigas Defendants clearly recognized that offering the enticement of investment banking fees would cause the banks to participate in the co-borrowing facilities. In his February 17, 2000 letter to certain banks regarding the CCH Co-Borrowing Facility, James Brown stated that:

> All of the lead managers and co-managers of each of these credit facilities are expected to have an opportunity to play a meaningful role in either the ADLAC or ABIZ public security offerings.

Thus, by agreeing to participate in the CCH Co-Borrowing Facility, among others, these banks all but insured that their affiliated Underwriter Defendants would garner substantial fees.

184. The Underwriter Defendants also structured public offerings of Adelphia securities to generate proceeds that Adelphia used to pay off debt owed to their affiliated commercial banks, thereby transferring the risk of default to the unsuspecting investing public.

## IV. The June 1999 Offering

### A. Background

185. The June 1999 Offering was an exchange offer undertaken to satisfy Adelphia's contractual obligations under a Registration Rights Agreement it had entered into with purchasers of unregistered 7 ½% Senior Notes and 7 ¾% Senior Notes issued in January 1999 issued pursuant to SEC Rule 144A.

186. Under the terms of the June 1999 Offering, Adelphia offered to take back the notes issued in January and issue in exchange new, fully-registered 7 ½% Senior Notes and 7 ¾% Senior Notes. Purchasers of the notes issued in January were entitled to obtain the new notes upon tendering the old ones to Adelphia in accordance with the terms of the offer. This process is commonly known as an "exchange offer."

187. The June 1999 Offering was made pursuant to a Form S-4 Registration Statement, Registration No. 333-75995, filed with the SEC on April 9, 1999 (the "April 1999 Registration Statement"), a Form S-4/A filed on May 11, 1999 amending the Registration

Statement, and a prospectus dated May 14, 1999 (the "Exchange Offer Prospectus") filed as part of the amended April 1999 Registration Statement. The Exchange Offer Prospectus was substantially identical to the placement memorandum Adelphia and the underwriters used to sell the 144A notes.

188. John Rigas, Michael Rigas, Timothy Rigas, and James Rigas each signed the Form S-4 and S-4/A pursuant to which the June 1999 Offering was made.

189. Deloitte consented to being named in the Exchange Offer Prospectus and the Registration Statement, as amended, as having audited and certified the financial statements for Adelphia incorporated into the prospectus by reference from Adelphia's Form 10-K for the fiscal year ended March 31, 1998.

190. As detailed below, the Exchange Offer Prospectus incorporated in the April 1999 Registration Statement, contained numerous materially misleading statements and omitted information material to investors.

191. Huff participated in the June 1999 Offering by tendering to Adelphia the 7 ½% Senior Notes and 7 ¾% Senior Notes it had purchased in and after January 1999 and obtaining new notes in exchange. In addition, subsequent to the June 1999 Offering, Huff made additional purchases on the secondary market of 7 ½% Senior Notes and 7 ¾% Senior Notes that Adelphia issued as part of the June 1999 Offering. In making these purchases, Huff relied on the misleading statements and omissions contained in the April 1999 Registration Statement and the Exchange Offer Prospectus.

B.    **Materially Misleading Statements**

192. The Exchange Offer Prospectus incorporated by reference Adelphia's Form 10-K for the fiscal year ended March 31, 1998 (the "March 1998 10-K"). Far from presenting an accurate picture of the financial operations and condition of Adelphia and its subsidiaries and affiliates, the March 1998 10-K contains a host of distortions, misrepresentations and outright fabrications.

193. Beginning on page F-1, the March 1998 10-K presents Adelphia's

consolidated balance sheets and financial statements for the fiscal years ended March 31, 1997 and March 31, 1998.

194.     The consolidated financial statements for Adelphia contained in the March 1998 10-K stated that the total consolidated debt for Adelphia and its subsidiaries was $2,544,039,000 for the fiscal year ended March 31, 1997, and $2,909,745,000 for the fiscal year ended March 31, 1998. Immediately prior to the presentation of this information in the March 1998 10-K is the Independent Auditors' Report of Deloitte. In the Auditors' Report, Deloitte makes the following representations:

- that Deloitte functioned as an "independent" auditor;

- that Deloitte conducted an audit of the "consolidated balance sheets of Adelphia Communications Corporation and subsidiaries as of March 31, 1997 and 1998, and the related consolidated statements of operations, of convertible preferred stock, common stock and other stockholders' equity (deficiency), and of cash flows for each of the three years in the period ended March 31, 1998;"

- that Deloitte "conducted [its] audits in accordance with generally accepted auditing standards;"

- that Deloitte's audits "provide a reasonable basis for" its opinion concerning Adelphia's financial statements;

- that, in Deloitte's opinion, Adelphia's consolidated financial statements "present fairly, in all material respects, the financial position of Adelphia Communications Corporation and its subsidiaries at March 31, 1997 and 1998, and the results of their operations and their cash flows for each of the three years in the period ended March 31, 1998 in conformity with generally accepted accounting principles;" and

- that, in Deloitte's opinion, the financial statement schedules contained in the March 1998 10-K, which Deloitte also represented it had audited in accordance with GAAS, "when considered in relation to the basic consolidated financial statements taken as a whole, present fairly in all material respects the information set forth therein."

-73-

195. All of the above representations were materially false and misleading in that Deloitte did not function as an independent auditor and did not audit Adelphia's consolidated financial statements in accordance with GAAS. Moreover, by failing to account for the amounts borrowed by the Managed Entities under the co-borrowing facilities, the consolidated financial statements contained in the March 1998 10-K were not prepared in accordance with GAAP and, indeed, provided a grossly deceptive presentation of the following material aspects of Adelphia's operations and financial condition:

- Total parent and subsidiary debt was represented to be $2,544,039,000 for the fiscal year ended March 31, 1997, and $2,909,745,000 for the fiscal year ended March 31, 1998. In fact, these figures understated Adelphia's total consolidated debt by several hundred million dollars for each of these periods.

- Total convertible preferred stock, common stock and other stockholders' equity were represented to be deficient by $1,253,881,000 for the fiscal year ended March 31, 1997 and $1,315,865,000 for the fiscal year ended March 31, 1998. In fact, these figures overstated Adelphia's stockholder equity by several million dollars by failing to account for the fact that the equity securities purchased by the Rigases were paid for with funds borrowed under the co-borrowing facilities, which Adelphia and its subsidiaries are liable to repay.

- Revenue was overstated due to management fee income due from the Managed Entities that was never paid or intended to be paid, and due to Adelphia's inflation of their subscribers.

- Capital expenditures were grossly overstated.

- EBITDA was overstated through improper accounting practices.

- Interest expense - net was represented to be $232,325,000 for the fiscal year ended March 31, 1997, and $247,107,000 for the fiscal year ended March 31, 1998. In fact, these figures understated interest expense by several millions dollars by failing to account for interest due on the borrowings by the Managed Entities under the co-borrowing facilities.

- Similarly, total selling, general and administrative expenses ("SG&A")

-74-

were represented to be $81,763,000 for the fiscal year ended March 31, 1997, and $95,731,000 for the fiscal year ended March 31, 1998. In fact, these figures were understated by several million dollars by failing to account for amounts spent by Adelphia in connection with the operations of the Managed Entities.

- The understatements of SG&A expenses and interest expenses had the further effect of understating the amount of Adelphia's net losses for the same periods, which had been represented to be $130,642,000 for the fiscal year ended March 31, 1997, and $173,879,000 for the fiscal year ended March 31, 1998, but which were substantially higher in reality.

- Portions of the statements concerning Adelphia's cash flows were also misleading. Specifically, net cash provided by financing activities was represented to be $329,776,000 for the fiscal year ended March 31, 1997, and $712,606,000 for the fiscal year ended March 31, 1998. These figures were overstated by several million dollars because of the failure to account for the Managed Entities' co-borrowing activities, which resulted in understatement of Adelphia's repayments of debt on which the calculation of net cash provided by financing activities depends. In addition, the interest expenses in the calculation of Adelphia's cash flows were also understated as a result of the concealment of the co-borrowing arrangements.

196.   Although Adelphia acknowledged the existence of the co-borrowing arrangements in the March 1998 10-K, the amounts of the Managed Entities' borrowings under the co-borrowing arrangements were not included in Adelphia's statement of its total consolidated debt. Specifically, with respect to the co-borrowing arrangements, Adelphia stated, in a footnote:

> A subsidiary of Adelphia is a co-borrower with a managed partnership under a $200,000[,000] credit agreement. Each of the co-borrowers is liable for all borrowings under this credit agreement, although the lenders have no recourse against Adelphia other than against Adelphia's interest in such subsidiary.

197. This is the entire disclosure related to the co-borrowing facilities. The statement's rank inadequacy is apparent simply by contrasting it to the disclosures about the co-borrowing arrangements in Adelphia's May 2002 8-K.

198. This statement was materially false and misleading in that it represented to Adelphia investors that the co-borrowing arrangements were simply additional credit lines available for the legitimate business purposes of Adelphia's subsidiary, but which were also available for the use for legitimate business purposes of the Managed Entity. In reality, this disclosure hid from Adelphia's investors the true state of affairs, which was that the co-borrowing arrangement was strictly an artifice to conceal what was in actuality a guarantee by Adelphia of loans issued for the private use and benefit of the Rigas Family. In addition, when combined with the failure to include the amounts borrowed by the Managed Entity under the co-borrowing arrangements in the figures for Adelphia's consolidated debt, the disclosure quoted above misleads readers into believing that no amounts had been borrowed under the co-borrowing facilities, when in fact the Rigases had drawn down a substantial portion of the credit facility.

199. The statement regarding the co-borrowing arrangement was also materially misleading in that it failed to disclose:

(1) whether and in what amounts the co-borrowing facility had been drawn down, which left the misleading impression that no amounts had been drawn down;

(2) which entity drew down on the facilities, which would inform the investor whether the credit of Adelphia's subsidiary was being used for a legitimate purpose;

(3) what the proceeds were used for. In fact, the March 1998 10-K concealed the fact that the Managed Entities were using the proceeds of the co-borrowing facilities to purchase securities in Adelphia and other assets for the private use of the Rigas family; and

(4) whether the entity that borrowed funds under the facilities had the financial

-76-

ability to repay those borrowings. If it had been disclosed that the Managed Entity actually lacked the ability to repay, then Huff would have known that a high likelihood existed that Adelphia's subsidiary would have to repay the loan.

200. The March 1998 10-K contained the following additional material misrepresentations and omissions:

- Under Item 2, the March 1998 10-K stated that substantially all of the assets of Adelphia's subsidiaries "are subject to encumbrances as collateral in connection with the Company's credit arrangements, either directly with a security interest or indirectly through a pledge of the stock in the respective subsidiaries." What this failed to disclose was that, the assets of Adelphia's subsidiaries were pledged as collateral for loans taken by the Managed Entities and the Rigas Family that conferred no legitimate business benefits on Adelphia or its subsidiaries. Moreover, when considered in light of the failure to disclose the amounts borrowed by Managed Entities and the Rigas Family and the inability of those entities to repay, this disclosure misled Huff as to the degree to which the assets of Adelphia and its subsidiaries -- to which Huff looked to satisfy Adelphia's obligations under the securities purchased by Huff -- were at risk of being unavailable to support Adelphia's debt to Huff.

- Under Item 7, the March 1998 10-K described Adelphia's "financing strategy." This Item repeated the false figure of $2,909,745,000 for Adelphia's total outstanding debt for the fiscal year ended March 31, 1998. In addition, there is no disclosure that part of Adelphia's "financing strategy" included the use of co-borrowing facilities with the Managed Entities to finance the Rigas Family's acquisition of Adelphia securities and other assets for their personal use.

- The March 1998 10-K set forth "mandatory reductions in principal under all debt agreements for the next five years based on amounts outstanding at March 31, 1998" as follows: (a) $128,213,000 during the year ended March 31, 1999; (b) $50,268,000 during the year ended March 31, 2000; (c) $169,288,000 during the year ended March 31, 2001; (d)

-77-

$157,740,000 during the year ended March 31, 2002; and (e) $573,091,000 during the year ended March 31, 2003. These amounts were overstated, given that the "amounts outstanding at March 31, 1998" did not include amounts borrowed by the Managed Entities under the co-borrowing facilities.

201.   On page 3, the Exchange Offer Prospectus discussed a direct placement of Adelphia common stock with the Rigases in April 1999 for between $250 million and $375 million. These statements were materially false and misleading in that they failed to disclose that the Rigases were using proceeds from borrowings under the co-borrowing facilities to finance a substantial portion of their direct purchases of these securities, and that they lacked the ability to repay those borrowings. By failing to disclose this information, the Exchange Offer Prospectus misled Huff into believing that the Rigases were injecting new equity into Adelphia by means of these direct placements, when, in fact, Adelphia was merely incurring additional, undisclosed debt under the co-borrowing facilities that was senior to the notes purchased by Huff. Furthermore, by not disclosing these borrowings, the Exchange Offer Prospectus concealed from investors the risk that Adelphia's exposure on the co-borrowing arrangement would increase if the value of the assets supporting the Rigas Family's borrowings -- namely, the price of the Adelphia stock and other securities they bought with those borrowings -- fell to the point that a new infusion of cash into the Managed Entities became necessary in order to service the loans, or that the Managed Entities would be unable to pay. Nor does the Exchange Offer Prospectus disclose the risk of a severe adverse impact on Adelphia's stock price in the event that the lender on the co-borrowing facility is required to liquidate the Rigas Family's securities holdings in order to obtain repayment of the loan.

202.   On page 21, the Exchange Offer Prospectus stated that the Rigases at the time effectively controlled the voting power of Adelphia's outstanding common stock. This statement was materially false and misleading in that it did not disclose the far more pervasive extent to which the Rigas Family exercised day-to-day control over Adelphia and its cash resources beyond simply its ability to elect the Board of Directors. Nor did the Exchange Offer

Prospectus disclose the degree to which the Rigases were exercising that day-to-day control to self-deal.

203. On the same page, the Exchange Offer Prospectus stated that the outside business activities of the Rigases -- including their engagement in the cable television business outside of Adelphia -- "could present a conflict of interest with Adelphia." In addition, the Exchange Offer Prospectus noted that "there have been and will continue to be transactions between us and the executive officers or the other entities they own or with which they have affiliations." These disclosures were materially false and misleading in the following respects: First, while noting only that a conflict of interest "could" arise at some point in the future, the Exchange Offer Prospectus failed to disclose that severe conflicts of interest between the Rigases and Adelphia had already arisen by virtue of the Rigases' repeated pattern of engaging in self-dealing with Adelphia's financial resources. Second, although giving the impression that conflicts, when they do arise, will be brought to the attention of Adelphia's Board of Directors and evaluated for their fairness to Adelphia, the Exchange Offer Prospectus did not disclose that, in fact, the conflicts of interest that had already arisen were not brought to the Board's attention and were not the subject of fairness opinions. Third, the disclosure that transactions between Adelphia and its officers' affiliates will continue to occur was inadequate in that it did not disclose: (1) the nature of the transactions; (2) the parties involved; (3) the amounts at stake in such transactions; (4) the impact of such transactions on the operations and financial condition of Adelphia; and (5) the utter lack of internal controls to ensure fairness and prevent self-dealing. Specifically, the Exchange Offer Prospectus did not disclose that the Rigases had borrowed substantial amounts under the co-borrowing arrangements which they were unable to repay and for which Adelphia and its subsidiaries were liable, had used the proceeds of those borrowings for their own personal benefit, and had received numerous cash "advances" from Adelphia which they used for their own personal benefit.

V. **The November 1999 Offering**

    A. **Background**

204. The November 1999 Offering was made pursuant to a prospectus, dated May 14, 1999 (the "May 1999 Prospectus"), which Adelphia filed with the SEC as part of a Form S-3 Registration Statement, Registration No. 333-78027, on May 7, 1999 (the "May 1999 Registration Statement"), as well as a supplemental prospectus, dated November 10, 1999 (the "November 1999 Prospectus"), which Adelphia filed with the SEC on November 12, 1999 pursuant to Rule 424(b)(5). Both the May 1999 Prospectus and the November 1999 Prospectus are incorporated as part of the May 1999 Registration Statement.

205. Salomon acted as an underwriter in connection with the November 1999 Offering.

206. John Rigas, Michael Rigas, Timothy Rigas, and James Rigas each signed the May 1999 Registration Statement on behalf of Adelphia.

207. Deloitte consented to being named as an expert in the May 1999 Prospectus, the November 1999 Prospectus and the May 1999 Registration Statement as having audited and certified the consolidated financial statements for Adelphia as of March 31, 1998, December 31, 1998, and for the fiscal years ended March 31, 1997 and 1998 and the nine months ended December 31, 1998 incorporated by reference into the May 1999 Prospectus, the November 1999 Prospectus and the May 1999 Registration Statement.

208. As detailed below, the May 1999 Prospectus and November 1999 Prospectus, both of which were incorporated in the May 1999 Registration Statement, contained numerous materially misleading statements and omitted information material to investors in the securities issued by Adelphia in the November 1999 Offering.

209. Huff participated in the November 1999 Offering by purchasing 9 3/8% Senior Notes from Salomon. In addition, subsequent to the November 1999 Offering, Huff made additional purchases on the secondary market of 9 3/8% Senior Notes that Adelphia issued as part of the November 1999 Offering. In making these purchases, Huff relied on the misleading statements and omissions contained in the May 1999 Prospectus, November 1999 Prospectus and May 1999 Registration Statement.