**B.    Materially Misleading Statements**

210. The November 1999 Prospectus incorporated by reference Adelphia's Form 10-K for the transition period ended December 31, 1998 (the "1998 10-K"). Far from presenting an accurate picture of the financial operations and condition of Adelphia and its subsidiaries and affiliates, the 1998 10-K contains a host of distortions, misrepresentations and outright fabrications.

211. Beginning on page F-1, the 1998 10-K presented Adelphia's consolidated balance sheets and financial statements for the years ended March 31, 1998 and December 31, 1998.

212. Immediately prior to the presentation of this information in the 1998 10-K, was the Independent Auditors' Report of Deloitte. In the Auditors' Report, Deloitte made the following representations:

- that Deloitte functioned as an "independent" auditor;

- that Deloitte conducted an audit of the "consolidated balance sheets of Adelphia Communications Corporation and subsidiaries as of March 31, 1998 and December 31, 1998, and the related consolidated statements of operations, of convertible preferred stock, common stock and other stockholders' equity (deficiency), and of cash flows for the years ended March 31, 1997 and 1998 and the nine months ended December 31, 1998;"

- that Deloitte "conducted [its] audits in accordance with generally accepted auditing standards;"

- that Deloitte's audits "provide a reasonable basis for" its opinion concerning Adelphia's financial statements;

- that, in Deloitte's opinion, Adelphia's "consolidated financial statements "present fairly, in all material respects, the financial position of Adelphia Communications Corporation and its subsidiaries at March 31, 1998 and December 31, 1998, and the results of their operations and their cash flows for the years ended March 31, 1997 and 1998 and the nine months ended December 31, 1998 in conformity with generally accepted accounting principles;"

and

- that, in Deloitte's opinion, the financial statement schedules contained in the 1998 10-K, which Deloitte also represented it had audited in accordance with GAAS, "when considered in relation to the basic consolidated financial statements taken as a whole, present fairly in all material respects the information set forth therein."

213. All of the above representations were materially false and misleading in that Deloitte did not function as an independent auditor and did not audit Adelphia's consolidated balance sheets and financial statements in accordance with GAAS. Moreover, by failing to account for the amounts borrowed by the Managed Entities under the co-borrowing facilities, which began as early as 1996, the consolidated financial statements contained in the 1998 10-K were not prepared in accordance with GAAP and, indeed, provided a grossly deceptive presentation of the following material aspects of Adelphia's operations and financial condition:

- Total parent and subsidiary debt was represented to be $2,909,745,000 for the fiscal year ended March 31, 1998, and $3,527,452,000 for the year ended December 31, 1998. In fact, these figures understated Adelphia's total consolidated debt by several hundred million dollars for each of these periods.

- Total convertible preferred stock, common stock and other stockholders' equity were represented to be a deficiency of $1,315,865,000 for the fiscal year ended March 31, 1998, and $1,021,746,000 for the year ended December 31, 1998. In fact, these figures overstated Adelphia's stockholder equity by several million dollars by failing to account for the fact that the equity securities purchased by the Rigases were paid for with funds borrowed under the co-borrowing facilities, which Adelphia and its subsidiaries are liable to repay.

- Revenues were overstated due to management fees due from the Managed Entities that were neither paid nor intended to be paid, and due to the overstatement of Adelphia's subscribers.

- Capital expenditures were overstated.

- EBITDA was overstated through improper accounting practices.

- Interest expense - net was represented to be $247,107,000 for the fiscal year ended March 31, 1998 and $191,593,000 for the nine months ended December 31, 1998. In fact, these figures understate interest expense by several millions dollars by failing to account for interest due on the borrowings by the Managed Entities under the co-borrowing facilities.

- Similarly, total SG&A expenses are represented to be $95,731,000 for the year ended March 31, 1998, and $107,249,000 for the nine months ended December 31, 1998. In fact, these figures were understated by several million dollars by failing to account for amounts spent by Adelphia in connection with the operations of the Managed Entities.

- The understatements of SG&A and interest expenses had the further effect of understating the amount of Adelphia's net losses for the same periods, which had been represented to be $173,879,000 for the year ended March 31, 1998, and $115,130,000 for the nine months ended December 31, 1998, but which were substantially higher in reality.

- The portions of the statements concerning Adelphia's cash flows were also misleading. Specifically, net cash provided by financing activities was represented to be $712,606,000 for the year ended March 31, 1998, and $999,079,000 for the nine months ended December 31, 1998. These figures were overstated by several million dollars because of the failure to account for the Managed Entities' co-borrowing activities, which resulted in understatement of Adelphia's repayments of debt on which the calculation of net cash provided by financing activities depends. In addition, the interest expenses in the calculation of Adelphia's cash flows were also understated as a result of the concealment of the co-borrowing arrangements.

214. Although Adelphia acknowledged the existence of the co-borrowing arrangements in the 1998 10-K, the amounts of the Managed Entities' borrowings under the co-borrowing arrangements were not included in Adelphia's statement of its total consolidated debt. Specifically, with respect to the co-borrowing arrangements, Adelphia stated in a footnote:

A subsidiary of Adelphia is a co-borrower with a managed

partnership under a $200,000[,000] credit agreement. Each of the co-borrowers is liable for all borrowings under this credit agreement, although the lenders have no recourse against Adelphia other than against Adelphia's interest in such subsidiary.

215. This is the entire disclosure related to the co-borrowing facilities. This statement's rank inadequacy is apparent simply by contrasting it to the disclosures concerning the co-borrowing arrangements in Adelphia's May 2002 8-K.

216. This statement was materially false and misleading in that it represented to Adelphia investors that the co-borrowing arrangements were simply additional credit lines available for the legitimate business purposes of Adelphia's subsidiary, but which were also available for the use for legitimate business purposes of the Managed Entity. In reality, this disclosure hid from Adelphia's investors the true state of affairs, which was that the co-borrowing arrangement was strictly an artifice to conceal what was in actuality a guarantee by Adelphia of loans issued for the private use and benefit of the Rigas Family. In addition, when combined with the failure to include the amounts borrowed by the Managed Entity under the co-borrowing arrangements in the figures for Adelphia's consolidated debt, the disclosure quoted above misleads readers into believing that no amounts had been borrowed under the co-borrowing facilities, when in fact the Rigases had drawn down a substantial portion of the credit facility.

217. The statement regarding the co-borrowing arrangement was also materially misleading in that it failed to disclose:

> (1) whether and in what amounts the co-borrowing facility had been drawn down, which left the misleading impression that no amounts had been drawn down;
>
> (2) which entity drew down on the facilities, which would inform the investor whether the credit of Adelphia's subsidiary was being used for a legitimate purpose;
>
> (3) what the proceeds were used for. In fact, the 1998 10-K concealed the fact that the Managed Entities were using the proceeds of the co-borrowing facilities to purchase securities in Adelphia and other assets for the private use

-84-

of the Rigas family; and

(4) whether the entity that borrowed funds under the facilities had the financial ability to repay those borrowings. If it had been disclosed that the Managed Entity actually lacked the ability to repay, then Huff would have known that a high likelihood existed that Adelphia's subsidiary would have to repay the loan.

218. The 1998 10-K contained the following additional material misrepresentations and omissions:

- Under Item 2, the 1998 10-K stated that substantially all of the assets of Adelphia's subsidiaries "are subject to encumbrances as collateral in connection with the Company's credit arrangements, either directly with a security interest or indirectly through a pledge of the stock in the respective subsidiaries." What this failed to disclose was that the assets of Adelphia's subsidiaries were pledged as collateral for loans taken by the Managed Entities and the Rigas Family that conferred no legitimate business benefits on Adelphia or its subsidiaries. Moreover, when considered in light of the failure to disclose the amounts borrowed by Managed Entities and the Rigas Family and the inability of those entities to repay, this disclosure misled Huff as to the degree to which the assets of Adelphia and its subsidiaries -- to which Huff looked to satisfy Adelphia's obligations under the securities purchased by Huff -- were at risk of being unavailable to support Adelphia's debt to Huff.

- Under Item 7, the 1998 10-K described Adelphia's "financing strategy." This Item repeated the false figure of $3,527,452,000 for Adelphia's total outstanding debt for the year ended December 31, 1998. In addition, there was no disclosure that part of Adelphia's "financing strategy" included the use of co-borrowing facilities with the Managed Entities to finance the Rigas Family's acquisition of Adelphia securities and other assets for the Rigas Family's personal use.

- The 1998 10-K set forth "mandatory reductions in principal under all debt agreements for the next five years based on amounts outstanding at December 31, 1998" as

follows: (a) $101,402,000 during the year ended December 31, 1999; (b) $236,795,000 during the year ended December 31, 2000; (c) $190,403,000 during the year ended December 31, 2001; (d) $540,318,000 during the year ended December 31, 2002; and (e) $693,663,000 during the year ended December 31, 2003. These amounts were understated, given that the "amounts outstanding at December 31, 1998" did not include amounts borrowed by the Managed Entities under the co-borrowing facilities.

219. The November 1999 Prospectus incorporated by reference Adelphia's Form 10-Q for the quarter ended June 30, 1999 (filed with the SEC on or about August 16, 1999) (the "June 1999 10-Q"). The June 1999 10-Q, which was signed by Defendant Timothy Rigas, falsely reported that Adelphia had total consolidated debt of $3,794,539,000.

220. The June 1999 10-Q also stated:

> The accompanying unaudited condensed consolidated financial statements of Adelphia Communications Corporation and its majority owned subsidiaries . . . have been prepared in accordance with the rules and regulations of the Securities and Exchange Commission.
>
> In the opinion of management, all adjustments, consisting only of normal recurring accruals necessary for a fair presentation of the financial position of Adelphia at June 30, 1999, and the results of operations for the three and six months ended June 30, 1998 and 1999, have been included.

221. Adelphia's publicly-reported results for the second quarter of 1999 as reported in the June 1999 10-Q were materially false and misleading. As detailed above, Adelphia failed to disclose the full amount of its liability under the co-borrowing facilities. Adelphia's total consolidated debt and total liabilities were understated by at least $250 million through the deliberate omission of co-borrowing debt. As a result, the representation in the June 1999 10-Q that Adelphia's financial statements were fairly presented in accordance with SEC rules was also false.

222. On pages S-3 and S-5, the November 1999 Prospectus discussed two direct placements of Adelphia common stock with the Rigases in April and October 1999. These

-86-

statements were materially false and misleading in that they failed to disclose that the Rigases were using proceeds from borrowings under the co-borrowing facilities to finance a substantial portion of their direct purchases of these securities, and that they lacked the ability to repay those borrowings. By failing to disclose this information, the November 1999 Prospectus misled investors into believing that the Rigases were injecting new equity into Adelphia by means of these direct placements, when, in fact, Adelphia was merely incurring additional, undisclosed debt under the co-borrowing facilities that was senior to the notes purchased by Huff. Furthermore, by not disclosing these borrowings, the November 1999 Prospectus concealed from investors the risk that Adelphia's exposure on the co-borrowing arrangement would increase if the value of the assets supporting the Rigas Family's borrowings -- namely, the price of the Adelphia stock and other securities they bought with those borrowings -- fell to the point that a new infusion of cash into the Managed Entities became necessary in order to service the loans, or that the Managed Entities were unable to repay, leaving only Adelphia. Nor does the November 1999 Prospectus disclose the risk of a severe adverse impact on Adelphia's stock price in the event that the lender on the co-borrowing facility is required to liquidate the Rigas Family's securities holdings in order to obtain repayment of the loan.

223.   On pages S-7 to S-8, the November 1999 Prospectus represented that, as of June 30, 1999, the "Notes would have been effectively subordinated to approximately $6.0 billion of indebtedness and redeemable preferred stock of Adelphia's subsidiaries; and our total indebtedness excluding redeemable preferred stock would have been approximately $8.6 billion." These statements were materially false and misleading because, by not taking the amount of borrowings by the Rigases and the Managed Entities under the co-borrowing arrangements into account, the November 1999 Prospectus understated the amounts of indebtedness ostensibly senior to the notes and Adelphia's total indebtedness. This materially misleading representation was repeated on page S-10 of the November 1999 Prospectus.

224.   On page S-10, in its discussion of "Risk Factors," the November 1999 Prospectus disclosed that Adelphia had total indebtedness of $3.8 billion as of June 30, 1999.

-87-

This statement was materially false and misleading in that the figure for total indebtedness did not include amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements, which omission resulted in an understatement of Adelphia's total indebtedness.

225. On page S-12, the November 1999 Prospectus represented that Adelphia's total convertible preferred stock, common stock and other stockholders' equity at June 30, 1999 was approximately $267.7 million. This statement was materially false and misleading in that it overstated stockholders' equity by failing to account for the fact that the Rigases purchased Adelphia equity securities using proceeds from the co-borrowing arrangements which the Company was liable to repay. Rather than inject new equity into Adelphia, the securities purchased by the Rigases in reality created bank debt that was senior to the notes purchased by Huff.

226. On page S-18, the November 1999 Prospectus stated that the Rigases at the time effectively controlled the voting power of Adelphia's outstanding common stock. This disclosure was materially false and misleading in that it did not disclose the far more pervasive extent to which the Rigas Family exercised day-to-day control over Adelphia and its cash resources beyond simply its ability to elect the Board of Directors. Nor did the November 1999 Prospectus disclose the degree to which the Rigases were exercising that day-to-day control to self-deal.

227. On page S-18, the November 1999 Prospectus disclosed that the outside business activities of the Rigases -- including their engagement in the cable television business outside of Adelphia -- "could present a conflict of interest with Adelphia." In addition, the prospectus noted that "there have been and will continue to be transactions between us and the executive officers or the other entities they own or with which they have affiliations." These disclosures were materially false and misleading in the following respects: First, while noting only that a conflict of interest "could" arise at some point in the future, the prospectus failed to disclose that severe conflicts of interest between the Rigases and Adelphia had already arisen by virtue of the Rigases' repeated pattern of engaging in self-dealing with Adelphia's financial

resources. Second, although giving the impression that conflicts and transactions with the Rigas Family, when they do arise, will be brought to the attention of Adelphia's Board of Directors, approved by a majority of disinterested directors, and evaluated for their fairness to Adelphia after disclosure of all material facts as required by § 2.10 of Adelphia's By-Laws, the November 1999 Prospectus did not disclose that, in fact, the conflicts of interest that had already arisen were not properly approved by the Board in accordance with the By-Laws and were not fair to the Company. Third, the disclosure that transactions between Adelphia and its officers' affiliates will continue to occur was inadequate in that it did not disclose: (1) the nature of the transactions; (2) the parties involved; (3) the amounts at stake in such transactions; (4) the impact of such transactions on the operations and financial condition of Adelphia; and (5) the utter lack of internal controls to ensure fairness and prevent self-dealing. Specifically, the November 1999 Prospectus did not disclose that the Rigases had borrowed substantial amounts under the co-borrowing arrangements which they were unable to repay and for which Adelphia and its subsidiaries were liable, had used the proceeds of those borrowings for their own personal benefit, and had received numerous cash "advances" from Adelphia which they used for their own personal benefit.

228. On page S-23, the November 1999 Prospectus represented that Adelphia's total debt as of June 30, 1999 was $3,794,539,000. This statement was materially false and misleading in that the figure for total indebtedness did not include amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements, which omission resulted in an understatement of Adelphia's total indebtedness.

229. On page 4, in its discussion of "Risk Factors," the May 1999 Prospectus stated that Adelphia had total indebtedness of approximately $3.5 billion as of March 31, 1999. This statement was materially false and misleading in that the figure for total indebtedness did not include amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements, which omission resulted in an understatement of Adelphia's total indebtedness.

230. On pages 10-11, the May 1999 Prospectus disclosed the fact that the

Rigases at the time effectively controlled the voting power of Adelphia's outstanding common stock. This disclosure was materially false and misleading in that it did not disclose the far more pervasive extent to which the Rigas Family exercised day-to-day control over Adelphia and its cash resources beyond simply its ability to elect the Board of Directors. Nor did the May 1999 Prospectus disclose the degree to which Rigases were exercising that day-to-day control to self-deal.

231. On page 11, the May 1999 Prospectus stated that the outside business activities of the Rigases -- including their engagement in the cable television business outside of Adelphia -- "could present a conflict of interest with Adelphia." In addition, the May 1999 Prospectus noted that "there have been and will continue to be transactions between us and the executive officers or the other entities they own or with which they have affiliations." These disclosures were materially false and misleading in that they failed to disclose that (1) severe conflicts of interest between the Rigases and Adelphia had already arisen by virtue of the Rigases' repeated pattern of engaging in self-dealing with Adelphia's financial resources; (2) the Rigases had borrowed various amounts under the co-borrowing arrangements which they were unable to repay and for which Adelphia and its subsidiaries were liable; (3) the Rigases had used the proceeds of those borrowings for their own personal benefit; (4) the Rigases received numerous cash "advances" from Adelphia which they used for their own personal benefit; and (5) the utter lack of internal controls to ensure fairness and prevent self-dealing.

## VI.    The September 2000 Offering

### A.    Background

232. The September 2000 Offering was made pursuant to the May 1999 Prospectus, the May 1999 Registration Statement, as well as a supplemental prospectus, dated September 15, 2000 (the "September 2000 Prospectus"), which Adelphia filed with the SEC on September 18, 2000 pursuant to Rule 424(b)(5). Both the May 1999 Prospectus and the September 2000 Prospectus are incorporated as part of the May 1999 Registration Statement.

233. Salomon and Banc of America acted as underwriters in connection with

the September 2000 Offering and, in fact, were the lead underwriters for this offering. Salomon agreed to act as the qualified independent underwriter for pricing the offering and conducting due diligence in accordance with Rule 2710(c)(8) of the Conduct Rules of the National Association of Securities Dealers, Inc.

234. John Rigas, Michael Rigas, Timothy Rigas, and James Rigas each signed the May 1999 Registrations Statement on behalf of Adelphia.

235. Deloitte consented to being named as an expert in the September 2000 Prospectus as having audited and certified the consolidated financial statements for Adelphia as of December 31, 1998 and 1999, and for the fiscal year ended March 31, 1998, the nine months ended December 31, 1998 and the year ended December 31, 1999 incorporated by reference into the September 2000 Prospectus from Adelphia's Form 10-K for the year ended December 31, 1999.

236. As detailed below, the May 1999 Prospectus and September 2000 Prospectus, both of which were incorporated in the May 1999 Registration Statement, contained numerous materially misleading statements and omitted information material to investors in the securities issued by Adelphia in the September 2000 Offering.

237. Huff participated in the September 2000 Offering by purchasing 10 7/8% Senior Notes from the Underwriter Defendants. In addition, subsequent to the September 2000 Offering, Huff made additional purchases on the secondary market of 10 7/8% Senior Notes that Adelphia issued as part of the September 2000 Offering. In making these purchases, Huff actually relied on the misleading statements and omissions contained in the May 1999 Prospectus, September 2000 Prospectus and May 1999 Registration Statement, as well as subsequent public filings by the Company.

**B.    Materially Misleading Statements**

238. The September 2000 Prospectus incorporated by reference Adelphia's Form 10-K for the year ended December 31, 1999 (the "1999 10-K"). Far from presenting an accurate picture of the financial operations and condition of Adelphia and its subsidiaries and

affiliates, the 1999 10-K contains a host of distortions, misrepresentations and outright fabrications.

239. Beginning on page F-1, the 1999 10-K presents Adelphia's consolidated balance sheets and financial statements for the years ended December 31, 1998 and December 31, 1999.

240. The consolidated financial statements for Adelphia contained in the 1999 10-K stated that the total consolidated debt for Adelphia and its subsidiaries was $3,527,452,000 for the year ended December 31, 1998, and $9,291,732,000 for the year ended December 31, 1999. Immediately prior to the presentation of this information in the 1999 10-K was the Independent Auditors' Report of Deloitte. In the Auditors' Report, Deloitte made the following representations:

- that Deloitte functioned as an "independent" auditor;

- that Deloitte conducted an audit of the "consolidated balance sheets of Adelphia Communications Corporation and subsidiaries as of December 31, 1998 and 1999, and the related consolidated statements of operations, of convertible preferred stock, common stock and other stockholders' equity (deficiency), and of cash flows for the year ended March 31, 1998, the nine months ended December 31, 1998 and the year ended December 31, 1999;"

- that Deloitte "conducted [its] audits in accordance with generally accepted auditing standards;"

- that Deloitte's audits "provide a reasonable basis for" its opinion concerning Adelphia's financial statements;

- that, in Deloitte's opinion, Adelphia's "consolidated financial statements present fairly, in all material respects, the financial position of Adelphia Communications Corporation and subsidiaries at December 31, 1998 and 1999, and the results of their operations and their cash flows for the year ended March 31, 1998, the nine months ended December 31, 1998 and the year ended December 31, 1999 in conformity with generally accepted accounting principles;" and

- that, in Deloitte's opinion, the financial statement schedules contained in the 1999 10-K, which Deloitte also represented it had audited in accordance with GAAS, "when considered in relation to the basic consolidated financial statements taken as a whole, present fairly in all material respects the information set forth therein."

241.  All of the above representations were materially false and misleading in that Deloitte did not function as an independent auditor and did not audit Adelphia's consolidate balance sheets and financial statements in accordance with GAAS. Moreover, by failing to account for the amounts borrowed by the Managed Entities under the co-borrowing facilities, the consolidated financial statements contained in the 1999 10-K were not prepared in accordance with GAAP and, indeed, provided a grossly deceptive presentation of the following material aspects of Adelphia's operations and financial condition:

- Total parent and subsidiary debt was represented to be $3,527,452,000 for the year ended December 31, 1998, and $9,291,732,000 for the year ended December 31, 1999. In fact, these figures understated Adelphia's total consolidated debt by at least $700 million for the period ending December 31, 1999.

- Total convertible preferred stock, common stock and other stockholders' equity were represented to be a deficiency of $1,021,746,000 for the year ended December 31, 1998, and a positive of $3,721,187,000 for the year ended December 31, 1999. In fact, these figures overstated Adelphia's stockholder equity by hundreds of millions of dollars by failing to account for the fact that the equity securities purchased by the Rigases were paid for with funds borrowed under the co-borrowing facilities, which Adelphia and its subsidiaries are liable to repay.

- Revenue was overstated due to management fees due from the Managed Entities that were neither paid nor intended to be paid, and due to the inflation of Adelphia's subscribers.

- Capital expenditures were overstated.

- Interest expense - net was represented to be $180,452,000 for the nine

months ended December 31, 1998, and $359,585,000 for the year ended December 31, 1999. In fact, these figures understated interest expense by hundreds of millions of dollars by failing to account for interest due on the borrowings by the Managed Entities under the co-borrowing facilities.

- Similarly, total SG&A expenses were represented to be $107,249,000 for the nine months ended December 31, 1998, and $340,579,000 for the year ended December 31, 1999. In fact, these figures were understated by hundreds of millions of dollars by failing to account for amounts spent by Adelphia in connection with the operations of the Managed Entities.

- The understatements of SG&A expenses and interest expenses had the further effect of understating the amount of Adelphia's net losses for the same periods, which had been represented to be $115,130,000 for the nine months ended December 31, 1998, and $240,530,000 for the year ended December 31, 1999, but which were substantially higher in reality.

- Portions of the statements concerning Adelphia's cash flows were also misleading. Specifically, net cash provided by financing activities was represented to be $999,079,000 for the nine months ended December 31, 1998, and $2,978,313,000 for the year ended December 31, 1999. These figures were overstated by several hundred million dollars because of the failure to account for the Managed Entities' co-borrowing activities and purchases of Adelphia debt securities using co-borrowed funds, which resulted in overstatement of Adelphia's proceeds from debt and understatement of Adelphia's repayments of debt on which figures the calculation of net cash provided by financing activities depends. In addition, the interest expenses in the calculation of Adelphia's cash flows were also understated as a result of the concealment of the co-borrowing arrangements.

242.    Although Adelphia acknowledged the existence of the co-borrowing arrangements in the 1999 10-K, the amounts of the Managed Entities' borrowings under the co-borrowing arrangements were not included in Adelphia's statement of its total consolidated debt.

Specifically, with respect to the co-borrowing facilities, Adelphia stated in a footnote:

> Certain subsidiaries of Adelphia are co-borrowers with Managed Entities under credit facilities for borrowings of up to $3,751,250[,000]. Each of the co-borrowers is liable for all borrowings under the credit agreements, and may borrow up to the entire amount of the available credit under the facility. The lenders have no recourse against Adelphia other than against Adelphia's interest in such subsidiaries.

243. This is the entire disclosure related to the co-borrowing facilities. The statement's rank inadequacy is apparent simply by contrasting it to the disclosures concerning the co-borrowing facilities contained in Adelphia's May 2002 8-K.

244. This statement was materially false and misleading in that it represented to Adelphia investors that the co-borrowing arrangements were simply additional credit lines available for the legitimate business purposes of Adelphia's subsidiaries, but which were also available for the use for legitimate business purposes of the Managed Entities, all of which were managed by Adelphia for a fee. In reality, this disclosure hid from Adelphia's investors the true state of affairs, which was that the co-borrowing arrangements were strictly an artifice to conceal what was in actuality a guarantee by Adelphia of loans issued for the private use and benefit of the Rigas Family. In addition, when combined with the failure to include the amounts borrowed by the Managed Entities under the co-borrowing arrangements in the figures for Adelphia's consolidated debt, the disclosure quoted above misleads readers into believing that no amounts had been borrowed under the co-borrowing facilities, when in fact the Rigases had borrowed at least $700 million as of December 31, 1999.

245. The statement concerning the co-borrowing arrangements was also materially misleading in that it failed to disclose:

  (1) whether and in what amounts the co-borrowing facilities had been drawn down, which left the misleading impression that no amounts had been drawn down;

  (2) which entities drew down on the facilities, which would inform the investor

whether the credit of Adelphia's subsidiaries was being used for a legitimate purpose;

(3) what the proceeds were used for. In fact, the 1999 10-K concealed the fact that the Managed Entities were using the proceeds of the co-borrowing facilities to purchase securities in Adelphia and other assets for the private use of the Rigas family; and

(4) whether the entities that borrowed funds under the facilities had the financial ability to repay those borrowings. If it had been disclosed that the Managed Entities actually lacked the ability to repay, then Huff would have known that a high likelihood existed that Adelphia and its subsidiaries would have to pay those loans.

246. The 1999 10-K contained the following additional material misrepresentations and omissions:

- Under Item 1, the 1999 10-K stated that Adelphia "provides management and consulting services" to the Managed Entities, without disclosing that those Managed Entities, in the course of their operations, have borrowed money under the co-borrowing arrangements to finance the purchase of Adelphia securities by the Rigases and other Rigas entities.

- Also under Item 1, the 1999 10-K stated that Adelphia's "operations consist of providing telecommunications services primarily over networks," without disclosing that Adelphia's operations also included advancing and lending money to the Rigas Family and entities controlled by the Rigas Family for a wide variety of other businesses and investments, including golf course development, real estate, provision of venture capital, professional hockey and filmmaking.

- Item 1 of the 1999 10-K incorporates by reference the financial information contained in the audited financial statements discussed above, which, for the reasons stated above are materially incomplete and misleading.

- Under Item 2, the 1999 10-K stated that substantially all of the assets of Adelphia's subsidiaries "are subject to encumbrances as collateral in connection with the Company's credit arrangements, either directly with a security interest or indirectly through a pledge of the stock in the respective subsidiaries." What this failed to disclose was that the assets of Adelphia's subsidiaries were pledged as collateral for loans taken by the Managed Entities and the Rigas Family that conferred no legitimate business benefits on Adelphia or its subsidiaries. Moreover, when considered in light of the failure to disclose the amounts borrowed by Managed Entities and the Rigas Family and the inability of those entities to repay, this disclosure misled Huff as to the degree to which the assets of Adelphia and its subsidiaries -- to which Huff looked to satisfy Adelphia's obligations under the securities purchased by Huff -- were at risk of being unavailable to support Adelphia's debt to Huff.

- Under Item 7, the 1999 10-K discussed Adelphia's need for liquidity and continual financing to conduct, maintain, upgrade and acquire its cable systems, noting that Adelphia's "ability to generate cash to meet its future needs will depend generally on its results of operations and the continued availability of external financing." This disclosure failed to mention that Adelphia lacked the ability to obtain such external financing because it was contractually prohibited from taking on additional indebtedness by covenants in the indenture agreements for its previous bond issues and the restrictions in its credit agreements.

- Also under Item 7, the 1999 10-K described Adelphia's "financing strategy." This disclosure repeated the false figure of $9,291,732,000 for Adelphia's total outstanding debt for the year ended December 31, 1999. In addition, there was no disclosure that part of Adelphia's "financing strategy" included the use of co-borrowing facilities with the Managed Entities to finance the Rigas Family's acquisition of Adelphia securities and other assets for the Rigas Family's personal use. As for the financing transactions, there was no disclosure of Adelphia's breach of its indentures' restrictions on indebtedness or that purchases of Adelphia securities by the Rigas Family were financed with proceeds from the co-borrowing facilities.

- The 1999 10-K set forth "mandatory reductions in principal under all debt agreements for the next five years based on amounts outstanding at December 31, 1999" as follows: (a) $390,746,000 during the year ended December 31, 2000; (b) $285,401,000 during the year ended December 31, 2001; (c) $886,571,000 during the year ended December 31, 2002; (d) $1,341,190,000 during the year ended December 31, 2003; and (e) $919,147,000 during the year ended December 31, 2004. These amounts were dramatically understated, given that the "amounts outstanding at December 31, 1999" did not include amounts borrowed by the Managed Entities under the co-borrowing facilities.

247.   The September 2000 Prospectus incorporated by reference Adelphia's Form 10-Q for the quarter ended March 31, 2000 (filed with the SEC on or about May 15, 2000) (the "March 2000 10-Q"). The March 2000 10-Q, which was signed by Defendant Timothy Rigas, falsely reported that Adelphia had total unconsolidated debt of $8,531,911,000 and total consolidated debt of $9,384,508,000, including subsidiary debt of $6,606,251,000 and parent debt of $2,778,257,000.

248.   The March 2000 10-Q also stated:

> The accompanying unaudited condensed consolidated financial statements of Adelphia Communications Corporation and its majority owned subsidiaries . . . have been prepared in accordance with the rules and regulations of the Securities and Exchange Commission.
>
> In the opinion of management, all adjustments, consisting only of normal recurring accruals necessary for a fair presentation of the financial position of Adelphia at March 31, 2000, and the results of operations for the three and six months ended March 31, 1999 and 2000, have been included.

249.   The March 2000 10-Q also falsely represented that Adelphia had a total of 5,003,517 basic cable subscribers.

250.   Adelphia's publicly-reported results for the first quarter of 2000 as reported in the March 2000 10-Q were materially false and misleading. As detailed above, Adelphia failed to disclose the full amount of its liability under the co-borrowing facilities.

Adelphia's total consolidated debt and total liabilities were understated by at least $618 million through the deliberate omission of co-borrowing debt. The March 2000 10-Q also overstated Adelphia's subscribers by tens of thousands. As a result, the representation in the March 2000 10-Q that Adelphia's financial statements were fairly presented in accordance with SEC rules was also false.

251. The September 2000 Prospectus incorporated by reference Adelphia's Form 10-Q for the quarter ended June 30, 2000 (filed with the SEC on or about August 14, 2000) (the "June 2000 10-Q"). The June 2000 10-Q, which was signed by Defendant Timothy Rigas, falsely reported that Adelphia had total unconsolidated debt of $9,011,675,000 and total consolidated debt of $9,978,775,000, including subsidiary debt of $7,200,203,000 and parent debt of $2,778,572,000.

252. The June 2000 10-Q also stated:

> The accompanying unaudited condensed consolidated financial statements of Adelphia Communications Corporation and its majority owned subsidiaries . . . have been prepared in accordance with the rules and regulations of the Securities and Exchange Commission.
>
> In the opinion of management, all adjustments, consisting only of normal recurring accruals necessary for a fair presentation of the financial position of Adelphia at June 30, 2000, and the results of operations for the three and six months ended June 30, 1999 and 2000, have been included.

253. The June 2000 10-Q also falsely represented that Adelphia had a total of 5,018,068 basic cable subscribers.

254. Adelphia's publicly-reported results for the second quarter of 2000 as reported in the June 2000 10-Q were materially false and misleading. As detailed above, Adelphia failed to disclose the full amount of its liability under the co-borrowing facilities. Adelphia's total consolidated debt and total liabilities were understated by at least $397 million through the deliberate omission of co-borrowing debt. The March 2000 10-Q also overstated Adelphia's subscribers by tens of thousands. As a result, the representation in the March 2000

10-Q that Adelphia's financial statements were fairly presented in accordance with SEC rules was also false.

255. The September 2000 Prospectus did not provide any additional disclosures concerning the amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements or the uses to which the proceeds of those borrowings were put.

256. On page S-3, the September 2000 Prospectus discusses a direct placement of 2,500,000 shares of Adelphia common stock with the Rigases in July 2000 for $145 million. These statements were materially false and misleading in that they failed to disclose that the Rigases had used proceeds from borrowings under the co-borrowing facilities to finance a substantial portion of their direct purchases of these securities, and that they lacked the ability to repay those borrowings. By failing to disclose this information, the September 2000 Prospectus misled investors into believing that the Rigases were injecting new equity into Adelphia by means of these direct placements, when, in fact, Adelphia was merely incurring additional, undisclosed debt under the co-borrowing facilities that was senior to the notes purchased by Huff. Furthermore, by not disclosing these borrowings, the September 2000 Prospectus concealed from investors the risk that Adelphia's exposure on the co-borrowing arrangement would increase if the value of the assets supporting the Rigas Family's borrowings -- namely, the price of the Adelphia stock and other securities they bought with those borrowings -- fell to the point that a new infusion of cash into the Managed Entities became necessary in order to service the loans, or that the Managed Entities would be unable to repay. Nor does the September 2000 Prospectus disclose the risk of a severe adverse impact on Adelphia's stock price in the event that the lender on the co-borrowing facility is required to liquidate the Rigas Family's securities holdings in order to obtain repayment of the loan.

257. On pages S-5 to S-6, the September 2000 Prospectus represented that, as of June 30, 2000, the "Notes would have been effectively subordinated to approximately $9.2 billion of indebtedness and redeemable preferred stock of Adelphia's subsidiaries; and our total indebtedness excluding redeemable preferred stock would have been approximately $12.4