billion." These statements were materially false and misleading because, by not taking the amount of borrowings by the Rigases and the Managed Entities under the co-borrowing arrangements into account, the prospectus understated the amounts of indebtedness senior to the notes and Adelphia's total indebtedness by at least $700 million. This materially misleading representation was repeated on page S-8 of the September 2000 Prospectus.

258.  On page S-8, in its discussion of "Risk Factors," the September 2000 Prospectus stated that Adelphia had total indebtedness of $10.0 billion as of June 30, 2000. This statement was materially false and misleading in that the figure for total indebtedness did not include amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements, which omission resulted in an understatement of Adelphia's total indebtedness of at least $700 million.

259.  On page S-9, the September 2000 Prospectus represented that Adelphia's total convertible preferred stock, common stock and other stockholders' equity at June 30, 2000 was approximately $3.9 billion. This statement was materially false and misleading in that it overstated stockholders' equity by failing to account for the fact that the Rigases purchased Adelphia equity securities using proceeds from the co-borrowing arrangements, which the Company was liable to repay. Rather than inject new equity into Adelphia, the securities purchased by the Rigases in reality created bank debt that was senior to the notes purchased by Huff.

260.  On page S-15, the September 2000 Prospectus stated that the Rigases at the time effectively controlled the voting power of Adelphia's outstanding common stock. This disclosure was materially false and misleading in that it did not disclose the far more pervasive extent to which the Rigas Family exercised day-to-day control over Adelphia and its cash resources beyond simply its ability to elect the Board of Directors. Nor did the September 2000 Prospectus disclose the degree to which the Rigases were exercising that day-to-day control to self-deal.

261.  On pages S-16 to S-17, the September 2000 Prospectus stated that the

outside business activities of the Rigases -- including their engagement in the cable television business outside of Adelphia -- "could present a conflict of interest with Adelphia." In addition, the September 2000 Prospectus noted that "there have been and will continue to be transactions between us and the executive officers or the other entities they own or with which they have affiliations." These disclosures were materially false and misleading in the following respects: First, while noting only that a conflict of interest "could" arise at some point in the future, the September 2000 Prospectus failed to disclose that severe conflicts of interest between the Rigases and Adelphia had already arisen by virtue of the Rigases' repeated pattern of engaging in self-dealing with Adelphia's financial resources. Second, although giving the impression that conflicts and transactions with the Rigas Family, when they do arise, will be brought to the attention of Adelphia's Board of Directors, approved by a majority of disinterested directors, and evaluated for their fairness to Adelphia after disclosure of all material facts as required by § 2.10 of Adelphia's By-Laws, the September 2000 Prospectus did not disclose that, in fact, the conflicts of interest that had already arisen were not properly approved by the Board in accordance with the By-Laws and were not fair to the Company. Third, the disclosure that transactions between Adelphia and its officers' affiliates will continue to occur was inadequate in that it did not disclose (1) the nature of the transactions; (2) the parties involved; (3) the amounts at stake in such transactions; (4) the impact of such transactions on the operations and financial condition of Adelphia; and (5) the utter lack of internal controls to ensure fairness and prevent self-dealing. Specifically, the September 2000 Prospectus did not disclose that the Rigases had borrowed substantial amounts under the co-borrowing arrangements which they were unable to repay and for which Adelphia and its subsidiaries were liable, had used the proceeds of those borrowings for their own personal benefit, and had received numerous cash "advances" from Adelphia which they used for their own personal benefit.

        262.    On page S-19, the September 2000 Prospectus represented that Adelphia's total debt as of June 30, 2000 was $9,978,775,000. This statement was materially false and misleading in that the figure for total indebtedness did not include amounts borrowed by the

Rigases and the Managed Entities under the co-borrowing arrangements, which omission resulted in an understatement of Adelphia's total indebtedness of at least $700 million.

263. On page 4, in its discussion of "Risk Factors," the May 1999 Prospectus stated that Adelphia had total indebtedness of approximately $3.5 billion as of December 31, 1998. This statement was materially false and misleading in that the figure for total indebtedness did not include amounts borrowed by the Rigases and the Managed Entities under the co-borrowing arrangements, which omission resulted in an understatement of Adelphia's total indebtedness.

264. On pages 10-11, the May 1999 Prospectus disclosed the fact that the Rigases at the time effectively controlled the voting power of Adelphia's outstanding common stock. This disclosure was materially false and misleading in that it did not disclose the far more pervasive extent to which the Rigas Family exercised day-to-day control over Adelphia and its cash resources beyond simply its ability to elect the Board of Directors. Nor did the May 1999 Prospectus disclose the degree to which the Rigases were exercising that day-to-day control to self-deal.

265. On page 11, the May 1999 Prospectus stated that the outside business activities of the Rigases -- including their engagement in the cable television business outside of Adelphia -- "could present a conflict of interest with Adelphia." In addition, the May 1999 Prospectus noted that "there have been and will continue to be transactions between us and the executive officers or the other entities they own or with which they have affiliations." These disclosures were materially false and misleading in the following respects: First, while noting only that a conflict of interest "could" arise at some point in the future, the May 1999 Prospectus failed to disclose that severe conflicts of interest between the Rigases and Adelphia had already arisen by virtue of the Rigases' repeated pattern of engaging in self-dealing with Adelphia's financial resources. Second, although giving the impression that conflicts, when they do arise, will be brought to the attention of Adelphia's Board of Directors and evaluated for their fairness to Adelphia, the May 1999 Prospectus did not disclose that, in fact, the conflicts of interest that

-103-

had already arisen were not brought to the Board's attention and were not the subject of fairness opinions. Third, the disclosure that transactions between Adelphia and its officers' affiliates will continue to occur was inadequate in that it did not disclose (1) the nature of the transactions; (2) the parties involved; (3) the amounts at stake in such transactions; (4) the impact of such transactions on the operations and financial condition of Adelphia; and (5) the utter lack of internal controls to ensure fairness and prevent self-dealing. Specifically, the May 1999 Prospectus did not disclose that the Rigases had borrowed substantial amounts under the co-borrowing arrangements which they were unable to repay and for which Adelphia and its subsidiaries were liable, had used the proceeds of those borrowings for their own personal benefit, and had received numerous cash "advances" from Adelphia which they used for their own personal benefit.

## VII   Other False and Misleading Statements

266. Adelphia's Form 10-K for the year ending December 31, 2000 (the "2000 10-K") was materially false and misleading. Far from presenting an accurate picture of the financial operations and condition of Adelphia and its subsidiaries and affiliates, the 2000 10-K contained a host of distortions, misrepresentations and outright fabrications.

267. Beginning on page F-1, the 2000 10-K presented Adelphia's consolidated balance sheets and financial statements for the years ended December 31, 1999 and December 31, 2000.

268. The consolidated financial statements for Adelphia contained in the 2000 10-K stated that the total consolidated debt for Adelphia and its subsidiaries was $9,291,732,000 for the year ended December 31, 1999, and $12,603,413,000 for the year ended December 31, 2000. Immediately prior to the presentation of this information in the 2000 10-K was the Independent Auditors' Report of Deloitte. In the Auditors' Report, Deloitte made the following representations:

- that Deloitte functioned as an "independent" auditor;

- that Deloitte conducted an audit of the "consolidated balance sheets of Adelphia Communications Corporation and subsidiaries as of December 31, 1999 and 2000, and the related consolidated statements of operation and comprehensive income (loss), of convertible preferred stock, common stock and other stockholders' equity (deficiency), and of cash flows for the nine months ended December 31, 1998 and the years ended December 31, 1999 and 2000;"

- that Deloitte "conducted [its] audits in accordance with auditing standards generally accepted in the United States of America;"

- that Deloitte's audits "provide a reasonable basis for" its opinion concerning Adelphia's financial statements;

- that, in Deloitte's opinion, Adelphia's "consolidated financial statements "present fairly, in all material respects, the financial position of Adelphia Communications Corporation and its subsidiaries at December 31, 1999 and 2000, and the results of their operations and their cash flows for the nine months ended December 31, 1998 and the years ended December 31, 1999 and 2000 in conformity with accounting principles generally accepted in the United States of America;" and

- that, in Deloitte's opinion, the financial statement schedules contained in the 2000 10-K, which Deloitte also represented it had audited in accordance with GAAS, "when considered in relation to the basic consolidated financial statements taken as a whole, present fairly in all material respects the information set forth therein."

269. All of the above representations were materially false and misleading in that Deloitte did not function as an independent auditor and did not audit Adelphia's consolidated balance sheets and financial statements in accordance with GAAS. Moreover, by failing to account for the amounts borrowed by the Managed Entities under the co-borrowing facilities, the consolidated financial statements contained in the 2000 10-K were not prepared in accordance with GAAP and, indeed, provided a grossly deceptive presentation of the following material aspects of Adelphia's operations and financial condition:

- Total parent and subsidiary debt was represented to be $9,291,732,000 for

the year ended December 31, 1999 and $12,603,413,000 for the year ended December 31, 2000. In fact, these figures understated Adelphia's total consolidated debt by at least $700 million for the period ending December 31, 1999 and $1.2 billion for the year ended December 31, 2000.

- Total convertible preferred stock, common stock and other stockholders' equity were represented to be $3,742,302,000 for the year ended December 31, 1999 and $4,150,279,000 for the year ended December 31, 2000. In fact, these figures overstated Adelphia's stockholder equity by hundreds of millions of dollars by failing to account for the fact that the equity securities purchased by the Rigases were paid for with funds borrowed under the co-borrowing facilities, which Adelphia and its subsidiaries are liable to repay.

- Revenues were overstated due to management fees due from the Managed Entities that were neither paid nor intended to be paid, and due to the inflation of Adelphia's subscribers.

- Capital expenditures were grossly overstated.

- As subsequently disclosed in the June 10, 2002 8-K, EBITDA was overstated by at least $160 million for the year ended December 31, 2000.

- Interest expense - net was represented to be $180,452,000 for the nine months ended December 31, 1998, $359,585,000 for the year ended December 31, 1999, and $922,865,000 for the year ended December 31, 2000. In fact, these figures understated interest expense by hundreds of millions of dollars by failing to account for interest due on the borrowings by the Managed Entities under the co-borrowing facilities.

- Similarly, total SG&A expenses were represented to be $107,249,000 for the nine months ended December 31, 1998, $340,579,000 for the year ended December 31, 1999, and $749,612,000 for the year ended December 31, 2000. In fact, these figures were understated by hundreds of millions of dollars by failing to account for amounts spent by Adelphia in connection with the operations of the Managed Entities.

- The understatements of SG&A expenses and interest expenses had the further effect of understating the amount of Adelphia's net losses for the same periods, which

had been represented to be $93,826,000 for the nine months ended December 31, 1998, $240,719,000 for the year ended December 31, 1999, and $602,484,000 for the year ended December 31, 2000, but which were substantially higher in reality.

- The portions of the statements concerning Adelphia's cash flows were also misleading. Specifically, net cash provided by financing activities was represented to be $999,079,000 for the nine months ended December 31, 1998, $2,978,313,000 for the year ended December 31, 1999, and $3,516,804,000 for the year ended December 31, 2000. These figures were overstated by several hundred million dollars because of the failure to account for the Managed Entities' co-borrowing activities and purchases of Adelphia debt securities using co-borrowed funds, which resulted in overstatement of Adelphia's proceeds from debt and understatement of Adelphia's repayments of debt on which figures the calculation of net cash provided by financing activities depends. In addition, the interest expenses in the calculation of Adelphia's cash flows were also understated as a result of the concealment of the co-borrowing arrangements.

270. Although Adelphia acknowledged the existence of the co-borrowing arrangements in the 2000 10-K, the amounts of the Managed Entities' borrowings under the co-borrowing arrangements were not included in Adelphia's statement of its total consolidated debt Specifically, with respect to the co-borrowing facilities, Adelphia stated in a footnote:

> Certain subsidiaries of Adelphia are co-borrowers with Managed Entities under credit facilities for borrowings of up to $3,751,250[,000]. Each of the co-borrowers is liable for all borrowings under the credit agreements, and may borrow up to the entire amount of the available credit under the facility. The lenders have no recourse against Adelphia other than against Adelphia's interest in such subsidiaries.

272. This is the entire disclosure related to the co-borrowing facilities. This statement's rank inadequacy is apparent simply by contrasting it to the disclosures concerning the co-borrowing facilities made in Adelphia's May 2002 8-K.

272. This statement was materially false and misleading in that it represented to

Adelphia investors that the co-borrowing arrangements were simply additional credit lines available for the legitimate business purposes of Adelphia's subsidiaries, but which were also available for the use for legitimate business purposes of the Managed Entities, all of which were managed by Adelphia for a fee. In reality, this disclosure hid from Adelphia's investors the true state of affairs, which was that the co-borrowing arrangements were strictly an artifice to conceal what was in actuality a guarantee by Adelphia of loans issued for the private use and benefit of the Rigas Family. In addition, when combined with the failure to include the amounts borrowed by the Managed Entities under the co-borrowing arrangements in the figures for Adelphia's consolidated debt, the disclosure quoted above misleads readers into believing that no amounts had been borrowed under the co-borrowing facilities, when in fact the Rigases had borrowed $1.2 billion as of December 31, 2000.

273. The statement concerning the co-borrowing arrangements was also materially misleading in that it failed to disclose:

(1) whether and in what amounts the co-borrowing facilities had been drawn down, which left the misleading impression that no amounts had been drawn down;

(2) which entities drew down on the facilities, which would inform the investor whether the credit of Adelphia's subsidiaries was being used for a legitimate purpose;

(3) what the proceeds were used for. In fact, the 2000 10-K concealed the fact that the Managed Entities were using the proceeds of the co-borrowing facilities to purchase securities in Adelphia and other assets for the private use of the Rigas family; and

(4) whether the entities that borrowed funds under the facilities had the financial ability to repay those borrowings. If it had been disclosed that the Managed Entities actually lacked the ability to repay, then Huff would have known that a high likelihood existed that Adelphia and its subsidiaries would have to pay

those loans.

274. The 2000 10-K contained the following additional material misrepresentations and omissions:

- Under Item 1, the 2000 10-K stated that Adelphia "provides management and consulting services" to the Managed Entities, without disclosing that those Managed Entities, in the course of their operations, have borrowed money under the co-borrowing arrangements to finance the purchase of Adelphia securities by the Rigases and other Rigas entities.

- Also under Item 1, the 2000 10-K stated that Adelphia's "operations consist of providing telecommunications services primarily over its broadband networks," without disclosing that Adelphia's operations also included advancing and lending money to the Rigas Family and entities controlled by the Rigas Family for a wide variety of other businesses and investments, including golf course development, real estate, provision of venture capital, professional hockey and filmmaking.

- Item 1 of the 2000 10-K incorporates by reference the financial information contained in the audited financial statements discussed above, which, for the reasons stated above are materially incomplete and misleading.

- Under Item 2, the 2000 10-K stated that substantially all of the assets of Adelphia's subsidiaries "are subject to encumbrances as collateral in connection with the Company's credit arrangements, either directly with a security interest or indirectly through a pledge of the stock in the respective subsidiaries." What this failed to disclose was that the assets of Adelphia's subsidiaries were pledged as collateral for loans taken by the Managed Entities and the Rigas Family that conferred no legitimate business benefits on Adelphia or its subsidiaries. Moreover, when considered in light of the failure to disclose the amounts borrowed by Managed Entities and the Rigas Family and the inability of those entities to repay, this disclosure misled Huff as to the degree to which the assets of Adelphia and its subsidiaries -- to which Huff looked to satisfy Adelphia's obligations under the securities purchased by Huff --

were at risk of being unavailable to support Adelphia's debt to Huff.

- Under Item 7, the 2000 10-K discussed Adelphia's need for liquidity and continual financing to conduct, maintain, upgrade and acquire its cable systems, noting that Adelphia's "ability to generate cash to meet its future needs will depend generally on its results of operations and the continued availability of external financing." This disclosure failed to mention that Adelphia lacked the ability to obtain such external financing because it was contractually prohibited from taking on additional indebtedness by covenants in the indenture agreements for its previous bond issues and the restrictions in its credit agreements.

- Also under Item 7, the 2000 10-K described Adelphia's "financing strategy" and discussed various financing transactions that took place between July and September 2000. This disclosure repeated the false figure of $12,603,413,000 for Adelphia's total outstanding debt for the year ended December 31, 2000. In addition, there was no disclosure that part of Adelphia's "financing strategy" included the use of co-borrowing facilities with the Managed Entities to finance the Rigas Family's acquisition of Adelphia securities and other assets for their personal use. As for the financing transactions, there was no disclosure of Adelphia's breach of its indentures' restrictions on indebtedness or that purchases of Adelphia securities by the Rigas Family were financed with proceeds from the co-borrowing facilities.

- The 2000 10-K set forth "mandatory reductions in principal under all debt agreements for the next five years based on amounts outstanding at December 31, 2000" as follows: (a) $306,000,000 during the year ended December 31, 2001; (b) $986,866,000 during the year ended December 31, 2002; (c) $1,506,454,000 during the year ended December 31, 2003; (d) $1,244,571,000 during the year ended December 31, 2004; and (e) $1,360,647,000 during the year ended December 31, 2005. These amounts were dramatically understated, given that the "amounts outstanding at December 31, 2000" did not include amounts borrowed by the Managed Entities under the co-borrowing facilities.

- In Item 8, the 2000 10-K discussed a direct placement of Adelphia stock with the Rigases in January 2001. These statements were materially false and misleading in that

they failed to disclose that the Rigases had used proceeds from borrowings under the co-borrowing facilities to finance a substantial portion of their direct purchases of these securities, and that they lacked the ability to repay those borrowings. By failing to disclose this information, the 2000 10-K misled investors into believing that the Rigases were injecting new liquidity into Adelphia by means of these direct placements, when, in fact, Adelphia was merely incurring additional, undisclosed debt under the co-borrowing facilities. Furthermore, by not disclosing these borrowings, the 2000 10-K concealed from investors the risk that Adelphia's exposure on the co-borrowing arrangement would increase if the value of the assets supporting the Rigas Family's borrowings -- namely, the price of the Adelphia stock and other securities they bought with those borrowings -- fell to the point that a new infusion of cash into the Managed Entities became necessary in order to service the loans. Nor does the 2000 10-K disclose the risk of a severe adverse impact on Adelphia's stock price in the event that the lender on the co-borrowing facility is required to liquidate the Rigas Family's securities holdings in order to obtain repayment of the loan.

275. Adelphia's Form 10-Q for the quarter ended March 31, 2001 (filed with the SEC on or about May 15, 2001) (the "March 2001 10-Q") was materially false and misleading. The March 2001 10-Q, which was signed by Defendant Timothy Rigas, falsely reported that Adelphia had total unconsolidated debt of $12,474,439,000 and total consolidated debt of $13,661,372,000, including subsidiary debt of $9,374,821,000 and parent debt of $4,286,372,000.

276. The March 2001 10-Q also stated:

> The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions of Form 10-Q and Rule 10-01 of Regulation S-X. Such principles are applied on a basis consistent with those reflected in the December 31, 2000 Form 10-K Report of the Company filed with the Securities and Exchange Commission. The condensed consolidated financial statements contained herein should be read in conjunction with the consolidated financial statements and related notes contained in the December 31, 2000 Annual Report on Form 10-K. In the opinion of management, the unaudited condensed financial statements contained herein include all adjustments (consisting of only recurring adjustments) necessary for a fair presentation of the results of operations for the interim periods presented.

277. The March 2001 10-Q also falsely represented that Adelphia had a total of 5,723,315 basic cable subscribers.

278. Adelphia's publicly-reported results for the first quarter of 2001 as reported in the March 2001 10-Q were materially false and misleading. As detailed above, Adelphia failed to disclose the full amount of its liability under the co-borrowing facilities. Adelphia's total consolidated debt and total liabilities were understated by at least $1.2 billion through the deliberate omission of co-borrowing debt. The March 2001 10-Q also overstated Adelphia's subscribers by tens of thousands. As a result, the representation in the March 2001 10-Q that Adelphia's financial statements were fairly presented in accordance with SEC rules was also false.

279. Adelphia's Form 10-Q for the quarter ended June 30, 2001 (filed with the SEC on or about August 14, 2001) (the "June 2001 10-Q") was materially false and misleading. The June 2001 10-Q, which was signed by Defendant Timothy Rigas, falsely reported that Adelphia had total unconsolidated debt of $13,060,880,000 and total consolidated debt of $14,407,631,000, including subsidiary debt of $8,545,665,000 and parent debt of $5,861,966,000.

280. The June 2001 10-Q also stated:

> The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and with the instructions of Form 10-Q and Rule 10-01 of Regulation S-X. Such principles are applied on a basis consistent with those reflected in the December 31, 2000 Form 10-K Report of the Company filed with the Securities and Exchange Commission. The condensed consolidated financial statements contained herein should be read in conjunction with the consolidated financial statements and related notes contained in the December 31, 2000 Annual Report on Form 10-K. In the opinion of management, the unaudited condensed financial statements contained herein include all adjustments (consisting of only recurring adjustments) necessary for a fair presentation of the results of operations for the interim periods presented.

281. The June 2001 10-Q also falsely represented that Adelphia had a total of 5,672,225 basic cable subscribers.

282. Adelphia's publicly-reported results for the second quarter of 2001 as reported in the June 2001 10-Q were materially false and misleading. As detailed above, Adelphia failed to disclose the full amount of its liability under the co-borrowing facilities. Adelphia's total consolidated debt and total liabilities were understated by at least $1.2 billion through the deliberate omission of co-borrowing debt. The June 2001 10-Q also overstated Adelphia's subscribers by tens of thousands. As a result, the representation in the June 2001 10-Q that Adelphia's financial statements were fairly presented in accordance with SEC rules was also false.

## VII. No Safe Harbor

283. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Complaint. None of the allegedly false and misleading statements with regard to Adelphia's financial statements, reported revenues, and earnings pleaded herein was a forward looking statement nor were those statements identified as "forward-looking statements" when made. Nor was it stated that actual results "could differ materially from those projected." Nor

did meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements accompany those statements.

## COUNT I

### Violations of Section 11 of the Securities Act Against All Defendants

284. Except as described in paragraph 285, Huff repeats and realleges the allegations contained in the above paragraphs as if fully set forth herein.

285. For purposes of this claim, Huff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based on solely on claims of strict liability and/or negligence under the Securities Act.

286. This Count is asserted against all Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of Huff, who was damaged thereby.

287. Taking into account tolling of the limitations period while the class action in *In re Adelphia Communications Corporation Sec. & Deriv. Litig.*, No. 03 MD 1529 (LMM), was pending and prior to the Beneficial Owner's exclusion from that class, Huff has brought this claim within one year of discovery of the violations alleged herein, and within three years after the public offerings in connection with which the violations occurred.

288. As set forth in greater detail above, the April 1999 Registration Statement and the May 1999 Registration Statement, as well as the prospectuses filed with the SEC and made part of those registration statements, contained untrue statements of material fact and/or omitted to state material facts necessary to make the statements therein not misleading as of when such misleading parts of the registration statements became effective.

289. The Individual Defendants each signed one or more of the materially false and misleading registration statements filed by Adelphia registering securities acquired by Huff on behalf of the Beneficial Owner, and as such are liable to Huff for damages.

290. The Individual Defendants were each directors of Adelphia at the time one or more of the materially false and misleading registration statements were filed by Adelphia registering securities acquired by Huff on behalf of the Beneficial Owner, and as such are liable

to Huff for damages.

291. Deloitte consented to being named as having prepared or certified part of one or more of the materially false and misleading registration statements filed by Adelphia registering securities acquired by Huff on behalf of the Beneficial Owner, and/or having prepared or certified expert reports, opinions and valuations used in connection with one or more of such registration statements as alleged herein, and as such is liable to Huff for damages.

292. The Underwriter Defendants each acted as underwriters with respect to the Adelphia high yield debt securities registered pursuant to and traceable to the May 1999 Registration Statement and acquired by Huff. As such, each of these defendants is liable to Huff for damages.

293. In ignorance of the falsity of the material misrepresentations and omissions in the April 1999 Registration Statement and the May 1999 Registration Statement, as well as the prospectuses filed with the SEC and made part of those registration statements or of the true facts, Huff purchased Adelphia securities in reliance upon the representations contained therein. Had Huff known the true facts, Huff would not have purchased the securities at the inflated offering prices.

294. By reason of the foregoing, all Defendants are liable to Huff, on behalf of the Beneficial Owner, for damages resulting from their violations of Section 11 of the Securities Act, 15 U.S.C. §77k.

## COUNT II

### Violations of Section 12(a)(2) of the Securities Act Against The Underwriter Defendants

295. Except as described in paragraph 296, Huff repeats and realleges the allegations contained in the paragraphs above as if fully set forth herein.

296. For purposes of this claim, Huff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based on solely on claims of strict liability and/or negligence under the Securities Act.

297. This Count is asserted against the Underwriter Defendants for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. §77*l*(a)(2), by Huff on behalf of the Beneficial Owner who was damaged thereby.

298. Taking into account tolling of the limitations period while the class action in *In re Adelphia Communications Corporation Sec. & Deriv. Litig.*, No. 03 MD 1529 (LMM), was pending and prior to the Beneficial Owner's exclusion from that class, Huff has brought this claim within one year of discovery of the violations alleged herein, and within three years of the sales at issue.

299. The Underwriter Defendants, by the use and means of instrumentalities of interstate commerce and of the mails, offered and sold Adelphia high yield debt securities to Huff by means of the Exchange Offer Prospectus, the May 1999 Prospectus, the November 1999 Prospectus and the September 2000 Prospectus, each of which prospectuses included untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading in light of the circumstances in which they were made.

300. In ignorance of the falsity of the material misrepresentations and omissions in the Exchange Offer Prospectus, the May 1999 Prospectus, the November 1999 Prospectus, and the September 2000 Prospectus or of the true facts, Huff purchased the securities from the Section 12 Defendants in reliance upon the representations contained therein. Had Huff known the true facts, Huff would not have purchased the securities at the inflated offering prices.

301. Upon disclosure of the true facts, the price of the Adelphia debt securities held by Huff dropped, causing Huff to suffer damages in an amount to be proven at trial.

302. By reason of the foregoing, the Underwriter Defendants are liable to Huff, on behalf of the Beneficial Owner, for violations of Section 12(a)(2) of the Securities Act.

### COUNT III

### Controlling Person Liability Against the Individual Defendants Pursuant to Section 15 of the Securities Act

303. Except as described in paragraph 304, Huff repeats and realleges the

allegations contained in the above paragraphs as if fully set forth herein.

304. For purposes of this claim, Huff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based on solely on claims of strict liability and/or negligence under the Securities Act.

305. This Count is asserted against the Individual Defendants, for violations of Section 15 of the Securities Act, 15 U.S.C. §77*o*, on behalf of Huff, who was damaged thereby.

306. Taking into account tolling of the limitations period while the class action in *In re Adelphia Communications Corporation Sec. & Deriv. Litig.*, No. 03 MD 1529 (LMM), was pending and prior to the Beneficial Owner's exclusion from that class, Huff has brought this claim within one year of discovery of the violations alleged herein, and within three years of the public offerings and/or sales of securities complained of.

307. As alleged herein, Adelphia, by reason of the numerous material misstatements and omissions contained in the April 1999 Registration Statement, the May 1999 Registration Statement, the Exchange Offer Prospectus, the May 1999 Prospectus, the November 1999 Prospectus, and the September 2000 Prospectus used in connection with the offer and sale of its debt securities as alleged herein, violated Section 11 of the Securities Act.

308. Furthermore, as alleged herein, Adelphia, by reason of the numerous material misstatements and omissions contained in the Exchange Offer Prospectus, the May 1999 Prospectus, the November 1999 Prospectus and the September 2000 Prospectus used in connection with the offer and sale of its debt securities as alleged herein, violated Section 12(a)(2) of the Securities Act.

309. The Individual Defendants, by virtue of their positions within Adelphia, their stock ownership and their specific acts as described herein, were, at the time of the wrongs alleged herein, controlling persons of Adelphia within the meaning of Section 15 of the Securities Act.

310. The Individual Defendants had the power, influence and authority to direct or cause the direction of the management and policies of Adelphia, and, therefore, to cause or to

prevent the wrongful conduct and practices complained of herein, and in fact, directed and caused, in whole or in material part, such management and policies of Adelphia, so as to cause, and to fail to prevent, the wrongful conduct alleged herein.

311. As a direct and proximate result of the Individual Defendants' wrongful conduct, Huff was damaged in connection with its purchase of Adelphia debt securities.

312. By reason of the conduct alleged in Counts I and II, the Individual Defendants are liable jointly and severally and to the same extent as Adelphia for the wrongful conduct alleged herein, and are liable to Huff, on behalf of the Beneficial Owner, for the substantial damages which it suffered in connection with its purchases of Adelphia bonds at artificially inflated prices as a result of Adelphia's violations of the Securities Act.

## COUNT IV

### Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

313. Huff repeats and realleges each and every allegation contained in paragraphs 1 through 312 above as if fully set forth herein.

314. This Count is asserted against the Individual Defendants, for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, on behalf of Huff, who was damaged thereby.

315. Taking into account tolling of the limitations period while the class action in *In re Adelphia Communications Corporation Sec. & Deriv. Litig.*, No. 03 MD 1529 (LMM), was pending and prior to the Beneficial Owner's exclusion from that class, Huff has brought this claim within one year of discovery of the violations alleged herein, and within three years of the violations alleged herein.

316. As alleged herein, the Individual Defendants, individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to artificially inflate the

reported financial value of Adelphia and to conceal its true financial condition. Such defendants employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about Adelphia not misleading.

317. The Individual Defendants knew or recklessly disregarded that Adelphia's financial statements for the years 1998, 1999, 2000 and 2001 as reported in registration statements, prospectuses and filings with the SEC, and disseminated to the investing public, were materially overstated, failed to disclose material liabilities and were not prepared and presented in accordance with GAAP. In addition, those defendants knew or recklessly disregarded that the registration statements, prospectuses and filings with the SEC complained of were materially false and misleading for the reasons alleged herein.

318. The Individual Defendants, as directors and officers of Adelphia, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers and directors of Adelphia, the Individual Defendants were able to and did control the content of the public statements disseminated by Adelphia. With knowledge of the falsity and misleading nature of the statements contained therein and in reckless disregard of the truth as pertains to those statements, Adelphia and the Individual Defendants caused the heretofore complained of public statements to contain material misstatements and omissions of material facts as alleged herein.

319. The misrepresentations and omissions of the Individual Defendants were intentional or reckless and done for the purposes of enriching themselves, concealing Adelphia's true operating and financial condition from Plaintiffs and the investing public, and inducing Plaintiffs to purchase Adelphia securities at artificially high prices.

320. The Individual Defendants acted with scienter, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true

facts, even though such facts were available to them. The Individual Defendants were directors, officers, and among the senior management of Adelphia, and, therefore, were directly responsible for false and misleading statements and omissions disseminated to the public through financial statements, press releases, news reports, and filings with the SEC.

321. Rigas Family members John Rigas, Timothy Rigas, Michael Rigas, James Rigas and Peter Venetis used their high-level positions in and effective control over Adelphia to orchestrate the Rigas Family's self-interested transactions with Adelphia, directly benefited from those transactions, and actively participated in the scheme to cover up those transactions by means of materially false and misleading disclosures in Adelphia's public filings. Given their positions in Adelphia and personal involvement in many of the acts of self-dealing discussed in this complaint, the Individual Defendants knew that the Rigas Family was perpetrating such acts of self-dealing upon Adelphia and that material information about such conduct was being withheld from investors.

322. The Individual Defendants had the opportunity and motive to commit the wrongful acts alleged herein. Each of the Individual Defendants, by virtue of his position as a senior executive and/or director of Adelphia, controlled the reports, press releases, public filings, communications with analysts and other statements issued by Adelphia. Thus, each Individual Defendant controlled the public dissemination of the false and misleading statements to the investing public.

323. The Individual Defendants were motivated to conceal the true extent of the Rigas Family's insider dealings with Adelphia because disclosure of such conduct to the investing public would likely result in reduced investment in and liquidity for Adelphia, which in turn would deprive Adelphia of the ability to continue to provide funds for the Rigas Family's personal use, and deprive them of the continued benefits of their unlawful conduct.

324. As a result of the deceptive practices, common schemes and artifices, and false and misleading statements and omissions alleged herein, the prices of Adelphia securities were artificially inflated. In ignorance of the false and misleading statements, the material