omissions, and the deceptive and manipulative devices and contrivances employed by the Individual Defendants, Huffs relied on the statements complained of herein in purchasing Adelphia securities. Had Huff known the truth, it would not have purchased the bonds or would not have purchased them at the artificially inflated prices that it actually paid.

325. Upon disclosure of the true facts, the price of Adelphia debt securities dropped precipitously, and Huff, on behalf of the Beneficial Owner, suffered damages in an amount to be proven at trial.

326. By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud and deceit upon Huff in connection with its purchases of Adelphia debt securities.

## COUNT V

### Against the Individual Defendants
### Pursuant to Section 20(a) of the Exchange Act

327. Huff repeats and realleges each and every allegation contained in paragraphs 1 through 326 above as if fully set forth herein.

328. The Individual Defendants, by virtue of their positions within Adelphia, their stock ownership and their specific acts as described herein, were, at the time of the wrongs alleged herein, controlling persons of Adelphia within the meaning of Section 20(a) of the Exchange Act.

329. The Individual Defendants had the power, influence and authority to direct or cause the direction of the management and policies of Adelphia, and, therefore, to cause or to prevent the wrongful conduct and practices complained of herein, and in fact, directed and caused, in whole or in material part, such management and policies of the Company, so as to

cause, and to fail to prevent, the wrongful conduct alleged herein.

330. As a direct and proximate result of the Individual Defendants' wrongful conduct, Huff was damaged in connection with its purchase of Adelphia debt securities.

331. By reason of the conduct alleged above, the Individual Defendants are liable jointly and severally for the wrongful conduct alleged herein, and are liable to Huff, behalf of the Beneficial Owner, for the substantial damages which it suffered in connection with its purchases of Adelphia debt securities at artificially inflated prices as a result of Adelphia's violations of the Exchange Act.

## COUNT VI

### Against Deloitte for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

332. Huff repeats and realleges each and every allegation contained in paragraphs 1 through 331 above as if fully set forth herein.

333. This Count is asserted against Deloitte for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder, on behalf of Huff, who was damaged thereby.

334. Taking into account tolling of the limitations period while the class action in *In re Adelphia Communications Corporation Sec. & Deriv. Litig.*, No. 03 MD 1529 (LMM), was pending and prior to the Beneficial Owner's exclusion from that class, Huff has brought this claim within one year of discovery of the violations alleged herein, and within three years of the violations alleged herein.

335. As alleged herein, Deloitte, individually and in concert with Adelphia and the Individual Defendants, directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mails, knowingly or recklessly engaged and participated in a continuous course of conduct to conceal adverse material information about Adelphia, including its true financial position, as specified herein. Deloitte knowingly or recklessly employed devices, schemes, and artifices to defraud Huff while in possession of material, adverse non-

public information, and engaged in acts, practices, and a course of conduct that included the knowing and reckless making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about Adelphia not misleading.

336. Deloitte acted with scienter in that it knew or recklessly disregarded that its statements in the public documents and statements issued or disseminated by in the name of Adelphia were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

337. Deloitte had actual knowledge of the amount of the Managed Entities' borrowings under the co-borrowing arrangements, that the Rigases had used the proceeds of those borrowings to purchase Adelphia securities and other assets for their own benefit, that those amounts had improperly been excluded from the calculation of Adelphia's total consolidated debt since May 31, 1999, that the Rigases were engaging in a pattern of egregious self-dealing with respect to Adelphia's financial resources, and that the Rigases lacked the ability to repay their borrowings, leaving Adelphia to foot the bill. Indeed, Deloitte performed auditing and other accounting functions for Adelphia and the Rigas Entities/Managed Entities, meaning that Deloitte saw every transaction from both sides and knew what co-borrowing amounts had been borrowed or allocated to Adelphia subsidiaries or Rigas Entities, respectively.

338. Deloitte was aware of and knowingly acquiesced in the Rigas Defendants' desire to conceal the true amount of Adelphia's liabilities under the Co-Borrowing Facilities from the public. Deloitte had express conversations with the Rigas Defendants during its audit regarding what disclosures, if any, should be included in Adelphia's financial statements about the amounts that had been borrowed under the Co-Borrowing Facilities. During these conversations, Deloitte agreed with the Rigas Defendants that none of the co-borrowing debt that had been "allocated" to the Rigas Entities or Managed Entities had to be disclosed in the

Company's financial statements. Beginning with at least the audit for fiscal year 2000, Deloitte told the Rigas Defendants that Adelphia should include in a footnote the total amount of credit available under the Co-Borrowing Facilities, as well as the total amount that had been borrowed by the Rigas Entities. However, when the Rigas Defendants objected, Deloitte acquiesced in their desire to conceal this information, despite its material nature and the requirement that it be disclosed under GAAP.

339. The Wall Street Journal also reported on June 10, 2002 that Deloitte had actual knowledge of the Rigas Family's self-dealing -- the co-borrowing facilities, the Rigases' use of loan proceeds to buy Adelphia stock, related-party transactions and the Rigas Family's abuse of the CMS -- yet reportedly never informed the Board's Audit Committee of these matters, and never provided Adelphia with a management letter (which auditors routinely provide at the end of the year to suggest ways for the company to make improvements).

340. Alternatively, Deloitte recklessly disregarded the false and materially misleading statements in Adelphia's financial statements. Deloitte audited Adelphia's financial statements for the years 1998, 1999, and 2000 as a purportedly independent auditor. Given its complete access to the personnel, financial records and tax returns of Adelphia, its subsidiaries, the Managed Entities and the Rigas Entities, as well as the extraordinarily frequent occurrence of the related-party transactions and extensive misconduct described above, there can be no question that Deloitte had to be aware of the material misstatements, inaccuracies and omissions contained in Adelphia's consolidated balance sheets and financial statements. In fact, Deloitte's audits were so deficient in terms of their lack of GAAS compliance that the only conclusion one can reach is that Deloitte intentionally or, at the very least, recklessly, abdicated its auditing responsibilities.

341. Deloitte's failure to require revision of Adelphia's financial statements to disclose all material information and accurately reflect Adelphia's true financial condition and results could only have resulted from a decision on its part to intentionally conceal the truth from

Huff and other Adelphia investors, and/or from its knowing or reckless failure to conduct its audit in accordance with GAAS. The magnitude of the misstatements and omissions in Adelphia's financial statements is truly stunning -- the financial statements concealed over $3 billion of off-balance sheet debt from investors and overstated shareholders' equity by a similar magnitude. Misrepresentations as serious as these leave no question that Deloitte conducted its audit with willful blindness or, at the very least, recklessly failed to perform its audit in accordance with GAAS.

    342. Given what Deloitte knew and the information to which it had access, the deficiencies in the disclosure of the co-borrowing arrangements in Adelphia's financial statements had to be patently obvious to Deloitte. By contrast, a diligent investor who reads that disclosure would have no idea (1) that any amounts had been borrowed under the co-borrowing facilities; (2) that entities controlled by the Rigases borrowed the funds; and (3) that those borrowings were not included in the debt figures that appear elsewhere in the financial statements. The purpose of financial statements is to give investors an accurate picture of a company's financial condition at a given point in time. A person reading the co-borrowing disclosure had no idea what Adelphia had actually borrowed or what amount of credit remained available under the facilities. Deloitte's acquiescence in this patently inadequate disclosure was an egregious breach of its professional duty.

    343. Moreover, Adelphia presented several prominent "red flags" that should have caused Deloitte to view the Company as "high risk" and ratchet up the intensity of its audits. The Rigases totally dominated Adelphia, and frequently arranged related party transactions. Adelphia's CMS constituted the very antithesis of reasonable internal corporate controls. Cash flowed freely among Adelphia's subsidiaries, Rigas-owned entities, and the pockets of the Rigases themselves. The existence of this system would have been apparent to any auditor who simply tried to verify balances in Adelphia bank accounts. Indeed, the internal control deficiencies were so great that they undermined the validity of the financial numbers being generated by Adelphia's management. The true facts concerning what was happening at

Adelphia were simply too prominent for an accounting firm as reputedly competent as Deloitte to have ignored, if it were conducting its audit properly.

344. Deloitte also had the opportunity and motive to commit the wrongful acts alleged herein. Deloitte had opportunity when it conducted audits and gave its auditors' opinions. Deloitte's motive was to secure and maintain Adelphia's business, as well as other business from the Rigases besides the auditing work, such as tax, consulting and other accounting work. In particular, Deloitte was motivated by a desire to continue to perform accounting services for the other Rigas Entities. These services were a source of revenue to Deloitte that far exceeded the funds it earned from performing audit services for Adelphia. Moreover, because the Rigas Entities are not publicly traded, the Rigases could terminate Deloitte as accountant for those entities, keep Deloitte as accountant for Adelphia, and not have to disclose the existence of a significant difference with its auditors if Deloitte threatened to withhold a clean audit opinion. Consequently, the prospect of losing this work gave Deloitte a motive to acquiesce in the Rigases' misleading financial statements, and provide clean audit opinions.

345. This explains the incidents, alleged above, in which Deloitte backed down in the face of the Rigases' objections to its half-hearted suggestion that Adelphia disclose the amounts borrowed by the Managed Entities. Deloitte had a clear motive not to dispute the Rigases on this point; had Deloitte not acquiesced, the Rigases could have taken the Rigas Entities' work away from Deloitte without incurring any negative consequences. Keeping that work was a concrete benefit that gave Deloitte sufficient motive to commit fraud.

346. As a result of the deceptive practices, common schemes and artifices, and false and misleading statements and omissions alleged herein, the prices of Adelphia securities were artificially inflated.

347. In ignorance of the false and misleading statements, the material omissions, and the deceptive and manipulative devices and contrivances employed by Deloitte, Huff relied on the statements complained of herein in purchasing Adelphia securities. Had Huff

known the truth, it would not have purchased the bonds or would not have purchased them at the artificially inflated prices that were paid.

348.   When the truth was disclosed, the price of Adelphia bonds dropped precipitously, and Huff, on behalf of the Beneficial Owner, suffered damages in an amount to be proven at trial.

349.   By virtue of the foregoing, Deloitte has violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud and deceit upon Huff in connection with their purchases of Adelphia bonds.

## COUNT VII

### Against Salomon and Banc of America for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

350.   Huff repeats and realleges each and every allegation contained in paragraphs 1 through 349 above as if fully set forth herein.

351.   This Count is asserted against the Underwriter Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder, on behalf of Huff, who was damaged thereby.

352.   Taking into account tolling of the limitations period while the class action in *In re Adelphia Communications Corporation Sec. & Deriv. Litig.*, No. 03 MD 1529 (LMM), was pending and prior to the Beneficial Owner's exclusion from that class, Huff has brought this claim within one year of discovery of the violations alleged herein, and within three years of the violations alleged herein.

353.   As alleged herein, the Underwriter Defendants, individually and in concert with Adelphia, the Individual Defendants and their bank affiliates, directly and indirectly, by the

use and means of instrumentalities of interstate commerce and of the mails, knowingly or recklessly engaged and participated in a continuous course of conduct to conceal adverse material information about Adelphia, including its true financial position, as specified herein. The Underwriter Defendants knowingly or recklessly employed devices, schemes, and artifices to defraud Huff while in possession of material, adverse non-public information, and engaged in acts, practices, and a course of conduct that included the knowing and reckless making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about Adelphia not misleading.

354. The Underwriter Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated by them or in the name of Adelphia were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. By virtue of their failure to check the accuracy of information which they had a duty to monitor, and their receipt of information reflecting the true facts regarding Adelphia, their control over, and/or receipt and/or modification of Adelphia's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Adelphia, the Underwriter Defendants knowingly or recklessly made material representations or omissions, knowingly or recklessly employed devices, schemes and artifices to defraud, and knowingly or recklessly engaged in acts, practices and courses of conduct which operated as a fraud and deceit upon Huff. The ongoing fraudulent scheme described in this Complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the Underwriter Defendants.

355. The Underwriter Defendants were supposed to conduct extensive due diligence of Adelphia in connection with its public offerings of debt securities. Moreover, each

of the Underwriter Defendants had complete access to Adelphia's internal records through their bank affiliates. At all relevant times, the Underwriter Defendants and their respective bank affiliates shared all material information and due diligence regarding Adelphia, the Rigas Entities and the Rigas Family. The Underwriter Defendants and the banks did not properly maintain the "information walls" that would prohibit the sharing of such information. To the contrary, the Underwriter Defendants and their affiliated banks needed to and, in fact, did share information to maximize their ability to garner additional fees. Thus, uncovering the fraud would have been as simple as requesting from Adelphia -- or their bank affiliates -- the amounts outstanding under Adelphia's credit facilities and comparing those amounts with Adelphia's SEC filings. The Underwriter Defendants either obtained this information from their affiliated lenders (which would have provided actual notice of the fraud) or they recklessly failed to do so.

356. Given their access to inside information, the Underwriter Defendants knew about, or recklessly disregarded, the facts concerning the Rigases' acts of self-dealing and their concealment of those acts from the investing public. Moreover, these Defendants knew, or recklessly disregarded, the fact that Adelphia's financial statements for the above years -- and the registration statements and prospectuses incorporating the financial statements by reference -- repeatedly understated the amount of Adelphia's total consolidated debt by failing to include the amount of the Managed Entities' borrowings under the co-borrowing facilities and failed to disclose all material information concerning those facilities.

357. Given the extraordinarily frequent occurrence of the related-party transactions and extensive misconduct described above, the Underwriter Defendants simply could not have been unaware of the material misstatements, inaccuracies and omissions contained in the registration statements and prospectuses used in connection with the November 1999 Offering and the September 2000 Offering. Consequently, the Underwriter Defendants' failure to disclose all material information could only have resulted from their willful failure to conduct proper due diligence, or from a decision on their part to intentionally conceal the truth from Huff and other Adelphia investors.

358. Many of the false or misleading representations contained in the disclosure documents drafted by or on behalf of the Underwriter Defendants were plainly contradicted by source documents in the possession of Adelphia or the Rigases. A simple example concerned the Rigases' source of funds for their purchases of Adelphia securities. As revealed by Adelphia's present Board of Directors in the May 2002 8-K, the bookkeeping entries Adelphia made to record these transactions plainly revealed that no cash had changed hands, and that the Rigases had "paid" for the securities with proceeds from the co-borrowing arrangements.

359. Nor is this the only example. While describing in minute detail the restriction on indebtedness covenants contained in Adelphia's bond indentures, the prospectuses and registration statements for Adelphia's bond offerings in 2000 and 2001 failed to disclose that Adelphia had already breached those covenants. As part of their due diligence, the underwriters were required to ascertain whether Adelphia was in compliance with the bond covenants, and to review the compliance certificates that Adelphia's management was supposed to prepare -- but in many cases did not. Had the underwriters reviewed the underlying documents concerning the co-borrowing facilities, they would have learned that Adelphia was liable for amounts borrowed by the Managed Entities under those facilities, and that, when these borrowings were taken into consideration, Adelphia's total debt exceeded 8.75 x EBITDA -- the covenants' debt ratio limitation.

360. The Underwriter Defendants' preparation of disclosure documents containing representations that were blatantly contradicted by source documents gives rise to a strong inference of recklessness. These defendants egregiously refused to see the truth that was right under their noses.

361. The Underwriter Defendants had the opportunity and motive to commit the wrongful acts alleged herein. Each of these defendants exercised control over the contents and participated in the drafting of the prospectuses and registration statements for each of the public offerings at issue in this Complaint.

362. The motive for the Underwriter Defendants -- the concrete benefit they

stood to gain from deceiving the public -- was likewise straightforward. These defendants wanted to keep Adelphia's underwriting business, especially in light of Adelphia's frequent solicitations of the capital markets. These defendants knew that disclosure of adverse information against the wishes of John Rigas and the other members of the Rigas Family could result in the loss of lucrative that business. The Underwriter Defendants focused significantly more effort on generating fee income than ensuring appropriate disclosure of the Co-Borrowing Facilities.

363. The Underwriter Defendants had the additional motive to make sure that their respective parents and/or affiliates got paid back the money they had loaned Adelphia under the Company's co-borrowing commercial credit facilities and continued to reap the lucrative banking fees associated with those facilities. The public offerings on which the Underwriter Defendants served as underwriters generated a pool of funds that enabled Adelphia to periodically retire a portion of its commercial debt. The Underwriter Defendants thus had ample motive for manipulating the public to buy Adelphia securities out of its public offerings.

364. The debt securities solicited by the Underwriter Defendants were issued on a structurally subordinated basis to the Co-Borrowing Facilities. Thus, the purchasers of the debt securities -- the parties, like Huff, to whom the Underwriter Defendants provided misleading and false information -- would suffer the first losses if Adelphia collapsed under the weight of the undisclosed debt burden and massive fraud. The structurally subordinated debt securities also ensured that the Underwriter Defendants' affiliated banks would have more credit support to ensure repayment of the loans.

365. As a result of the deceptive practices, common schemes and artifices, and false and misleading statements and omissions alleged herein, the prices of Adelphia securities were artificially inflated.

366. In ignorance of the false and misleading statements, the material omissions, and the deceptive and manipulative devices and contrivances employed by the Underwriter Defendants, Huff relied on the statements complained of herein in purchasing

Adelphia securities. Had Huff known the truth, it would not have purchased the bonds or would not have purchased them at the artificially inflated prices that were paid.

367. When the truth was disclosed, the price of Adelphia bonds dropped precipitously, and Huff, on behalf of the Beneficial Owner, suffered damages in an amount to be proven at trial.

368. By virtue of the foregoing, the Underwriter Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud and deceit upon Huff in connection with their purchases of Adelphia bonds.

**PRAYER FOR RELIEF**

WHEREFORE, Huff prays for judgment as follows:

1. Awarding Huff, on behalf of the Beneficial Owner, recovery of the consideration paid for the Adelphia debt securities (upon Huff's tender of the securities), with interest thereon, as a result of the wrongs alleged in Count II of the Complaint, and pursuant to the remedies provided by Section 12 of the Securities Act;

2. Awarding Huff, on behalf of the Beneficial Owner, compensatory damages as a result of the wrongs alleged in Counts I and III - VII of the Complaint;

3. Awarding Huff, on behalf of the Beneficial Owner, its costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

4. Awarding Huff, on behalf of the Beneficial Owner, such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury for all issues so triable.

Dated: October 30, 2006
      Buffalo, New York

Respectfully submitted,

**DAMON & MOREY LLP**
1000 Cathedral Place
298 Main Street
Buffalo, New York 14202
716.856.5500

By: s/David S. Widenor
    William F. Savino
    David S. Widenor
Attorneys for Plaintiff
    W.R. Huff Asset Management Co., L.L.C.

-and-

**LOWENSTEIN SANDLER P C**
    Lawrence M. Rolnick (LR 0546)
    Thomas E. Redburn, Jr. (TR 3902)
1251 Avenue of the Americas
18th Floor
New York, NY 10020
Tel. 212.262.6700
Fax 212.262.7402

-and-

65 Livingston Avenue
Roseland, New Jersey 07068
Tel. 973.597.2500
Fax 973.597.2400
Attorneys for Plaintiff
    W.R. Huff Asset Management Co., L.L.C.
    (except as to claims against Deloitte &
    Touche LLP)

-and-

**LAW OFFICES OF MARC B. KRAMER**
A Professional Corporation
150 JFK Parkway, Suite 100
Short Hills, New Jersey 07078
973.847.5924
Attorneys for Plaintiff
    W.R. Huff Asset Management Co., L.L.C.
    (As to claims against Deloitte & Touche
    LLP)

11213/8 - 11/01/2006 2051739.01